NOT YET SCHEDULED FOR ORAL ARGUMENT

## No. 23-5110

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

People for the Ethical Treatment of Animals, Madeline Krasno, and Ryan Hartkopf,

*Plaintiffs–Appellants*,

v.

Lawrence A. Tabak, in his official capacity as Acting Director of the National Institutes of Health, and Xavier Becerra, in his official capacity as Secretary of the U.S. Department of Health and Human Services,

*Defendants–Appellees.*

———————————

On appeal from the United States District Court for the District of Columbia — No. 1:21-CV-02380 (Howell, B.)

———————————

## JOINT APPENDIX — VOLUME I OF IV (JA001–JA125)

Daniel Tenny
Jennifer L. Utrecht
U.S. Department of Justice
950 Pennsylvania Ave. N.W.
Washington, D.C. 20530
(202) 353-9039
daniel.tenny@usdoj.gov
jennifer.l.utrecht@usdoj.gov

*Counsel for Defendants–Appellees*

Stephanie Krent
Katherine A. Fallow
Alexia Ramirez
Jameel Jaffer
Knight First Amendment Institute at
    Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
stephanie.krent@knightcolumbia.org

*Counsel for Plaintiffs–Appellants*
*(Additional counsel on next page)*

Christopher A. Berry
Animal Legal Defense Fund
525 E. Cotati Ave.
Cotati, CA 94931
(707) 795-2533 ext. 1041
cberry@aldf.org

Caitlin M. Foley
Animal Legal Defense Fund
150 South Wacker Drive, Suite 2400
Chicago, IL 60606
(707) 795-2533 ext. 1043
cfoley@aldf.org

*Counsel for Plaintiffs–Appellants
    Madeline Krasno and Ryan Hartkopf*

Ashley Ridgway
Asher Smith
Aaron Frazier
People for the Ethical Treatment of
    Animals, Inc.
1536 16th Street NW
Washington, DC 20036
(202) 483-7382
ashleyr@petaf.org

*Counsel for Plaintiff–Appellant People
    for the Ethical Treatment of Animals,
    Inc.*

# Table of Contents

**VOLUME I**

Docket Entries ................................................................................JA001

Corrected Complaint (ECF No. 7), filed September 10, 2021 ..........................JA011

Attachment 1 to Corrected Complaint (ECF No. 7-1), filed
September 10, 2021..................................................................JA044

Attachment 2 to Complaint (ECF No. 7-2), filed September
10, 2021 ..................................................................................JA048

Joint Stipulation (ECF No. 28), filed February 11, 2022 .................................JA052

Order (ECF No. 43), filed March 31, 2023 .......................................................JA092

Memorandum Opinion (ECF No. 44), filed March 31, 2023 ...........................JA094

Notice of Appeal (ECF No. 45), filed May 11, 2023 .......................................JA124

**VOLUME II**

Exhibit 1 to Joint Stipulation (ECF No. 28-1),
filed February 11, 2022 ...........................................................JA126

Exhibit 2 to Joint Stipulation (ECF No. 28-2),
filed February 11, 2022 ...........................................................JA143

Exhibit 3 to Joint Stipulation (ECF No. 28-3),
filed February 11, 2022 ...........................................................JA151

Exhibit 4 to Joint Stipulation (ECF No. 28-4),
filed February 11, 2022 ...........................................................JA154

Exhibit 5 to Joint Stipulation (ECF No. 28-5),
filed February 11, 2022 ...........................................................JA190

Exhibit 6 to Joint Stipulation (ECF No. 28-6),
filed February 11, 2022 ...........................................................JA194

i

Exhibit 7 to Joint Stipulation (ECF No. 28-7),
    filed February 11, 2022 ........................................................................JA198

Exhibit 8 to Joint Stipulation (ECF No. 28-8),
    filed February 11, 2022 ........................................................................JA200

Exhibit 9 to Joint Stipulation (ECF No. 28-9),
    filed February 11, 2022 ........................................................................JA202

Exhibit 10 to Joint Stipulation (ECF No. 28-10),
    filed February 11, 2022 ........................................................................JA204

Exhibit 11 to Joint Stipulation (ECF No. 28-11),
    filed February 11, 2022 ........................................................................JA207

Exhibit 12 to Joint Stipulation (ECF No. 28-12),
    filed February 11, 2022 ........................................................................JA212

Exhibit 13 to Joint Stipulation (ECF No. 28-13),
    filed February 11, 2022 ........................................................................JA215

Exhibit 14 to Joint Stipulation (ECF No. 28-14),
    filed February 11, 2022 ........................................................................JA241

Exhibit 15 to Joint Stipulation (ECF No. 28-15),
    filed February 11, 2022 ........................................................................JA244

Exhibit 16 to Joint Stipulation (ECF No. 28-16),
    filed February 11, 2022 ........................................................................JA247

Exhibit 17 to Joint Stipulation (ECF No. 28-17),
    filed February 11, 2022 ........................................................................JA250

Exhibit 18 to Joint Stipulation (ECF No. 28-18),
    filed February 11, 2022 ........................................................................JA256

Exhibit 19 to Joint Stipulation (ECF No. 28-19),
    filed February 11, 2022 ........................................................................JA262

# VOLUME III

Exhibit 20 to Joint Stipulation (ECF No. 28-20),
    filed February 11, 2022 .......................................................................JA265

Exhibit 21 to Joint Stipulation (ECF No. 28-21),
    filed February 11, 2022 .......................................................................JA270

Exhibit 22 to Joint Stipulation (ECF No. 28-22),
    filed February 11, 2022 .......................................................................JA295

Exhibit 23 to Joint Stipulation (ECF No. 28-23),
    filed February 11, 2022 .......................................................................JA302

Exhibit 24 to Joint Stipulation (ECF No. 28-24),
    filed February 11, 2022 .......................................................................JA316

Exhibit 25 to Joint Stipulation (ECF No. 28-25),
    filed February 11, 2022 .......................................................................JA320

Exhibit 26 to Joint Stipulation (ECF No. 28-26),
    filed February 11, 2022 .......................................................................JA349

Exhibit 27 to Joint Stipulation (ECF No. 28-27),
    filed February 11, 2022 .......................................................................JA355

Exhibit 28 to Joint Stipulation (ECF No. 28-28),
    filed February 11, 2022 .......................................................................JA358

Exhibit 29 to Joint Stipulation (ECF No. 28-29),
    filed February 11, 2022 .......................................................................JA364

Exhibit 30 to Joint Stipulation (ECF No. 28-30),
    filed February 11, 2022 .......................................................................JA366

Exhibit 31 to Joint Stipulation (ECF No. 28-31),
    filed February 11, 2022 .......................................................................JA373

Exhibit 32 to Joint Stipulation (ECF No. 28-32),
    filed February 11, 2022 .......................................................................JA378

Exhibit 33 to Joint Stipulation (ECF No. 28-33),
    filed February 11, 2022 ...........................................................................JA382

Exhibit 34 to Joint Stipulation (ECF No. 28-34),
    filed February 11, 2022 ...........................................................................JA386

Exhibit 35 to Joint Stipulation (ECF No. 28-35),
    filed February 11, 2022 ...........................................................................JA389

Exhibit 36 to Joint Stipulation (ECF No. 28-36),
    filed February 11, 2022 ...........................................................................JA392

Exhibit 37 to Joint Stipulation (ECF No. 28-37),
    filed February 11, 2022 ...........................................................................JA395

Exhibit 38 to Joint Stipulation (ECF No. 28-38),
    filed February 11, 2022 ...........................................................................JA398

Exhibit 39 to Joint Stipulation (ECF No. 28-39),
    filed February 11, 2022 ...........................................................................JA405

**VOLUME IV**

Exhibit 40 to Joint Stipulation (ECF No. 28-40),
    filed February 11, 2022 ...........................................................................JA410

Exhibit 41 to Joint Stipulation (ECF No. 28-41),
    filed February 11, 2022 ...........................................................................JA413

Exhibit 42 to Joint Stipulation (ECF No. 28-42),
    filed February 11, 2022 ...........................................................................JA419

Exhibit 43 to Joint Stipulation (ECF No. 28-43),
    filed February 11, 2022 ...........................................................................JA423

Exhibit 44 to Joint Stipulation (ECF No. 28-44),
    filed February 11, 2022 ...........................................................................JA435

Exhibit 45 to Joint Stipulation (ECF No. 28-45),
    filed February 11, 2022 ...........................................................................JA439

Exhibit 46 to Joint Stipulation (ECF No. 28-46),
    filed February 11, 2022 ...........................................................JA441

Exhibit 47 to Joint Stipulation (ECF No. 28-47),
    filed February 11, 2022 ...........................................................JA444

Exhibit 48 to Joint Stipulation (ECF No. 28-48),
    filed February 11, 2022 ...........................................................JA446

Exhibit 49 to Joint Stipulation (ECF No. 28-49),
    filed February 11, 2022 ...........................................................JA450

Exhibit 50 to Joint Stipulation (ECF No. 28-50),
    filed February 11, 2022 ...........................................................JA453

Exhibit 51 to Joint Stipulation (ECF No. 28-51),
    filed February 11, 2022 ...........................................................JA457

Exhibit 52 to Joint Stipulation (ECF No. 28-52),
    filed February 11, 2022 ...........................................................JA459

Exhibit 53 to Joint Stipulation (ECF No. 28-53),
    filed February 11, 2022 ...........................................................JA527

Exhibit 54 to Joint Stipulation (ECF No. 28-54),
    filed February 11, 2022 ...........................................................JA529

Exhibit 55 to Joint Stipulation (ECF No. 28-55),
    filed February 11, 2022 ...........................................................JA531

Exhibit A to Defendants' Cross-Motion for Summary
    Judgment (ECF No. 31-2), filed May 6, 2022 ......................JA566

Exhibit B to Defendants' Cross-Motion for Summary
    Judgment (ECF No. 31-3), filed May 6, 2022 ......................JA574

Exhibit 56 to Plaintiffs' Opposition to Defendants' Cross-
    Motion for Summary Judgment and Reply in Support
    of their Motion for Summary Judgment (ECF No. 35-
    1), filed May 27, 2022 ...........................................................JA581

Exhibit 57 to Plaintiffs' Opposition to Defendants' Cross-
         Motion for Summary Judgment and Reply in Support
         of their Motion for Summary Judgment (ECF No. 35-
         2), filed May 27, 2022 ............................................................JA587

APPEAL,CLOSED,TYPE-L

# U.S. District Court
## District of Columbia (Washington, DC)
### CIVIL DOCKET FOR CASE #: 1:21-cv-02380-BAH

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS et al v. COLLINS et al | Date Filed: 09/09/2021 |
| Assigned to: Judge Beryl A. Howell | Date Terminated: 04/03/2023 |
| Case in other court: USCA, 23-05110 | Jury Demand: None |
| Cause: 28:1331 Federal Question: Other Civil Rights | Nature of Suit: 440 Civil Rights: Other |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

| | | |
|---|---|---|
| **PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS** | represented by | **Asher Smith**<br>PETA FOUNDATION<br>501 Front Street<br>Norfolk, VA 23510<br>202-540-2177<br>Email: ashers@petaf.org<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Katherine Amy Fallow**<br>KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY<br>475 Riverside Drive<br>Suite 302<br>New York, NY 10115<br>646-745-8500<br>Email: Katie.Fallow@knightcolumbia.org<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Stephanie Krent**<br>KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY<br>475 Riverside Drive<br>Suite 302<br>New York City, NY 10115<br>646-745-8500<br>Email: stephanie.krent@knightcolumbia.org<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

**Alyssa Morones**
KNIGHT FIRST AMENDMENT
INSTITUTE AT COLUMBIA
UNIVERSITY
475 Riverside Drive
Suite 302
New York City, NY 10115
646-745-8500
Email: alyssa.morones@knightcolumbia.org
*TERMINATED: 12/22/2022*
*PRO HAC VICE*

**Lyndsey Marie Wajert**
KNIGHT FIRST AMENDMENT
INSTITUTE AT COLUMBIA
UNIVERSITY
475 Riverside Drive
Suite 302
New York City, NY 10115
267-566-5883
Email: lyndsey.wajert@knightcolumbia.org
*TERMINATED: 09/15/2021*
*PRO HAC VICE*

**Jameel Jaffer**
KNIGHT FIRST AMENDMENT
INSTITUTE AT COLUMBIA
UNIVERSITY
475 Riverside Drive
Suite 302
New York, NY 10115
(646) 745-8500
Email: jameel.jaffer@knightcolumbia.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MADELINE KRASNO**                     represented by  **Katherine Amy Fallow**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephanie Krent**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Alyssa Morones**
(See above for address)
*TERMINATED: 12/22/2022*
*PRO HAC VICE*

**Caitlin Mairead Foley**

ANIMAL LEGAL DEFENSE FUND
150 South Wacker
Suite 2400
Chicago, IL 60606
707-795-2533
Email: cfoley@aldf.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lyndsey Marie Wajert**
(See above for address)
*TERMINATED: 09/15/2021*
*PRO HAC VICE*

**Jameel Jaffer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RYAN HARTKOPF**                                            represented by **Katherine Amy Fallow**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephanie Krent**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Alyssa Morones**
(See above for address)
*TERMINATED: 12/22/2022*
*PRO HAC VICE*

**Caitlin Mairead Foley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lyndsey Marie Wajert**
(See above for address)
*TERMINATED: 09/15/2021*
*PRO HAC VICE*

**Jameel Jaffer**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**FRANCIS M. COLLINS**
*in his official capacity as Director of the*
*National Institutes of Health*

represented by **Kuntal Virendra Cholera**
U.S. DEPARTMENT OF JUSTICE
1100 L. St. NW
Washington, DC 20005
(202) 305-8645
Email: kuntal.cholera@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**XAVIER BECERRA**
*in his official capacity as Secretary of the*
*U.S. Department of Health and Human*
*Services*

represented by **Kuntal Virendra Cholera**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/09/2021 | 1 | COMPLAINT against XAVIER BECERRA, FRANCIS M. COLLINS ( Filing fee $ 402 receipt number ADCDC-8720589) filed by PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, RYAN HARTKOPF, MADELINE KRASNO. (Attachments: # 1 Attachment 1, # 2 Attachment 2, # 3 Civil Cover Sheet, # 4 Certificate Rule LCvR 26.1, # 5 Summons for Francis M. Collins, # 6 Summons for Xavier Becerra)(Jaffer, Jameel) (Entered: 09/09/2021) |
| 09/09/2021 | 2 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Katie Fallow, Filing fee $ 100, receipt number ADCDC-8720860. Fee Status: Fee Paid. by RYAN HARTKOPF, MADELINE KRASNO, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Jaffer, Jameel) (Entered: 09/09/2021) |
| 09/09/2021 | 3 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Stephanie Krent, Filing fee $ 100, receipt number ADCDC-8720867. Fee Status: Fee Paid. by RYAN HARTKOPF, MADELINE KRASNO, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Jaffer, Jameel) (Entered: 09/09/2021) |
| 09/09/2021 | 4 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Lyndsey Wajert, Filing fee $ 100, receipt number ADCDC-8720901. Fee Status: Fee Paid. by RYAN HARTKOPF, MADELINE KRASNO, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Jaffer, Jameel) (Entered: 09/09/2021) |
| 09/09/2021 | 5 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Caitlin M. Foley, Filing fee $ 100, receipt number ADCDC-8720909. Fee Status: Fee Paid. by RYAN HARTKOPF, MADELINE KRASNO. (Attachments: # 1 Declaration, # 2 Text of Proposed Order) (Jaffer, Jameel) (Entered: 09/09/2021) |
| 09/09/2021 | 6 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Asher Smith, Filing fee $ 100, receipt number ADCDC-8720915. Fee Status: Fee Paid. by PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Jaffer, Jameel) (Entered: 09/09/2021) |
| 09/09/2021 | | NOTICE OF ERROR re 1 Complaint; emailed to jameel.jaffer@knightcolumbia.org, cc'd 2 associated attorneys -- The PDF file you docketed contained errors: 1. Noncompliance with LCvR 5.1(c). Please file an errata correcting the initiating pleading to include the name & |

| | | |
|---|---|---|
| | | full residence address of each party using the event Errata, 2. Pleading filed as attachment. Please file pleading as separate entry., 3. Missing 26.1 Disclosure(s). Please submit using the event LCvR 26.1 Certificate of Disclosure-Corporate Affiliations/Financial Interests. (zsb, ) (Entered: 09/09/2021) |
| 09/10/2021 | 7 | ERRATA *(correcting initiating pleading)* by RYAN HARTKOPF, MADELINE KRASNO, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS. (Attachments: # 1 Attachment 1, # 2 Attachment 2, # 3 Civil Cover Sheet, # 4 Summons for Francis M. Collins, # 5 Summons for Xavier Becerra)(Jaffer, Jameel) (Entered: 09/10/2021) |
| 09/10/2021 | 8 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS (Jaffer, Jameel) (Entered: 09/10/2021) |
| 09/10/2021 | 9 | MOTION to Permit *Omission of Home Address from Caption* by MADELINE KRASNO. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Jaffer, Jameel) (Entered: 09/10/2021) |
| 09/13/2021 | | Case Assigned to Chief Judge Beryl A. Howell. (zsb) (Entered: 09/13/2021) |
| 09/13/2021 | 10 | STANDING ORDER. Signed by Chief Judge Beryl A. Howell on September 13, 2021. (lcbah3) (Entered: 09/13/2021) |
| 09/13/2021 | | MINUTE ORDER (paperless) GRANTING plaintiffs' 2 Motion for Admission *Pro Hac Vice* of Katherine Fallow as Additional Counsel for Plaintiffs. Ms. Fallow may enter an appearance *pro hac vice* for the purpose of representing plaintiffs in this action. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Chi ef Judge Beryl A. Howell on September 13, 2021. (lcbah3) (Entered: 09/13/2021) |
| 09/13/2021 | | MINUTE ORDER (paperless) GRANTING plaintiffs' 3 Motion for Admission *Pro Hac Vice* of Stephanie Krent as Additional Counsel for Plaintiffs. Ms. Krent may enter an appearance *pro hac vice* for the purpose of representing plaintiffs in this action. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Chief Judge Beryl A. Howell on September 13, 2021. (lcbah3) (Entered: 09/13/2021) |
| 09/13/2021 | | MINUTE ORDER (paperless) GRANTING plaintiffs' 4 Motion for Admission *Pro Hac Vice* of Lyndsey Wajert as Additional Counsel for Plaintiffs. Ms. Wajert may enter an appearance *pro hac vice* for the purpose of representing plaintiffs in this action. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Chief Judge Beryl A. Howell on September 13, 2021. (lcbah3) (Entered: 09/13/2021) |
| 09/13/2021 | | MINUTE ORDER (paperless) GRANTING the 5 Motion for Admission *Pro Hac Vice* of Caitlin M. Foley as Additional Counsel for Plaintiffs Ryan Hartkopf and Madeline Krasno. Ms. Foley may enter an appearance *pro hac vice* for the purpose of representing only plaintiffs Ryan Hartkopf and Madeline Krasno in this action. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Chief Judge Beryl A. Howell on September 13, 2021. (lcbah3) (Entered: 09/13/2021) |
| 09/13/2021 | | MINUTE ORDER (paperless) GRANTING the 6 Motion for Admission *Pro Hac Vice* of Asher Smith as Additional Counsel for Plaintiff People for the Ethical Treatment of Animals. Mr. Smith may enter an appearance *pro hac vice* for the purpose of representing only plaintiff People for the Ethical Treatment of Animals in this action. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR** |

| | | |
|---|---|---|
| | | **83.6(a).** Click for instructions. Signed by Chief Judge Beryl A. Howell on September 13, 2021. (lcbah3) (Entered: 09/13/2021) |
| 09/14/2021 | 11 | SUMMONS (2) Issued Electronically as to XAVIER BECERRA, FRANCIS M. COLLINS. (Attachments: # 1 Notice and Consent)(znmw) (Entered: 09/14/2021) |
| 09/14/2021 | | MINUTE ORDER (paperless) GRANTING 9 Plaintiff Madeline Krasno's Motion for Permission to Omit Home Address from Caption ("Pl.'s Mot.").<br><br>Generally, "[t]he first filing by or on behalf of a party shall have in the caption the. . . full residence address of the party," and "[f]ailure to provide the address information within 30 days of filing may result in the dismissal of the case against the defendant." LCvR 5.1(c)(1). Courts apply the factors identified in *United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980), to determine when a party's privacy interests are sufficiently weighty to overcome the general presumption in favor of public access to information concerning judicial proceedings.<br><br>Here, an evaluation of all the *Hubbard* factors supports granting plaintiff's request. Plaintiff notes that as a component of her advocacy work on controversial topics concerning animal testing, she must maintain a robust social media presence. Pl.'s Mot. at 2. In this capacity, she has already experienced unwanted harassment and attention unconnected to the subject matter of her advocacy, and reasonably fears that "her safety will be at risk due to potential trolls and stalkers" should her home address become a matter of public record. *Id*. Further, plaintiff convincingly explains the lack of prejudice to the government defendants in this case of omitting her home address, as well as the lack of public interest in her home address with respect to this litigation. *See id*. at 3. Under these circumstances, sufficient cause exists to grant plaintiff's request to omit her home address from filings with this Court.<br><br>Signed by Chief Judge Beryl A. Howell on September 14, 2021. (lcbah3) (Entered: 09/14/2021) |
| 09/15/2021 | 12 | NOTICE of Appearance by Caitlin Mairead Foley on behalf of RYAN HARTKOPF, MADELINE KRASNO (Foley, Caitlin) (Entered: 09/15/2021) |
| 09/15/2021 | 13 | NOTICE of Appearance by Stephanie Krent on behalf of All Plaintiffs (Krent, Stephanie) (Entered: 09/15/2021) |
| 09/15/2021 | 14 | NOTICE of Appearance by Katherine Amy Fallow on behalf of All Plaintiffs (Fallow, Katherine) (Entered: 09/15/2021) |
| 09/15/2021 | 15 | NOTICE of Appearance by Lyndsey Marie Wajert on behalf of All Plaintiffs (Wajert, Lyndsey) (Entered: 09/15/2021) |
| 09/15/2021 | 16 | NOTICE of Appearance by Asher Smith on behalf of PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS (Smith, Asher) (Entered: 09/15/2021) |
| 09/15/2021 | 17 | NOTICE OF WITHDRAWAL OF APPEARANCE as to RYAN HARTKOPF, MADELINE KRASNO, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS. Attorney Lyndsey Marie Wajert terminated. (Wajert, Lyndsey) (Entered: 09/15/2021) |
| 10/28/2021 | 18 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. XAVIER BECERRA served on 9/20/2021 (Krent, Stephanie) (Entered: 10/28/2021) |
| 10/28/2021 | 19 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 9/21/2021. (Krent, Stephanie) (Entered: 10/28/2021) |

| 10/28/2021 | 20 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 10/7/2021. Answer due for ALL FEDERAL DEFENDANTS by 12/6/2021. (Krent, Stephanie) (Entered: 10/28/2021) |
|---|---|---|
| 11/09/2021 | 21 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. FRANCIS M. COLLINS served on 11/8/2021 (Krent, Stephanie) (Entered: 11/09/2021) |
| 11/23/2021 | 22 | NOTICE of Appearance by Kuntal Virendra Cholera on behalf of All Defendants (Cholera, Kuntal) (Main Document 22 replaced on 11/24/2021) (zeg). (Entered: 11/23/2021) |
| 11/23/2021 | 23 | Joint MOTION for Briefing Schedule *and to Stay Answer Deadline* by XAVIER BECERRA, FRANCIS M. COLLINS. (Cholera, Kuntal) (Entered: 11/23/2021) |
| 11/24/2021 | | MINUTE ORDER (paperless) GRANTING the parties' 23 Joint Motion for Entry of Briefing Schedule; STAYING the deadline for defendants to file their answer(s) until further order of the Court; and ISSUING the following SCHEDULING ORDER to govern proceedings in this matter: (1) by December 8, 2021, the parties shall file a joint stipulation of facts; (2) by January 14, 2022, plaintiffs shall file their motion for summary judgment; (3) by February 11, 2022, defendants shall file their cross-motion for summary judgment and response to plaintiffs' motion for summary judgment; (4) by March 2, 2022, plaintiffs shall file their response to defendants' cross-motion for summary judgment and any reply in support of their own motion for summary judgment; and (5) by March 18, 2022, defendants shall file any reply in support of their cross-motion for summary judgment. Signed by Chief Judge Beryl A. Howell on November 24, 2021. (lcbah3) (Entered: 11/24/2021) |
| 11/24/2021 | | Set/Reset Deadlines: Joint stipulation of facts due by 12/8/2021. Plaintiffs' motion for summary judgment due by 1/14/2022. Defendants' cross-motion and response to plaintiffs' motion for summary judgment due by 2/11/2022. Plaintiffs' response to defendants' cross-motion for summary judgment and any reply in support of their motion for summary judgment due by 3/2/2022. Defendants' reply in support of their cross-motion for summary judgment due by 3/18/2022. (hmc) (Entered: 11/24/2021) |
| 12/03/2021 | 24 | Joint MOTION for Extension of Time *file Fact Stipulation* by XAVIER BECERRA, FRANCIS M. COLLINS. (Cholera, Kuntal) (Entered: 12/03/2021) |
| 12/06/2021 | | MINUTE ORDER (paperless) GRANTING the parties' 24 Joint Motion for Extension of Time and MODIFYING the SCHEDULING ORDER previously entered in this matter, *see* Min. Order (Nov. 24, 2021), only as follows: by December 16, 2021, the parties shall file their joint stipulation of facts. Signed by Chief Judge Beryl A. Howell on December 6, 2021. (lcbah3) (Entered: 12/06/2021) |
| 12/06/2021 | | Set/Reset Deadlines: Joint stipulation of facts due by 12/16/2021. (ztg) (Entered: 12/06/2021) |
| 12/15/2021 | 25 | Joint MOTION for Extension of Time *File Joint Stipulation* by RYAN HARTKOPF, MADELINE KRASNO, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS. (Attachments: # 1 Text of Proposed Order)(Krent, Stephanie) (Entered: 12/15/2021) |
| 12/15/2021 | | MINUTE ORDER (paperless) GRANTING the parties' 25 Joint Motion for Further Extension of Time; STAYING the briefing schedule set forth in the Minute Order issued November 24, 2021; and DIRECTING the parties to file, by January 14, 2022, their joint stipulation of fact *and* a joint status report proposing a schedule for further proceedings. If the parties wish to seek a further extension of time to file the joint stipulation of fact, they shall file an appropriate motion by January 10, 2022, pursuant to paragraph 7(b) of the 10 |

| | | |
|---|---|---|
| | | Standing Order in this case: Signed by Chief Judge Beryl A. Howell on December 15, 2021. (lcbah3) (Entered: 12/15/2021) |
| 12/15/2021 | | Set/Reset Deadlines: Joint stipulation of fact and joint status report due by 1/14/2022. (ztg) (Entered: 12/15/2021) |
| 01/10/2022 | 26 | Joint MOTION for Extension of Time to *File Fact Stipulation and Proposed Schedule for Proceedings* by XAVIER BECERRA, FRANCIS M. COLLINS. (Attachments: # 1 Text of Proposed Order)(Cholera, Kuntal) (Entered: 01/10/2022) |
| 01/11/2022 | | MINUTE ORDER (paperless) GRANTING the parties' 26 Joint Motion for Further Extension of Time; and DIRECTING the parties to file, by January 28, 2022, their joint stipulation of fact *and* a joint status report proposing a schedule for further proceedings. Signed by Chief Judge Beryl A. Howell on January 11, 2022. (lcbah3) (Entered: 01/11/2022) |
| 01/12/2022 | | Set/Reset Deadlines: Joint Stipulation of Fact and Joint Status Report due by 1/28/2022. (ztg) (Entered: 01/12/2022) |
| 01/24/2022 | 27 | Joint MOTION for Extension of Time to *File Fact Stipulation and Proposed Schedule for Proceedings* by XAVIER BECERRA, FRANCIS M. COLLINS. (Attachments: # 1 Text of Proposed Order)(Cholera, Kuntal) (Entered: 01/24/2022) |
| 01/25/2022 | | MINUTE ORDER (paperless) GRANTING the parties' 27 Joint Motion for Further Extension of Time; and DIRECTING the parties to file, by February 11, 2022, their joint stipulation of fact *and* a joint status report proposing a schedule for further proceedings. Signed by Chief Judge Beryl A. Howell on January 25, 2022. (lcbah3) (Entered: 01/25/2022) |
| 01/25/2022 | | Set/Reset Deadlines: Response to Order of the Court due by 2/11/2022. (ztg) (Entered: 01/25/2022) |
| 02/11/2022 | 28 | STIPULATION *(Joint)* by RYAN HARTKOPF, MADELINE KRASNO, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46, # 47 Exhibit 47, # 48 Exhibit 48, # 49 Exhibit 49, # 50 Exhibit 50, # 51 Exhibit 51, # 52 Exhibit 52, # 53 Exhibit 53, # 54 Exhibit 54, # 55 Exhibit 55, # 56 Index of Exhibits)(Jaffer, Jameel) (Entered: 02/11/2022) |
| 02/11/2022 | 29 | Joint STATUS REPORT by RYAN HARTKOPF, MADELINE KRASNO, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS. (Krent, Stephanie) (Entered: 02/11/2022) |
| 02/24/2022 | | MINUTE ORDER (paperless) ISSUING, in light of the parties' 29 Joint Status Report, the following SCHEDULING ORDER: (1) by April 1, 2022, plaintiffs shall file their motion for summary judgment; (2) by May 6, 2022, defendants shall file their cross-motion for summary judgment and opposition to plaintiffs' motion; (3) by May 27, 2022, plaintiffs shall file their opposition to defendants' cross-motion and reply in support of plaintiffs' motion; and (4) by June 17, 2022, defendants shall file their reply in support of their cross-motion; WAIVING the requirement of LCvR 7(h) that any motion for or opposition to summary judgment include a statement of material facts; and STAYING, until 30 days after the resolution of the anticipated motion and cross-motion for summary judgment, all |

| | | |
|---|---|---|
| | | deadlines that would otherwise be applicable under Fed.R. Civ. P. 26, Fed. R. Civ P. 16, LCvR 16.3, and paragraph 3 of the 10 Standing Order. Signed by Chief Judge Beryl A. Howell on February 24, 2022. (lcbah3) (Entered: 02/24/2022) |
| 02/24/2022 | | Set/Reset Deadlines: Summary judgment motion due by 4/1/2022; cross-motion/opposition to motion for summary judgment due by 5/6/2022; opposition to cross-motion and reply to opposition to motion for summary judgment due by 5/27/2022; reply to opposition to cross-motion due by 6/17/2022. (ztg) (Entered: 02/24/2022) |
| 04/01/2022 | 30 | MOTION for Summary Judgment by RYAN HARTKOPF, MADELINE KRASNO, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Krent, Stephanie) (Entered: 04/01/2022) |
| 05/06/2022 | 31 | Cross MOTION for Summary Judgment by XAVIER BECERRA, FRANCIS M. COLLINS. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B) (Cholera, Kuntal) (Entered: 05/06/2022) |
| 05/06/2022 | 32 | Memorandum in opposition to re 30 MOTION for Summary Judgment filed by XAVIER BECERRA, FRANCIS M. COLLINS. (See Docket Entry 31 to view document). (zeg) (Entered: 05/11/2022) |
| 05/26/2022 | 33 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Alyssa Morones, Filing fee $ 100, receipt number ADCDC-9265080. Fee Status: Fee Paid. by RYAN HARTKOPF, MADELINE KRASNO, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Jaffer, Jameel) (Entered: 05/26/2022) |
| 05/26/2022 | | MINUTE ORDER (paperless) GRANTING plaintiffs' 33 Motion for Admission *Pro Hac Vice* of Alyssa Morones as Additional Counsel for Plaintiffs. Ms. Morones may enter an appearance *pro hac vice* for the purpose of representing plaintiffs in this action. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Chief Judge Beryl A. Howell on May 26, 2022. (lcbah3) (Entered: 05/26/2022) |
| 05/27/2022 | 34 | Memorandum in opposition to re 31 Cross MOTION for Summary Judgment filed by RYAN HARTKOPF, MADELINE KRASNO, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS. (Attachments: # 1 Exhibit 56, # 2 Exhibit 57)(Krent, Stephanie) (Entered: 05/27/2022) |
| 05/27/2022 | 35 | REPLY to opposition to motion re 30 MOTION for Summary Judgment filed by RYAN HARTKOPF, MADELINE KRASNO, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS. (Attachments: # 1 Exhibit 56, # 2 Exhibit 57)(Krent, Stephanie) (Entered: 05/27/2022) |
| 05/27/2022 | | COUNSEL IS TO DISREGARD THIS ENTRY, SEE DE#35..... NOTICE OF ERROR re 34 Memorandum in Opposition; emailed to stephanie.krent@knightcolumbia.org, cc'd 8 associated attorneys -- The PDF file you docketed contained errors: 1. **Please note the following deficiency and file/refile document as instructed**, 2. Two-part document; second docket entry is required, 3. Please file using the event reply to opposition to Motion for Summary Judgment. (zeg, ) Modified on 5/31/2022 (zjf). (Entered: 05/27/2022) |
| 05/31/2022 | 36 | NOTICE of Appearance by Alyssa Morones on behalf of All Plaintiffs (Morones, Alyssa) (Entered: 05/31/2022) |
| 06/17/2022 | 37 | REPLY to opposition to motion re 31 Cross MOTION for Summary Judgment filed by XAVIER BECERRA, FRANCIS M. COLLINS. (Cholera, Kuntal) (Entered: 06/17/2022) |

| | | |
|---|---|---|
| 08/16/2022 | 38 | NOTICE OF SUPPLEMENTAL AUTHORITY by RYAN HARTKOPF, MADELINE KRASNO, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS (Attachments: # 1 Exhibit A)(Krent, Stephanie) (Entered: 08/16/2022) |
| 08/24/2022 | 39 | RESPONSE re 38 NOTICE OF SUPPLEMENTAL AUTHORITY filed by XAVIER BECERRA, FRANCIS M. COLLINS. (Cholera, Kuntal) (Entered: 08/24/2022) |
| 11/29/2022 | 40 | NOTICE OF SUPPLEMENTAL AUTHORITY by XAVIER BECERRA, FRANCIS M. COLLINS (Attachments: # 1 Exhibit A)(Cholera, Kuntal) (Entered: 11/29/2022) |
| 12/08/2022 | 41 | RESPONSE re 40 NOTICE OF SUPPLEMENTAL AUTHORITY filed by RYAN HARTKOPF, MADELINE KRASNO, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS. (Krent, Stephanie) (Entered: 12/08/2022) |
| 12/22/2022 | 42 | NOTICE OF WITHDRAWAL OF APPEARANCE as to RYAN HARTKOPF, MADELINE KRASNO, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS. Attorney Alyssa Morones terminated. (Morones, Alyssa) (Entered: 12/22/2022) |
| 03/31/2023 | 43 | ORDER DENYING plaintiffs' 30 Motion for Summary Judgment and GRANTING defendants' 31 Cross-Motion for Summary Judgment. See Order for further details. The Clerk of the Court is directed to close this case. Signed by Judge Beryl A. Howell on March 31, 2023. (lcbah3) (Entered: 03/31/2023) |
| 03/31/2023 | 44 | MEMORANDUM OPINION regarding plaintiffs' 30 Motion for Summary Judgment and defendants' 31 Cross-Motion for Summary Judgment. Signed by Judge Beryl A. Howell on March 31, 2023. (lcbah3) (Entered: 03/31/2023) |
| 05/11/2023 | 45 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 43 Order on Motion for Summary Judgment, 44 Order on Motion for Summary Judgment by RYAN HARTKOPF, MADELINE KRASNO, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS. Filing fee $ 505, receipt number ADCDC-10063107. Fee Status: Fee Paid. Parties have been notified. (Krent, Stephanie) (Entered: 05/11/2023) |
| 05/15/2023 | 46 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 45 Notice of Appeal to DC Circuit Court. (zed) (Entered: 05/15/2023) |
| 05/16/2023 | | USCA Case Number 23-5110 for 45 Notice of Appeal to DC Circuit Court, filed by RYAN HARTKOPF, MADELINE KRASNO, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS. (znmw) (Entered: 05/16/2023) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/30/2023 12:14:04 | | |
| **PACER Login:** | reedcanaan | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-02380-BAH |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

JA010

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PEOPLE FOR THE ETHICAL
TREATMENT OF ANIMALS
501 Front St.
Norfolk, VA 23510,

MADELINE KRASNO,*

RYAN HARTKOPF,
6633 Raymond Rd.
Madison, WI 53711,

    Plaintiffs,

  v.

FRANCIS M. COLLINS, in his official
capacity as Director of the National Institutes
of Health
9000 Rockville Pike
Bethesda, MD 20892,

XAVIER BECERRA, in his official capacity
as Secretary of the U.S. Department of Health
and Human Services
200 Independence Ave, S.W.
Washington, D.C. 20201,

    Defendants.

Civil Action No. 21-2380

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Introduction

1.  This lawsuit seeks to stop the Secretary of the U.S. Department of Health and

Human Services ("HHS") and the Director of the National Institutes of Health ("NIH")

(collectively, "Defendants") from unconstitutionally blocking comments posted to the agencies'

social media accounts based on the viewpoint and/or content of that speech. The NIH, the federal

agency charged with supporting biomedical research, uses its social media accounts to

---

\* In a concurrently filed motion, Plaintiff Madeline Krasno has requested a waiver of her obligation under Local
Rule 5.1(c)(1) to provide her home address in the caption of this complaint.

communicate with members of the public about scientific breakthroughs, to announce new research efforts, to host live interviews and videos, and to provide critical updates about COVID-19 research, treatment, and vaccines. HHS oversees the NIH and, as the agency responsible for promoting the health and well-being of Americans, communicates with members of the public about health care, aging, and public health policy through its social media pages. These official accounts are important public fora for speech about medical research, science, and bioethics.

2.   Plaintiffs are animal rights advocates, including an animal rights organization, who believe that the government's continued support of primate testing is unconscionable. They have attempted to raise these concerns by commenting on the NIH's Facebook and Instagram pages, but the NIH routinely hides Plaintiffs' comments from public view by using keyword blocking tools to prevent certain words and phrases associated with disfavored viewpoints, content, or speakers—like "PETA" and "#stopanimaltesting"—from appearing on its social media pages. Plaintiffs would also like to express their views about primate testing on HHS's Facebook pages, but HHS, too, blocks comments containing keywords associated with critical viewpoints, like "monkey." If a comment on any of these social media pages contains one of these prohibited words and phrases, it cannot be viewed or engaged with by members of the public.

3.   Defendants' actions violate the First Amendment. Multiple courts have held that government-run social media accounts that are open for comments from the general public are public forums. *See, e.g.*, *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019); *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 234 (2d Cir. 2019), *vacated as moot sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021). It is well-settled that the government may not, consistent with the First Amendment, exclude speech from such forums based on viewpoint or unjustifiable content-based restrictions. Defendants' viewpoint-

discriminatory and content-based suppression of comments about animal testing violates Plaintiffs' right to speak in a public forum. It also violates their right to read the speech of others who have used blocked keywords in comments.

4.     Plaintiffs respectfully ask that the Court declare that Defendants' viewpoint-discriminatory and content-based use of keyword blocking violates the First Amendment. Plaintiffs also ask that the Court order Defendants to remove these keyword filters and order other relief as requested below.

## Jurisdiction and Venue

5.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the U.S. Constitution.

6.     The Court has authority to issue declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and this Court's inherent equitable jurisdiction. The Court also has authority to award costs and attorneys' fees pursuant to 28 U.S.C. § 2412.

7.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(A).

## Parties

8.     Plaintiff People for the Ethical Treatment of Animals ("PETA") is a nonprofit animal rights organization based in Norfolk, Virginia. Founded in 1980, PETA is dedicated to establishing and defending the rights of all animals. PETA's public education and campaign activities have a particular focus on animal mistreatment in laboratories, the food industry, the clothing trade, and the entertainment industry.

9.     Plaintiff Madeline Krasno, who resides in Oakland, California, is a former animal research technician turned animal rights advocate. She operates an Instagram account under the

handle @madeline_krasno, and she maintains a Facebook profile under the name Madeline Krasno.

10.  Plaintiff Ryan Hartkopf, who resides in Madison, Wisconsin, is an engineer in the digital health field. He operates an Instagram account under the handle @ryanhartkopf, and he maintains a Facebook profile under the name Ryan Hartkopf.

11.  Defendant Francis S. Collins is the Director of the NIH. The NIH is a medical research center and is one of the eight health agencies of the Public Health Service. The Public Health Service is part of HHS. Defendant Collins has authority over all NIH policies and practices, including those challenged here. Plaintiffs sue him in his official capacity only.

12.  Defendant Xavier Becerra is the Secretary of HHS. HHS is a cabinet-level department and federal agency that oversees the government's public health, social services, medical, and scientific efforts. Defendant Becerra has authority over all HHS policies and practices and those of HHS's operating divisions, including the NIH. Plaintiffs sue him in his official capacity only.

### Factual Allegations

## I.  Background

### A.  The Facebook platform

13.  Facebook is the world's largest social networking platform, with approximately 2.7 billion monthly active users worldwide, including more than 179 million monthly active users in the United States.

14.  The platform allows users to post content, including writings, links, photographs, and videos, for the public or other Facebook users to see. Facebook users can also engage with the speech of others on the platform, including by sharing others' posts, "liking" those posts, and commenting on or replying to comments attached to a post. Individuals and organizations who

create Facebook accounts can communicate publicly on the platform. Many public officials and government agencies have created Facebook pages and communicate with their constituents and the general public.

15.  **Users.** Any individual or organization that has created an account on the platform is a Facebook "user." Individual Facebook users can connect with other users by "friending" them; these connected users are called Facebook "friends." When users post content on the Facebook platform, they have the option of making their posts visible to the public (including non-Facebook users), to their friends only, or to a subset of their friends.

16.  **Pages.** Users who want to create Facebook accounts for "businesses, brands, organizations, [or] public figures" can create Facebook "pages." Facebook pages include the title of the business or organization, and an "About" section where the administrator can provide the organization's contact information, photos, and more. Part of the NIH and HHS Facebook pages recently looked like this:





17.    All internet users can view Facebook pages, regardless of whether they are Facebook users. Facebook users can also "like" a page in order to get continuous updates from that page in their "News Feed"—a personalized, constantly updating stream of content posted on the platform by others.

18.    **Verification.** Public figures, brands, and official organizations can request "verification" of their pages and profiles on Facebook. When it verifies a Facebook page, Facebook confirms that the operators of the page are the authentic representatives of the entity represented in the page. Verified pages feature a blue checkmark next to their page name or profile name.

19.    **Posts.** A Facebook "post" is any combination of text, images, videos, audio, or Internet hyperlinks published by a Facebook user on the user's Facebook page. Users who visit or follow a Facebook page can see all of the posts published by the administrator of the page. Posts on the NIH page include links to news stories and press releases about NIH research,

6

advertisements for virtual events (such as conversations with leading health researchers), and infographics. These are recent posts on the NIH and HHS pages.



20.    **Facebook Live.** Facebook users can also engage with others by going "Live" through the Facebook Live feature. Facebook Live allows users or pages to stream video in real-time for viewing by other users. After they first air, the videos remain viewable on the posting

JA017

user's page or profile. All Live videos are visible to the public by default, although page administrators may also choose to broadcast only to a specific subset of their page's followers.

21.    **Comments and comment threads.** Facebook users can respond to others' posts—including Live videos—by commenting on them. Facebook comments can include the same type of content as Facebook posts, including text, images, and hyperlinks. Comments appear beneath the original post. Facebook users may also reply to other comments appended to a post or to replies that have been posted by others. The collection of replies and replies-to-replies is sometimes referred to as a "comment thread." In comment threads, users engage with other users and with the corporations, public officials, and organizations that post content on Facebook through their pages and accounts. Any Facebook user can comment on a public post, and comment threads on public posts function as venues for public debate.

22.    **Likes and reactions.** Users can also "react" to others' posts by clicking the "Like" button and selecting emojis corresponding to "Like," "Love," "Care," "Haha," "Wow," "Sad," and "Angry." When a user reacts to a post, other users will be able to see the user's reaction in a list of reactions on the post. The total number of reactions and shares are listed on each post. This is a recent post from the NIH's Facebook page, displaying the associated comments and likes.



23.     **Sharing.** In addition to commenting on and reacting to posts, users can also choose to "share" them. "Sharing" a post causes it to appear on an individual user's own Facebook profile and increases the likelihood that a user's friends will see it. When users share posts, they can add text that appears above the shared posts. Users often employ this feature to provide commentary on the posts they are sharing.

24.     **Comment filtering and keyword blocking.** Administrators of Facebook pages can limit comments that appear on their posts by using Facebook's moderation tools, including comment filtering. Page administrators may, for example, filter all comments that contain profanity by turning on Facebook's built-in "profanity filter." Administrators may also input their

JA019

own lists of words or phrases that they wish to filter from other users' comments on their posts. When a page administrator adds a word to this list, any past or future comments from users containing the word will automatically be hidden from public view. Although a hidden comment remains visible to the user who posted it and to the user's friends, other Facebook users are unable to read or engage with the comment. The practice of preventing comments containing certain keywords from being publicly visible is commonly known as "keyword blocking."

25.     Page administrators may also block individual comments by "hiding" or deleting them from the comment threads associated with their posts. When a comment is deleted, it is erased from the page altogether.

26.     Typically, the user whose comment has been affected does not receive notice of these moderation actions. Hiding a specific comment changes its visibility, but the user who posted the comment will not be notified. The same is true of users who post comments containing filtered words: they will not be aware that their comments contain filtered words, and they will not be notified that their comments' visibility has been limited. On information and belief, users only receive notifications of blocked content (a red box indicating that the comment was "unable to post") if they attempt to post comments during a Live video that run afoul of moderation settings the video host selected for that Live video session. In most instances, then, users whose comments are hidden would not be aware that their comments have been suppressed.

27.     **Banning and blocking.** Page administrators may "ban" or "block" individual users from their pages. Banning a user prevents the user from commenting on or liking any content from the page, but it permits the user to continue to access the page and its posts. Blocking a user, by contrast, prevents the user from accessing the page altogether: the user is no longer able to view the content posted to the page or even locate the page using Facebook's search function.

28.     These moderation features permit page administrators to exclude particular viewpoints, types of content, or specific individuals from public discussion on their Facebook pages.

**B.    The Instagram platform**

29.     Instagram is a social media platform with over one billion monthly active users worldwide and nearly 120 million monthly active users in the United States. Instagram, which was acquired by Facebook in 2012, is a platform for visual content, allowing users to share photos and videos and engage with content through likes or comments. Although Instagram began as a primarily personal social media platform, numerous brands, celebrities, public officials, and public entities have Instagram accounts and post pictures or videos to communicate with the public at large.

30.     **Users.** An Instagram "user" is an individual or organization that has created an account on the platform. Each Instagram user creates a unique username, such as "@nihgov." Other Instagram users can locate an account by searching for the account's username on Instagram's website or mobile application to access the user's profile page.

31.     **Profiles.** Each Instagram user has a unique webpage or "profile." Each user's profile displays the associated username as well as other information about the account, including the profile photo associated with the user, the account's followers, and the accounts the user is following. If a user's profile is public, any Instagram user or member of the public who navigates to the user's profile can view all of the user's posts. If a user's profile is private, only approved followers of the user may view the user's posts. Below is a screenshot of the NIH Instagram public profile page.

JA021



32.   **Followers.** Instagram users may "follow" the profiles of other users by clicking on the "Follow" button that appears at the top of an account's profile. Following an account means subscribing to it—all of the followed account's posts will automatically appear in the user's "Instagram feed," a personalized, constantly updating page on the Instagram platform that displays all of the content shared by the accounts that a user follows.

33.   **Posts.** An Instagram post is a discrete piece of content that a user shares to the user's profile page. A post on Instagram can be an image, a video, or a collection of images or videos. When a user shares an image or video, the user can include a text-based caption that will be displayed alongside or underneath the post.

34.   **Instagram Stories.** In addition to standard Instagram posts, users may also share content via the platform's "Instagram Story" feature. The Instagram Story is a slideshow-like multimedia presentation that displays all content—images, videos, and text—users share to their Stories. Unlike an Instagram post, content shared to a story remains visible to other users for only 24 hours after it is shared. Instagram stories can be accessed by clicking on the profile image of an

JA022

Instagram user when it is circled by a colorful ring—the indicator that the user has posted a story. Although Instagram stories are normally visible for only 24 hours, users can save stories to their profiles indefinitely by making them "highlights." Highlights remain at the top of the user's page and are publicly accessible by default. For example, the top of the NIH profile page recently looked like this, indicating that the NIH had posted at least one Instagram story in the preceding 24 hours and had saved and highlighted previous stories relating to COVID-19 updates, past live events, and important NIH news:



35.    **IGTV.** Instagram also permits users to upload long-form video content using a feature called "IGTV." Videos uploaded to this feature are accessible from a user's profile by clicking on a tab labeled "IGTV." Recent content uploaded to the NIH's IGTV page can be seen below.



13

36.  **Comments and comment threads.** Instagram users can interact with posts and IGTV videos by commenting on them, or by replying to other comments on an Instagram post. This creates a space for discussion beneath each Instagram post, a type of comment thread. Users can express approval or disagreement with the post in the comment thread, or even make tangential or unrelated remarks. The author of a post may also comment or respond to comments in the comment thread, allowing the author to engage with the other users who have commented or replied. By default, all comments and replies to posts from a public profile are visible to the public at large. Comment threads are a space for public debate and conversation about whatever post is being commented on.

37.  **Likes.** In addition to commenting on posts, users may "like" posts by clicking on the heart-shaped button next to the image. Liking a post indicates approval or acknowledgment of the content. This is a recent post from @nihgov with likes and comments shown.



38.    **Mentions and Tags.** A user may also "mention" another user in a comment or "tag" a user in a post by using the "@" feature on Instagram and entering the user's username. Mentions of users in comments will appear in the comment section of a post. If the tagging user's profile is set to public, the post with the tagged user will appear under the "tagged" section of a tagged user's profile.

39.    **Comment filtering and keyword blocking.** Instagram provides account holders with a variety of tools to control or moderate the conversations on their posts. Account holders may, for example, control the content of the comments on their posts by keyword filtering. The comment filtering function permits users to hide all comments containing specified words or phrases. Thus, if an account holder designates the word "testing" as a filtered keyword on the account holder's page, any user's comment containing that word will automatically be hidden from public view as soon as it is posted. The filtered comment will be visible *only* to the user who posted it and to the account holder if they choose to "view hidden comments." No other user, including users who follow the comment author, will be able to see, reply to, or engage with the hidden comment.

40.    Account holders may also hide comments that contain any keyword in a list of "Default Keywords" created and maintained by Instagram. Enabling the "Use Default Keywords" setting automatically hides comments containing keywords that are commonly found in posts reported as violating Instagram's terms of service. Unlike keyword-blocked comments, comments automatically hidden under this setting do not disappear completely for all users. Rather, any user can view these comments by scrolling to the bottom of a post's comments section and clicking on a "view hidden comments" button.

JA025

41.     **Restricting comments.** Instagram account holders may also moderate the comments on their posts by "restricting" another user's comments. This option automatically hides all comments from a particular user, but gives the restricting account holder the option to pre-screen the comments and decide whether to allow certain comments to be seen. This feature allows a given user prior review over each comment that appears on their profile.

42.     **Blocking a user's comments.** Account holders may also "block" other users from commenting on any of their posts by using the platform's "block comments" function. The blocked user's comments and replies are then automatically rendered invisible to all other users. In addition to blocking a user's comments, account holders may block the user from viewing the account holder's profile or any of their posts.

43.     Instagram users are not notified when their comments have been hidden, restricted, or blocked. Because these comments remain visible to the user making them, users will generally be unaware that their comments are invisible to others.

## II.     Defendants' social media accounts

### A.     The NIH's verified Facebook page

44.     The NIH established the Facebook page "@nih.gov" on October 14, 2008. The page is registered as a "Government Organization" and the page's profile photo is the NIH logo. The account features a blue checkmark, indicating that Facebook has deemed it an "authentic Page for this public figure, media company or brand." The page includes links to the external NIH website, and the phone number listed in the "About" section is the phone number for the main operator for the NIH. The "About" section also reads "NIH...Turning Discovery Into Health ®. Read our Privacy Policy: http://www.nih.gov/about/privacy.htm. Visit http://www.nih.gov for more information." The links made available on the NIH Facebook page direct users to the NIH homepage or to the "Web Policies and Notices" page on the NIH's external website.

16

45.     The NIH Facebook page is public and accessible to all other Facebook users, and 561,584 users currently "follow" the page, allowing them to see updates from the NIH in their own Facebook News Feeds. The NIH uses the account to post: information about its work, such as interviews with NIH experts, including a Facebook Live interview with Mark Zuckerberg and Dr. Anthony Fauci; links to stories or blogs on the NIH website, such as a post titled "Lack of Sleep in Middle Age May Increase Dementia Risk"; and updates regarding the ongoing COVID-19 pandemic. Facebook users can comment on the posts, "react" to the NIH's posts through the "reaction" options Facebook offers, and share the NIH's posts to their own Facebook profile pages.

46.     The NIH publishes guidelines for commenting on its social media accounts. The guidelines state that the agency will review all comments "before they can be posted" and will prohibit certain content, including comments with external links or "off-topic" comments. Although the comment guidelines are available on the NIH's own website, the NIH does not link to the guidelines or otherwise explain its social media policy on its Facebook page.

### B.     The @nihgov Instagram account

47.     The NIH officially launched the Instagram account "@nihgov" on January 23, 2018. In the first post on the account, the NIH urged Instagram users to "Follow us for cool science images, health tips, and a behind-the-scenes look at the nation's top biomedical research institute! #Followus #FirstPost #Health #Wellness #Science #research."



48.     The Instagram page is registered as a "Government Organization" and the page's profile photo is the NIH logo. The account features a blue checkmark, indicating that it is a verified Instagram account.

49.     A portion of the NIH Instagram page is accessible to anyone with Internet access, but only Instagram users can see all of the previous posts on the page. The NIH page currently has 196,000 followers, meaning that those users see the NIH's posts in their personal timelines without needing to navigate directly to the @nihgov Instagram page.

50.     The NIH has posted more than one thousand times to its Instagram page. It uses the account to post photos, videos, and information about its work, including interviews with NIH experts, news about numerous NIH health campaigns, and updates regarding the ongoing COVID-19 pandemic. Instagram users can comment on or "like" NIH's posts on the page.

51.     Many of the NIH's Instagram stories are highlighted on its profile page, as well as numerous videos that appear on the "IGTV" section of the account. Further, users who click on the "Tagged" tab can access some of the photos that @nihgov has been tagged in by other users.

52.     As with its Facebook page, the NIH's Instagram page does not mention or link to its social media guidelines.

**C.     HHS's verified Facebook page**

53.     HHS established the Facebook page "@HHS" on May 6, 2013. The page is listed as a "Government Organization" and the page's profile photo is the HHS logo. Like the NIH's Facebook page, the account features a blue checkmark, indicating that Facebook has deemed it "authentic." The page includes links to the external HHS website as well as to its Instagram account. The "About" section reads: "Follow this page to share information that can benefit someone you know. The U.S. Department of Health and Human Services (HHS) touches the lives of nearly all Americans from research to food safety, health care, aging and much more." A link in the "About" section labeled "Privacy Policy" directs users to the "HHS Privacy Policy Notice" page on HHS's external website.

54.     The HHS Facebook page is public and accessible to all other Facebook users, and 434,687 people currently "follow" the page, allowing them to see updates from HHS in their own Facebook News Feeds. HHS uses the account to post a variety of content: health- and safety-related resources, such as "sunscreen tips and guidelines"; information about the work of HHS and its sub-agencies, including interviews with Secretary Becerra; the latest CDC guidelines on COVID-19 vaccines and social distancing; and links to stories about biomedical research by the Department's agencies, such as "Studies Confirm COVID-19 mRNA Vaccines Safe, Effective for Pregnant Women." Facebook users can comment on the posts, "react" to them, and share them to their own Facebook profile pages.

55.     HHS publishes guidelines for the operation of its official social media accounts, including a section on content moderation. Like the NIH's social media commenting guidelines, HHS guidelines state that the agency will "review[]" and "clear[]" comments before they are posted. The guidelines also contemplate that HHS employees will suppress certain comments, including those that contain views that may be considered offensive or "blatantly partisan." The guidelines are available on the HHS's website, but the HHS Facebook page does not link to them or otherwise describe HHS's content moderation policies.

III.    **Defendants' viewpoint-discriminatory and content-based blocking of comments from their social media accounts.**

56.     Plaintiffs are Facebook and Instagram users who have had their comments to Defendants' Facebook and/or Instagram pages hidden because the comments were critical of, or contained keywords associated with criticism of, the government's role in animal testing. Defendants' actions of hiding or filtering Plaintiffs' comments prevent them from fully participating in the comment threads and from expressing their views to others who are reading Defendants' Instagram and Facebook posts.

57.     The NIH, through individuals acting as administrator(s) and/or account holder(s), uses keyword blocking to target and hide comments that criticize the government's animal testing practices, including Plaintiffs' comments. As explained in detail below, *see* ¶¶ 60–79, Plaintiffs discovered the blocked keywords through their own experiences attempting to communicate on the NIH's social media pages and through a FOIA request submitted by Mr. Hartkopf. The following keywords are blocked from the NIH's Instagram and/or Facebook accounts:

    a.   #stopanimaltesting

    b.   #stoptesting

    c.   #stoptestingonanimals

    d.  Animal(s), animalitos, animales

    e.  Chimpanzee(s), chimp(s)

    f.  Primate(s)

    g.  Marmoset(s)

    h.  Cats, gatos [*i.e.*, Spanish for "cats"]

    i.  Monkey(s), monkies

    j.  Mouse, mice

    k.  Experiment

    l.  Test(ing), testing facility

    m.  Stop

    n.  PETA, PETALatino

    o.  Suomi,[1] Harlow[2]

    p.  Hurt, hurting

    q.  Kill

    r.  Torture(s), torturing

    s.  Torment(ing)

    t.  Cruel

---

[1] Stephen J. Suomi is currently the Chief of the Laboratory of Comparative Ethology at the National Institute of Child Health and Human Development. He has conducted extensive research on behavioral development by testing on monkeys and other nonhuman primates. *See* Jessica Firger, *Questions Raised About Mental Health Studies on Baby Monkeys at NIH Labs*, CBS News (Sep. 8, 2014 12:55 PM), https://perma.cc/FS97-HE48. Following an extensive public campaign by PETA, the NIH announced that Dr. Suomi's laboratory would be closed down and that he would no longer be involved in any testing on animals. *See* Michelle Kretzer, *NIH Ending Baby Monkey Experiments*, PETA (Dec. 11, 2015), https://perma.cc/49QP-F9XR.

[2] Harry Harlow was an American psychologist known for his testing on the effect of maternal deprivation on monkeys. The Harlow Center on Biological Psychology, named for Mr. Harlow, is affiliated with the Wisconsin National Primate Research Center and houses the monkeys and nonhuman primates used in experiments. *Harlow Center for Biological Psychology*, University of Wisconsin Madison, https://perma.cc/N9B7-RENQ. After Dr. Harlow died in 1981, PETA campaigned against the NIH's continuation of his work and frequently mentions Dr. Harlow in their advocacy against animal testing. *Psychological Torture Experiments at NIH Must Stop*, PETA, https://perma.cc/956S-ZKQS.

u. Revolting

58.     HHS also uses keyword blocking to hide comments that criticize the government's animal testing practices. As explained in further detail below, *see* ¶ 65, through attempts to communicate on HHS's page, Plaintiff PETA discovered that HHS blocks all comments containing the keyword "monkey."

59.     Defendants' practice of hiding comments containing words associated with animal rights advocacy, including the name of a well-known animal rights organization, is a viewpoint-discriminatory and content-based restriction on speech that infringes Plaintiffs' First Amendment rights. It violates Plaintiffs' right to speak in a public forum and their right to read the speech of others who have used blocked keywords in comments on Defendants' social media pages.

*PETA*

60.     PETA is a nonprofit animal rights organization based in Norfolk, Virginia. Founded in 1980, PETA is dedicated to establishing and defending the rights of all animals. PETA's public education and campaign activities have a particular focus on animal mistreatment in laboratories, the food industry, the clothing trade, and the entertainment industry. To accomplish these goals, PETA and its affiliates frequently launch social media campaigns in order to pressure public and private entities to change their animal treatment practices. One of PETA's current campaigns targets the NIH and the National Institute of Mental Health (NIMH) for its funding of primate testing, including "monkey fright" experiments conducted by NIMH scientist Elisabeth Murray. As part of this campaign, PETA employees and members have sought to advocate for the end of primate testing on the NIH's social media pages.

61.     PETA has been impaired in its ability to engage in this expression because Defendants have set automatic filters that hide many of their comments criticizing the government's treatment of animals.

62.     The NIH hid multiple comments about animal testing that PETA employee Evelyn Wagaman attempted to post in the course of her work for PETA. These comments, all offered during the NIH's Facebook Live videos, were marked as "unable to post." On information and belief, Ms. Wagaman was unable to post these comments because they contained keywords that had been preemptively blocked by the NIH.

    a.  On September 24, 2020, Ms. Wagaman was prevented from posting three comments on a Facebook Live video about COVID-19 vaccine research. In effect, these comments thanked Director Collins for his efforts on the COVID-19 vaccine but asked why the NIH continued to funnel money into primate experiments. Ms. Wagaman believed that she was "unable to post" these comments because of their viewpoint, as another comment that did not advocate for the end of animal experimentation was posted successfully.

    b.  On October 8, 2020, Ms. Wagaman again tried to comment on an NIH Facebook Live video about gene editing, but several comments were blocked from being posted publicly, including: "CRISPR can be used for advanced, non-animal experiments. In light of the many non-animal technologies that are developing, how can NIH continue to conduct experiments on macaques and other primates?"

    c.  On May 27, 2021, Ms. Wagaman attempted to post several comments to an NIH Live video featuring Dr. Kizzmekia Corbett, including: "Thank you, Dr. Corbett and Dr. Collins, for your hard work on the COVID vaccines! Why is the NIH still wasting funds on Elisabeth Murray's monkey fright experiments instead of investing more in important clinical research about COVID-19?" Although she did not receive any indication that the comments had been moderated, the comments were hidden from public view and only viewable by Ms. Wagaman and her Facebook friends. A screenshot of one of Ms. Wagaman's attempted comments is below.



63.     Despite the NIH's use of keyword blocking, PETA employees have occasionally been able to advocate for animal rights on NIH posts by modifying the spelling and spacing of certain words. For example, on October 16, 2020, Ms. Wagaman commented on an NIH Facebook Live video about COVID-19 treatment, saying "Francis Collins, thank you for your hard work finding a vaccine for COVID-19. In light of the urgency of devoting resources to find a vaccine and the ineffectiveness of experiments on an1mals, will you please end the fright expts on macaques of Elisabeth Murray?" This comment was not hidden or filtered, and was viewable by the public.

64.     PETA employees wish to continue posting comments about animal testing on the NIH's Facebook page, but the NIH's use of keyword blocking has hampered their ability to advocate on the NIH's Facebook and Instagram pages.

65.     PETA employees also wish to post comments about animal testing on HHS's Facebook page as part of their campaign to stop the funding of primate testing, but like the NIH, HHS engages in keyword blocking. PETA employees who have attempted to post comments containing the word "monkey" have found that the comments were hidden by HHS.

JA034

66.     Plaintiff PETA also wishes to engage with and read the comments of other animal rights advocates. Defendants' viewpoint-based keyword blocking prevents PETA from hearing the speech of other animal rights advocates who may be trying to comment on Defendants' social media posts or videos.

*Madeline Krasno*

67.     Plaintiff Madeline Krasno resides in Oakland, California. She is a former animal research lab technician turned animal rights advocate. She operates an Instagram account under the handle @madeline_krasno, and she maintains a Facebook profile under the name Madeline Krasno.

68.     Ms. Krasno has long advocated for the end of animal testing in laboratories. As a student at the University of Wisconsin, Ms. Krasno studied zoology and worked as a student primate caretaker at the Harlow Center for Biological Psychology. Her firsthand experience with primate testing led her to conclude that animal testing is immoral and compelled her to publicly share the details of her experiences. Ms. Krasno contributes to the public discourse on animal testing in part by drawing attention to the NIH's funding of National Primate Research Centers. One way Ms. Krasno brings attention to the NIH's involvement in animal testing is by commenting on the NIH's social media posts.

69.     Ms. Krasno has written several comments to posts on the @nihgov Instagram account and the NIH Facebook page that have been hidden due to her use of blocked keywords. Several of Ms. Krasno's comments posted to the NIH's Instagram and Facebook pages have been hidden, including:

> a.  On April 29, 2021, Ms. Krasno commented on an @nihgov Instagram post about a study on Alzheimer's disease treatment that was conducted on mice. Ms. Krasno wrote, "It's pretty messed up that you block conversation about animal testing." Although Ms. Krasno was able to view the comment when she was logged into her

personal Instagram account, when she logged out and viewed the NIH's post, she could not see her comment. She concluded that her comment had been hidden. A screenshot of Ms. Krasno's view of the comments under the NIH's post and a screenshot of the public's view of the comments to the same post appear below.



JA036



b. On May 6, 2021, Ms. Krasno attempted to comment on an NIH Facebook post about Public Service Recognition Week 2021. She wrote: "@National Institutes of Health (NIH), If you actually wanted to extend life and reduce illness and disability, you'd directly put funding in the hands of those who need it now and stop wasting billions of dollars torturing animals in labs throughout the US like @University of Wisconsin-Madison." The comment was hidden from the NIH's public-facing page, and only Ms. Krasno and her Facebook friends could view the comment.

70.    Ms. Krasno wishes to continue posting comments about animal testing on the NIH's Facebook and Instagram pages, but the NIH's continued use of keyword blocking has hampered her ability to advocate on the NIH's social media pages.

71.    Ms. Krasno also wants to comment on HHS's Facebook page, because HHS oversees the NIH and its funding of animal testing. She is hindered in her ability to comment freely on the HHS Facebook Page, however, because HHS blocks comments containing the keyword "monkey."

JA037

72.    Ms. Krasno also wishes to engage with and read the comments of other animal rights advocates. Defendants' viewpoint-based keyword blocking prevents her from hearing the speech of other animal rights advocates who may be trying to comment on Defendants' social media posts or videos.

*Ryan Hartkopf*

73.    Plaintiff Ryan Hartkopf resides in Madison, Wisconsin. He is an engineer in the digital health field. He operates an Instagram account under the handle @ryanhartkopf, and he maintains a Facebook profile under the name Ryan Hartkopf.

74.    Mr. Hartkopf's opposition to animal testing stems from 2018. That year, he moved to Madison and started passing the Wisconsin National Primate Research Center ("WNPRC") on his way to work. Mr. Hartkopf began to learn more about the WNPRC through videos on Facebook and PETA campaigns. At one point, he saw a video Ms. Krasno posted describing her past work at the Harlow Center and her goal of shutting down the lab. Mr. Hartkopf reached out to Ms. Krasno to connect and offer his assistance.

75.    Mr. Hartkopf began assisting Ms. Krasno by identifying which of her posts were publicly viewable, and he quickly concluded that the NIH was using keyword blocking to filter or hide posts criticizing the agency's funding of primate testing. Several of Mr. Hartkopf's comments on Instagram were blocked.

    a. On April 24, 2021, Mr. Hartkopf commented on an April 23, 2021 @nihgov Instagram post about "National DNA Day": "The Wisconsin NPRC is a disgrace. I personally know 2 former employees who were traumatized by their experience as primate caretakers. There is no humane way to keep 1,650 primates in small steel cages for decades without inflicting massive psychological damage. On top of that, the University of Wisconsin has banned any keywords regarding primate testing on their social media pages, meaning any opposition on social media is automatically silenced. They also delete the testimonials of former employees. Why go to all that trouble to silence their own alumni if everything is above-board? We need to reinvest in human-relevant, modern research instead of this barbaric and archaic

practice, which does not yield cures to our most deadly diseases!" After checking the @nihgov post using a different Instagram account and confirming that the comment post was not publicly viewable, Mr. Hartkopf deleted this comment in frustration.

b. On April 29, 2021, Mr. Hartkopf decided to comment again on an @nihgov Instagram post about treatment for antibiotic-resistant infections, raising the same concerns he raised in his previous April 24, 2021 comment. This comment, like his previous one, was hidden. A screenshot of Mr. Hartkopf's view of the comment thread to the @nihgov post and a screenshot of the public's view of the same comment thread appear below.





76.     To confirm that the NIH was intentionally blocking comments with certain keywords from being viewed publicly, Mr. Hartkopf filed Freedom of Information Act ("FOIA") requests with the NIH on April 24, 2021, seeking "a screenshot of all keywords that are blocked" on the NIH's Facebook page and the NIH's Instagram account. A few days later, on April 29, 2021, Mr. Hartkopf received the records responsive to his FOIA request and confirmed that the NIH was engaged in extensive keyword blocking to hide comments relating to animal rights advocacy. *See* Attachment 1 (the NIH response to Mr. Hartkopf's Facebook FOIA request); Attachment 2 (the NIH response to Mr. Hartkopf's Instagram FOIA request).

\* In a concurrently filed motion, Plaintiff Madeline Krasno has requested a waiver of her obligation under Local Rule 5.1(c)(1) to provide her home address in the caption of this complaint.

77.     Mr. Hartkopf wishes to continue posting comments about animal testing on the NIH's Facebook and Instagram pages, but the NIH's continued use of keyword blocking has hampered his ability to advocate on those pages.

78.     Mr. Hartkopf also wishes to raise awareness of animal testing by commenting on HHS's Facebook page. He is hindered in his ability to comment freely on the HHS Facebook page, however, because HHS blocks all comments containing the keyword "monkey."

79.     Mr. Hartkopf also wishes to engage with and read the comments of other animal rights advocates. Defendants' viewpoint-based keyword blocking prevents him from hearing the speech of other animal rights advocates who may be trying to comment on Defendants' social media posts or videos.

## **Cause of Action**

### **Violation of the First Amendment of the U.S. Constitution**

80.     Defendants' blocking of comments containing words and phrases associated with animal rights advocacy from their social media accounts violates Plaintiffs' clearly established First Amendment rights because it imposes a viewpoint-based burden on their participation in a public forum.

81.     Additionally, Defendants' blocking of comments containing words and phrases associated with animal rights advocacy from their social media accounts violates Plaintiffs' clearly established First Amendment rights because it imposes unjustifiable content-based restrictions on their participation in a public forum.

82.     Defendants' blocking of comments containing words and phrases associated with animal rights advocacy from their social media accounts violates Plaintiffs' clearly established First Amendment rights because it imposes viewpoint-based restrictions on their right to hear.

83.     Additionally, Defendants' blocking of comments containing words and phrases associated with animal rights advocacy from their social media accounts violates Plaintiffs' clearly established First Amendment rights because it imposes unjustifiable content-based restrictions on their right to hear.

**Prayer for Relief**

WHEREFORE, Plaintiffs respectfully request that this Court:

1.      Declare that Defendants' viewpoint- and content-based comment blocking from the NIH Instagram and Facebook accounts and HHS Facebook account is unconstitutional;

2.      Enter an injunction requiring Defendants to remove the keyword blocking filters associated with animal rights advocacy described in ¶¶ 57–58, *supra*, and prohibiting Defendants from blocking, hiding, or filtering comments on the basis that they advocate for animal rights or use phrases associated with animal rights advocacy;

3.      Award Plaintiffs their costs, including reasonable attorneys' fees, pursuant to 28 U.S.C. § 2412; and

4.      Grant any additional relief as may be just and proper.

Respectfully submitted,

 /s/ Jameel Jaffer
Jameel Jaffer (MI0067)
Katherine Fallow*
Stephanie Krent*
Lyndsey Wajert*
Alex Abdo*
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
jameel.jaffer@knightcolumbia.org
*Counsel for Plaintiffs*

 /s/ Caitlin M. Foley

Caitlin M. Foley*
Animal Legal Defense Fund
150 South Wacker Drive, Suite 2400
Chicago, IL 60606
(707) 795-2533 ext. 1043
cfoley@aldf.org

Christopher A. Berry (Bar ID CA00106)
Animal Legal Defense Fund
525 E. Cotati Ave.
Cotati, CA 94931
(707) 795-2533 ext. 1041
cberry@aldf.org

*Counsel for Plaintiffs Madeline Krasno and
 Nick Hartkopf*

 */s/ Asher Smith*
Asher Smith*
People for the Ethical Treatment of Animals
1536 16th Street NW
Washington, DC 20036
(202) 483-7382
AsherS@petaf.org

*Counsel for Plaintiff People for the Ethical
 Treatment of Animals*

*Pro Hac Vice* motion forthcoming

September 10, 2021

USCA Case #23-5110   Document #2016055      Filed: 09/08/2023   Page 52 of 133

# Attachment 1

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

National Institutes of Health
Freedom of Information Office
Building 31, Room 5B-35
31 Center Drive, MSC 2107
Bethesda, Maryland 20892-2107
phone: (301) 496-5633
fax: (301) 402-4541

Via E-mail: ryanhartkopf@gmail.com

April 29, 2021

Ryan Hartkopf
6633 Raymond Rd
Madison, WI 53711

Re: FOI Case No. 56228

Dear Mr. Hartkopf:

This is the final response to your April 24, 2021 Freedom of Information Act (FOIA) request addressed to the National Institutes of Health (NIH) FOIA Office and received in this office on April 26, 2021. You requested a copy of a screenshot of all keywords that are blocked on the NIH Facebook page https://www.facebook.com/nih.gov

The NIH FOIA Office reviewed the 1 page responsive to your request, and it is enclosed with this letter.

If you are not satisfied with the processing and handling of this request, you may contact the OD FOIA Public Liaison and/or the Office of Government Information Services (OGIS):

NIH FOIA Public Liaison                OGIS
Denean Standing-Ojo                    National Archives and Records Admin
Public Affairs Specialist              8601 Adelphi Rd - OGIS
Office of Communications and Public Liaison    College Park, MD 20740-6001
Building 31, Room 5B52S                202-741-5770 (phone)
31 Center Drive                        1-877-684-6448 (toll-free)
Bethesda, MD 20814                     202-741-5769 (fax)
301-496-5077 (phone)                   ogis@nara.gov (email)
301-496-0818 (fax)
nihfoia@od.nih.gov (email)

JA045

In certain circumstances, provisions of the FOIA and HHS FOIA Regulations allow us to recover part of the cost of responding to your request.  Because no unusual circumstances apply to the processing of your request, there are no charges for search time.

If you have any questions about this response, please call the NIH FOIA office at 301-496-5633.

Sincerely,

Hawyee
Yan -S

Digitally signed by
Hawyee Yan -S
Date: 2021.04.29
14:07:32 -04'00'

for
Gorka Garcia-Malene
Freedom of Information Officer, NIH

Attachment: 1 page, PDF

**Page Moderation**

Block posts or comments containing the following words

Add a word, phrase or emoji

☐ Upload from .CSV

.org ✕ | .com ✕ | #believemothers ✕ | www ✕ | whats-app ✕

watsapp ✕ | whatsapp ✕ | gmail ✕ | marmosets ✕

marmoset ✕ | sex experiments ✕ | hamsters ✕ | hamster ✕

giphy.com ✕ | gifs ✕ | marijuana ✕ | cannabis ✕

mothafucka ✕ | mothafuckas ✕ | ampligen ✕ | ampligen ✕

chimpanzee ✕ | chimpanzees ✕ | chimps ✕ | chimp ✕

bulshit ✕ | bullshit ✕ | bitches ✕ | bitch ✕

www.facebook.com ✕ | https ✕ | http ✕ | m.facebook.com ✕

10152749671620560 ✕ | cats ✕ | gatos ✕ | animalitos ✕

animales ✕ | mierda ✕ | puto ✕ | puta ✕ | fb.me ✕

cruelty ✕ | primates ✕ | primate ✕ | tormenting ✕ | torment ✕

xjh3m5da ✕ | suck ✕ | hitler ✕ | nazi ✕ | 5647744585 ✕

suomi ✕ | harlow ✕ | 10153174633989502 ✕ | 020228238 ✕

10152714324724586 ✕ | petalatino ✕ | torturing ✕ | tortures ✕

torture ✕ | peta ✕ | animals ✕ | animal ✕ | sicko ✕

sickos ✕ | monkies ✕ | monkeys ✕ | monkey ✕ | piss ✕

shits ✕ | fuked ✕ | fuckin ✕ | cunts ✕ | cunt ✕ | bastards ✕

bastard ✕ | morons ✕ | moron ✕ | asshole ✕ | assholes ✕

ass ✕ | shit ✕ | shiting ✕ | shitting ✕ | fucked ✕

fucktard ✕ | fucktards ✕ | motherfucking ✕ | motherfuckers ✕

fuk ✕ | fuking ✕ | fucking ✕ | fuckers ✕ | fucks ✕ | fuck ✕

fuckit ✕ | mouse ✕ | mice ✕ | cruel ✕ | revolting ✕ | + ✕

JA047

# Attachment 2

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

National Institutes of Health
Freedom of Information Office
Building 31, Room 5B-35
31 Center Drive, MSC 2107
Bethesda, Maryland 20892-2107
phone: (301) 496-5633
fax: (301) 402-4541

Via E-mail: ryanhartkopf@gmail.com

April 29, 2021

Ryan Hartkopf
6633 Raymond Rd
Madison, WI 53711

Re: FOI Case No. 56229

Dear Mr. Hartkopf:

This is the final response to your April 24, 2021 Freedom of Information Act (FOIA) request
addressed to the National Institutes of Health (NIH) FOIA Office and received in this office on
April 26, 2021. You requested a copy of the list of keywords that are blocked on the @nih.gov
Instagram account.

The NIH FOIA Office reviewed the 1 page responsive to your request, and it is enclosed with
this letter.

If you are not satisfied with the processing and handling of this request, you may contact the OD
FOIA Public Liaison and/or the Office of Government Information Services (OGIS):

NIH FOIA Public Liaison
Denean Standing-Ojo
Public Affairs Specialist
Office of Communications and Public Liaison
Building 31, Room 5B52S
31 Center Drive
Bethesda, MD 20814
301-496-5077 (phone)
301-496-0818 (fax)
nihfoia@od.nih.gov (email)

OGIS
National Archives and Records Admin
8601 Adelphi Rd - OGIS
College Park, MD 20740-6001
202-741-5770 (phone)
1-877-684-6448 (toll-free)
202-741-5769 (fax)
ogis@nara.gov (email)

JA049

Page 2 – Hartkopf 56229

In certain circumstances, provisions of the FOIA and HHS FOIA Regulations allow us to recover part of the cost of responding to your request.  Because no unusual circumstances apply to the processing of your request, there are no charges for search time.

If you have any questions about this response, please call the NIH FOIA office at 301-496-5633.

Sincerely,

Hawyee
Yan -S

Digitally signed by
Hawyee Yan -S
Date: 2021.04.29
14:11:16 -04'00'

for
Gorka Garcia-Malene
Freedom of Information Officer, NIH

Attachment: 1 page, PDF

## Controls

### Allow Comments From
Everyone  ›

### Block Comments From
0 People  ›

Any new comments from people you block won't be visible to anyone but them.

## Filters

### Hide Offensive Comments


Automatically hide comments that may be offensive from your posts, stories, reels and live videos.

### Manual Filter


#stopanimaltesting, #stoptesting, #stoptestingonanimals, animal, animals, chimpanzees, chimps, experiment, fuck, hurt, hurting, kill, monkey, monkeys, pedos, peta, rapist, stop, test, testing, testing facility, torture, torturing, 🤬🐵🐒❌

Hide comments that contain certain words or phrases. Enter the words or phrases you want to hide, separated by commas. Learn More

### Filter Most Reported Words


Hide comments that contain words or phrases that people report the most. Learn More

    

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, MADELINE KRASNO, and RYAN HARTKOPF, <br><br> Plaintiffs, <br><br> v. <br><br> LAWRENCE A. TABAK, in his official capacity as Acting Director of the National Institutes of Health, and XAVIER BECERRA, in his official capacity as Secretary of the U.S. Department of Health and Human Services, <br><br> Defendants. | Civil Action No. 21-2380 (BAH) |

<u>**JOINT STIPULATION OF FACTS**</u>

The parties in the above-captioned matter hereby stipulate to the following facts for the purposes of this litigation.

**PARTIES**

1.      Plaintiff People for the Ethical Treatment of Animals ("PETA") is a nonprofit animal rights organization based in Norfolk, Virginia. Founded in 1980, PETA is dedicated to establishing and defending the rights of all animals. PETA's public education and campaign activities have a particular focus on animal mistreatment in laboratories, the food industry, the clothing trade, and the entertainment industry, as well as other issues including cruelty to domesticated animals and animals who are often considered "pests." PETA frequently launches social media campaigns in order to pressure public and private entities to change their animal treatment practices. One of PETA's current campaigns targets the National Institutes of Health

(NIH) and the National Institute of Mental Health (NIMH) for its funding of primate testing, including monkey experiments conducted by NIMH scientist Elisabeth Murray. As part of this campaign, PETA employees and members have sought to advocate for the end of primate testing on the NIH's social media pages.

2.      Plaintiff Madeline Krasno, who resides in Oakland, California, is a former animal research technician turned animal rights advocate. She operates an Instagram account under the handle @madeline_krasno, and she maintains a Facebook profile under the name Madeline Krasno. Ms. Krasno has long advocated for the end of animal testing in laboratories. As a student at the University of Wisconsin, Ms. Krasno studied zoology and worked as a student primate caretaker at the Harlow Center for Biological Psychology. Her firsthand experience with primate testing led her to conclude that animal testing is immoral and compelled her to publicly share the details of her experiences. Ms. Krasno seeks to contribute to the public discourse on animal testing in part by drawing attention to the NIH's funding of National Primate Research Centers. One way Ms. Krasno seeks to bring attention to the NIH's involvement in animal testing is by commenting on the NIH's social media posts.

3.      Plaintiff Ryan Hartkopf, who resides in Madison, Wisconsin, is an engineer in the digital health field. He operates an Instagram account under the handle @ryanhartkopf, and he maintains a Facebook profile under the name Ryan Hartkopf. Mr. Hartkopf's opposition to animal testing stems from 2018. That year, he moved to Madison and started passing the Wisconsin National Primate Research Center ("WNPRC") on his way to work. Mr. Hartkopf began to learn more about the WNPRC through videos he found on Facebook and PETA campaigns. At one point, he saw a video Ms. Krasno posted describing her past work at the Harlow Center and her

goal of shutting down the lab. Mr. Hartkopf reached out to Ms. Krasno to connect and offer his assistance.

4.      At the time the Plaintiffs filed the Complaint, Francis S. Collins was the Director of the NIH. On December 20, 2021, Defendant Lawrence A. Tabak became the Acting Director of the NIH. The NIH is a medical research center and is one of the eight health agencies of the Public Health Service. The Public Health Service is part of U.S. Department of Health and Human Services ("HHS"). Defendant Tabak has authority over the NIH policies and practices pertaining to the NIH's social media pages at issue here. The NIH is the primary agency of the federal government charged with performing and supporting biomedical and behavioral research. *See* The National Institutes of Health, *Background and Congressional Issues*, Congressional Research Service Report R41705, https://crsreports.congress.gov/product/pdf/R/R41705 (last updated April 19, 2019). It has major roles in training biomedical researchers and disseminating health information. *Id.* The NIH's mission is "to seek fundamental knowledge about the nature and behavior of living systems and the application of that knowledge to enhance health, lengthen life, and reduce illness and disability." *Id.* (quoting *Mission and Goals*, National Institutes of Health, https://perma.cc/8X68-8YXD).

5.      Defendant Xavier Becerra is the Secretary of HHS. HHS is a cabinet-level department and federal agency that oversees the government's public, social services, medical, and scientific efforts.

JA054

## THE FACEBOOK PLATFORM[1]

6.     Facebook is a social media platform operated by Meta. The company states that the Facebook platform is designed to connect users with "friends, family, and communities of people who share [their] interests." The platform allows users to post content, including writings, links, photographs, and videos, for other Facebook users to see. It is the parties' understanding that it is feasible that Internet users without Facebook accounts could see certain user-posted content on a Facebook page, because Facebook initially displays some public content to all internet users before prompting individuals to create an account or sign in. Individuals and organizations who create Facebook accounts can communicate with other users on the platform by sharing others' posts, "liking" those posts, and commenting on or replying to comments attached to a post. Many public officials and government agencies have created Facebook pages to communicate with interested parties.

7.     **Users.** Any individual or organization that has created an account on the platform is a Facebook "user." Individual Facebook users can connect with other users by "friending" them; these connected users are called Facebook "friends." When users post content on the Facebook platform, they have the option of making their posts visible to the public (which may include non-Facebook users to the extent Facebook permits viewing a Facebook page without an account), to their friends only, or to a subset of their friends.

8.     **Pages.** Users who want to create Facebook accounts for "businesses, brands, organizations, [or] public figures" can create Facebook "pages." Facebook pages include the title of the business or organization, and an "About" section where the administrator of the page can

---

[1] The parties agree that the Court may take judicial notice of the information published in Facebook's help center, https://www.facebook.com/help.

provide information concerning the business or organization. Part of the NIH page recently looked like this:



9.      All internet users in the United States can generally access a selection of recent posts from all public Facebook pages before they are required to sign-in or sign-up, but only Facebook users can see all of the previous posts on the page. Facebook users can also "like" a page in order to get updates from that page in their "News Feed"—a personalized, constantly updating stream of content posted on the platform by others.

10.     **Verification.** Public figures, brands, and official organizations can request "verification" of their pages and profiles on Facebook. When it verifies a Facebook page, Facebook confirms that the operators of the page are the authentic representatives of the entity represented in the page. Verified pages feature a blue checkmark next to their page name or profile name.

11.     **Posts.** A Facebook "post" is any combination of text, images, videos, audio, or Internet hyperlinks published by a Facebook user on the user's Facebook page. Users who visit or

follow a Facebook page can see all of the posts published by the administrator of the page. Posts

on the NIH's page include agency-related news updates and public health information. This is a

recent post on the NIH's page.



12.    **Facebook Live.** Facebook users can also share content with others by going "Live"

through the Facebook Live feature. Facebook Live allows users or pages to stream video in real-

time for viewing by other users. After they first air, the videos remain viewable on the posting

user's page or profile. Live videos are generally visible to Facebook users and to viewers without

a Facebook account who access the livestream directly through a Uniform Resource Locator

(URL). Page administrators may also choose to broadcast only to a specific subset of their page's

followers.

13.    **Comments and comment threads.** Facebook users can respond to others' posts—

including Live videos—by commenting on them. Facebook comments can include the same type

6

of content as Facebook posts, including text, images, and hyperlinks. Facebook users may also reply to other comments appended to a post or to replies that have been posted by others. The collection of replies and replies-to-replies is sometimes referred to as a "comment thread." Any Facebook user can comment on a post or comment made viewable to the public. Those without a Facebook account cannot comment on any Facebook content they may be able to view.

14.     **Likes and reactions.** Users can also "react" to others' posts by clicking the "Like" button and selecting emojis corresponding to "Like," "Love," "Care," "Haha," "Wow," "Sad," and "Angry." When a user reacts to a post, other users will be able to see the user's reaction in a list of reactions on the post. The total number of reactions and shares are listed on each post. This is a recent post from the NIH's Facebook page, displaying some associated comments and reactions.

7



15.     **Sharing.** In addition to commenting on and reacting to posts, users can also choose to "share" them. "Sharing" a post causes it to appear on an individual user's own Facebook profile page and increases the likelihood that a user's friends will see it in their News Feeds. When users share posts, they can add text that appears above the shared posts. Users can employ this feature to provide commentary on the posts they are sharing.

16.     **Comment filtering and keyword blocking.** Administrators of Facebook pages can limit comments that appear on their posts by using Facebook's opt-in moderation tools, including comment filtering. Page administrators may, for example, filter all comments that contain profanity by turning on Facebook's built-in "profanity filter." Administrators may also input their own lists of words or phrases that they wish to filter from other users' comments on their posts. When a page administrator adds a word to this list, any past or future comments from users containing the word should automatically be hidden from public view. Although a hidden comment remains visible to the user who posted it and to the user's friends, other Facebook users viewing the page are unable to read or engage with the comment. Facebook refers to the practice of hiding comments containing certain keywords from view as "blocking."

17.     Page administrators may also block individual comments either by manually "hiding" them, or by deleting them from the comment threads associated with their posts. When a comment is deleted, it is removed from the page altogether, and neither the Facebook user who posted the comment nor the user's Facebook friends may view it. Manually hidden comments remain visible to the user who posted the comment and that user's friends, but other individuals viewing the page are unable to read or engage with the comment.

18.     Typically, the user whose comment has been hidden or deleted by a page administrator does not receive notice of these moderation actions.

19.     **Banning and blocking.** Page administrators may "ban" or "block" individual users from their pages. Banning a user prevents the user from commenting on or liking any content from the page, but it does not foreclose the user from continuing to access the page and its posts. Blocking a user, by contrast, prevents the user from accessing the page altogether while they are

logged into Facebook: the user is no longer able to view the content posted to the page or even locate the page using Facebook's search function.

20.     **Facebook's Community Standards.** In addition to making comment moderation options available to a page administrator, Facebook also engages in certain content moderation. The Facebook Community Standards outline "what is and isn't allowed on the Facebook app," including what types of content may be demoted, hidden or deleted by Facebook on its own accord. Examples of information that Facebook itself may remove include content that incites or facilitates serious violence, coordinating harm and publicizing crime, hate speech, spam, imagery of dead people, or fraud and deception.[2] Facebook states that it notifies users when their posts or comments have been removed for violating its community standards. *See Transparency Center*, Meta (Jan. 19, 2022), https://perma.cc/B5SV-6B69.

### THE INSTAGRAM PLATFORM[3]

21.     Meta also operates the social media platform Instagram. Instagram is a platform for visual content, allowing users to share photos and videos and respond to posts through likes or comments. The company states that Instagram is designed to "foster a safe and inclusive community where people can express themselves, feel closer to anyone they care about and turn passion into a living." Numerous brands, celebrities, public officials, and public entities have Instagram accounts and post pictures or videos to communicate with interested parties.

22.     **Users.** An Instagram "user" is an individual or organization that has created an account on the platform. Each Instagram user creates a unique username, such as "@nihgov."

---

[2] *See Facebook Community Standards,* Meta, https://perma.cc/UM3D-MSZK. The parties agree that the Court may take judicial notice of the information published as part of these standards.

[3] The parties agree that the Court may take judicial notice of the information published in Instagram's help center, https://help.instagram.com/.

Other Instagram users can locate an account by searching for the account's username on Instagram's website or mobile application to access the user's profile page.

23.     **Profiles.** Each Instagram user has a unique webpage or "profile." Each user's profile displays the associated username as well as other information about the account, including the profile photo associated with the user, the account's followers, and the accounts the user is following. If a user's profile is open for public view, any Instagram user who navigates to the user's profile can view all of the user's posts. A non-Instagram user with internet access may view some posts open to public view and comments on those posts, until Instagram prompts the individual to create an account or log in. If a user's profile is private, only approved followers of the user may view the user's posts. Below is a screenshot of the NIH's Instagram profile page.



24.     **Followers.** Instagram users may "follow" the profiles of other users by clicking on the "Follow" button that appears at the top of an account's profile. Following an account means subscribing to it—the followed account's posts appear in the user's "Instagram feed," a personalized, constantly updating page on the Instagram platform that displays content shared by the accounts that a user follows.

25.     **Posts.** An Instagram post is a discrete piece of content that a user shares to the user's profile page. A post on Instagram can be an image, a video, or a collection of images or videos. When a user shares an image or video, the user can include a text-based caption that will be displayed alongside or underneath the post.

26.     **Instagram Stories.** In addition to standard Instagram posts, users may also share content via the platform's "Instagram Story" feature. The Instagram Story is a slideshow-like presentation that displays all content—images, videos, and text—users share to their Stories. Unlike an Instagram post, content shared to a Story remains visible to other users for only 24 hours after it is shared. Instagram Stories can be accessed by clicking on the profile image of an Instagram user when it is circled by a multi-colored ring—the indicator that the user has posted a story. Although Instagram stories are normally visible for only 24 hours, users can save stories to their profiles indefinitely by making them "highlights." Rather than being accessed by clicking on the profile image, highlights remain saved just below the profile image and are accessible by default to Instagram users. For example, the top of the NIH's profile page recently looked like this, indicating that the NIH had posted at least one Instagram story in the preceding 24 hours and had saved and highlighted previous stories relating to COVID-19 updates, past live events, and NIH news:



27.   **IGTV.** Instagram also permits users to upload long-form video content using a feature called "IGTV." Videos uploaded to this feature are accessible from a user's profile by clicking on a tab labeled "IGTV." Recent content uploaded to the NIH's IGTV page can be seen below.



28.   **Comments and comment threads.** Instagram users can comment on posts and IGTV videos and reply to other comments. The author of a post may also comment or respond to comments in the comment thread. By default, the Instagram platform makes all comments and

replies to posts from a public profile visible to all Instagram users, and the public at large until Instagram requires a log-in to continue viewing.

29.  **Likes.** In addition to commenting on posts, users may "like" posts by clicking on the heart-shaped button next to the image. Liking a post may indicate approval or acknowledgment of the content.

30.  **Comment filtering and hiding.** Instagram provides account holders with a variety of tools to control or moderate the conversations on their posts. Account holders may, for example, use comment filtering and hiding to automatically control the content of the comments on their posts. The "Custom Words and Phrases" function permits account holders to automatically hide all comments containing specified words or phrases. Thus, if an account holder designates the word "testing" as a custom hidden word on the account holder's page, any comment containing that word should automatically be hidden from public view as soon as it is posted. The filtered comment will be visible only to the user who posted it and to the account holder if they choose to "view hidden comments." No other user, including users who follow the comment author, will be able to see, reply to, or engage with the hidden comment.

31.  Account holders may also hide comments that contain any keyword in a list of default keywords created and maintained by Instagram. The "Hide Comments" function is on by default, and automatically hides comments containing common offensive words, phrases, or emojis found in posts reported as violating Instagram's terms of service. Unlike comments filtered due to the inclusion of a word on an account holder's custom hidden words list, comments automatically hidden under this function do not disappear completely for all users. Rather, any user can view these comments by scrolling to the bottom of a post's comments section and clicking on a "view hidden comments" button.

14

32. **Restricting comments.** Instagram account holders may also moderate the comments on their posts by "restricting" another user's comments. This option automatically hides all comments posted by a particular user from members of the public, but gives the restricting account holder the option to pre-screen the comments and decide whether to allow certain comments to be seen. This feature allows a given user prior review over each comment that appears on their profile.

33. **Blocking a user's comments.** Account holders may also "block" other users from commenting on any of their posts by using the platform's "block comments" function. The blocked user's comments and replies are then automatically rendered invisible to all other users. In addition to blocking a user's comments, account holders may block the user from viewing the account holder's profile or any of their posts.

34. Instagram users are not notified when their comments have been hidden or filtered. Because these comments remain visible to the user making them, users will generally be unaware that their comments are invisible to others.

35. **Instagram's Community Guidelines.** In addition to making comment moderation options available to an account holder, Instagram itself also engages in certain content moderation. The Instagram Community Guidelines outline "what is and isn't allowed on Instagram," including what types of content may be removed by Instagram of its own accord.[4] Examples of information that Instagram itself may remove include content that incites or facilitates violence, hate speech, and spam.[5] These comments are automatically removed by Instagram and are not viewable by users. Instagram has stated that it notifies users when their posts or comments have been removed

---

[4] *How does Instagram decide what to remove?*, Instagram Help Center, https://perma.cc/6MZJ-PRA5?type=image.

[5] *See Community Guidelines*, Instagram Help Center, https://perma.cc/YC88-XQBH?type=image. The parties agree that the Court may take judicial notice of the Instagram Community Guidelines.

for violating its community standards. *See Transparency Center*, Meta (Jan. 19, 2022), https://perma.cc/B5SV-6B69. In October 2020, Instagram also began to offer a feature that relies on an artificial intelligence algorithm to automatically hide comments similar to others that have been reported as violating its community guidelines. *See Kicking Off National Bullying Prevention Month With New Anti-Bullying Features*, Instagram (Oct. 6, 2020), https://perma.cc/3FLS-DXWQ. The comments hidden via this mechanism can be viewed by any user who chooses to "view hidden comments" at the bottom of a post. *Id.*

## THE NIH'S SOCIAL MEDIA ACCOUNTS

### *The NIH's verified Facebook page*

36.     NIH uses social media accounts, including Facebook, to "communicate and interact with citizens" about agency-related updates and public health news. *Web Policies and Notices*, National Institutes of Health (Jan. 14, 2021), https://perma.cc/BC7R-ZFME. "NIH Facebook pages are managed by NIH staff members who post news and other items of interest to be consumed by the public." *Id.*

37.     The NIH established the Facebook page "@nih.gov" on October 14, 2008. The page is registered as a "Government Organization" page, and the page's profile photo is the NIH logo. The account features a blue checkmark, indicating that Facebook has deemed it an authentic page for the NIH. The page includes links to the official public NIH website, www.nih.gov, and the phone number listed in the "About" section is the phone number for the main operator for the NIH. The "Intro" section on the NIH's Facebook page reads "NIH...Turning Discovery Into Health ®. Read our Privacy Policy: http://www.nih.gov/about/privacy.htm. Visit http://www.nih.gov for more information."

38.     The NIH Facebook page is viewable by the public, meaning that a portion of its page is generally accessible to those with internet access until Facebook requires a log-in. Any member of the public with a Facebook account can view the entirety of the page, including prior posts and comments to those posts. Approximately 565,515 users currently "follow" the page, allowing them to see updates from the NIH in their own Facebook News Feeds. The NIH uses the account to post agency-related information and public health updates, including updates regarding the ongoing COVID-19 pandemic.

39.     Facebook users can comment on the posts, "react" to the NIH's posts through the "reaction" options Facebook offers, and share the NIH's posts to their own Facebook profile pages. Certain NIH Facebook posts garner dozens of comments and replies, and some of them have hundreds of comments and replies. Examples of the NIH's Facebook posts, and comments and replies to those posts, are attached hereto as Exhibits 1–6.

40.     The parties will confer in good faith if either party wishes to submit, with summary judgment briefing, additional posts and comments on the Facebook pages of the NIH and the Plaintiffs. Neither party will unreasonably object to the admissibility of additional posts and comments on the NIH's Facebook page and Plaintiffs' Facebook pages in relation to the claims raised in the Complaint.

*The NIH's verified Instagram account*

41.     The NIH launched the Instagram account @nihgov on January 23, 2018. In the first post on the account, the NIH urged Instagram users to "Follow us for cool science images, health tips, and a behind-the-scenes look at the nation's top biomedical research institute! #Followus #FirstPost #Health #Wellness #Science #research."



42.     The Instagram page is registered as belonging to a "Government Organization" and the page's profile photo is the NIH logo. The account features a blue checkmark, indicating that it is a verified Instagram account.

43.     The NIH's Instagram page is viewable by the public, meaning that a portion of the page is generally accessible to anyone with Internet access until Instagram requires a log-in. Any Instagram user can see all of the previous posts and comments on the page. The NIH's Instagram page has approximately 206,000 followers.

44.     The NIH uses the account to post content about the agency's work, including interviews with NIH experts and news about numerous NIH health campaigns, and public health updates, including updates on the ongoing COVID-19 pandemic.

45.     Instagram users can comment on or "like" the NIH's posts on the page. Certain posts have received over one hundred comments, including both positive and negative responses.

18

Examples of NIH's Instagram posts, including comments to those posts, are attached hereto as Exhibits 7–11.

46.     The parties will confer in good faith if either party wishes to submit, with summary judgment briefing, additional posts and comments on the Instagram pages of the NIH and the Plaintiffs. Neither party will unreasonably object to the admissibility of additional posts and comments on the NIH's Instagram page or Plaintiffs' Instagram pages in relation to the claims raised in the Complaint.

### *The NIH's social media comment moderation practices*

47.     Many persons and entities have made comments on posts on the NIH's Facebook and Instagram pages; the NIH believes that some, however, have posted comments that are off-topic because they are unrelated to the topic of the posts. For example, the NIH posted, on October 22, 2021 on its Instagram account, an "immunofluorescence microscopy image of a human retina from Dr. Angela Kruse at Vanderbilt University," with a few concluding notes, such as "#WomenInScience." A copy of this post is attached hereto as Exhibit 12. In response, multiple users—including Plaintiff Ms. Krasno—made a number of comments concerning animals that NIH believes are unrelated to the topic of the post. For example, Ms. Krasno commented: "No longer use T A X \$\$ to cut vocal cords of d o g s and k I l l them." Other users posted comments that NIH believes are similar, such as "PUPPY KILLERS," and "Sham [sic] on you killers." *Id*. A copy of the post with all comments viewable by users is also attached hereto as Exhibit 13.[6]

48.     Similarly, the NIH made a post on its Instagram account on November 12, 2021 conveying a woman's story concerning her mother's experience with Alzheimer's disease. For

---

[6] As discussed above, comments on public posts may also be viewable by members of the public without Instagram or Facebook accounts, because Meta initially allows anyone with an internet connection to view a selection of recent public posts before prompting the individual to create or log into an account.

example, the woman stated, "if I had to tell anyone [on] this journey, the biggest piece is just preparing yourself emotionally to lose that person a little bit every single day. Because that's what happens. In six months, something else is different about them. And that's extremely challenging." A copy of this post is attached hereto as Exhibit 14. The NIH again received a number of comments concerning animals that NIH believes are unrelated to the post, such as "stopanimalabuse" and "FREE THE BEAGLES!!!!!!" *Id.* A copy of the post with all comments viewable by users is also attached hereto as Exhibit 15.

49.    Another Instagram post by NIH dated September 17, 2021 referenced a "biomedical engineering professor" who "helped develop a portable diagnostic device to detect sickle cell disease in newborns" which could "save lives in remove, underserved areas of the world." A copy of this post is attached hereto as Exhibit 16. Multiple users commented, "#animalabuser." *Id.* One commenter noted: "burn in hell elizabeth #animalabuser." *Id.* Given other comments made in response to the post, the NIH believes the commenter was likely referencing Dr. Elisabeth Murray, an NIH Senior Investigator in the Laboratory of Neuropsychology who has been the subject of some of PETA's advocacy efforts. *See Government Experimenters Frighten Monkeys With Snakes*, PETA (Feb. 24, 2021), https://perma.cc/H86T-2YJ2. A copy of the post with all comments viewable by users is also attached hereto as Exhibit 17.

50.    The NIH made a post on its Facebook page concerning gene therapies for rare diseases. In particular, NIH posted: "#RareDiseases affect about 30 million Americans, but of the approximately 7,000 rare diseases identified, only two heritable diseases currently have [FDA-approved] #GeneTherapies. That's why #NIH . . . teamed up" with other entities "to launch the Bespoke Gene Therapy Consortium." A copy of this post with all comments viewable by users is

attached hereto as Exhibit 18. Again, in response, NIH received a number of comments concerning animals that NIH believes were unrelated to the topic of the post. One commenter noted: "Absolutely disgusted with you. Feeding puppies to hungry sand flies? . . . Idea, lets try it on you instead." *Id.* Another commenter noted, "You deserve a fate in prison. You donate money to create unnecessary suffering, you are part of the murders, you are THE very conspirator." *Id.*

51.    The NIH, like many other public entities both at the federal and state levels,[7] publishes guidelines for commenting on its social media accounts. A copy of the NIH's current, operative comment guidelines is attached hereto as Exhibit 19.

52.    The comment guidelines—which were posted online on March 30, 2015 and minimally updated on March 13, 2019 to include "images and videos" in the guidelines— "encourage" members of the public "to share [their] thoughts and ideas [on] any other website owned or administered by the National Institutes of Health (NIH) where commenting is supported." Ex. 19. However, the guidelines state that those pages "are not intended to serve as public forums." *Id.* The guidelines further state that since the "NIH utilizes moderated blogs, comments submitted for consideration are not immediately visible" and "are reviewed before they can be posted to ensure compliance with the[] guidelines." *Id.* The guidelines impose a number of restrictions on user comments to "encourage respectful and constructive dialogue." *Id.* The guidelines thus prohibit comments that include, among other things, "[v]ulgar, obscene, profane,

---

[7]   *See, e.g.*,   https://perma.cc/BA5M-AFVJ;   https://perma.cc/LA6L-UVSH;   https://perma.cc/Q5WV-4PZK; https://perma.cc/3EVX-G75X;           https://perma.cc/4F85-8S5C;           https://perma.cc/QVC3-KTHH; https://perma.cc/FD5W-2BSE;          https://perma.cc/WH6A-W4RK;          https://perma.cc/T5WG-FGWC; https://mn.gov/dhs/general-public/policies/social-media.jsp; https://perma.cc/JX4U-6LGZ; https://perma.cc/M3X3-9ZR6;        https://perma.cc/L9EM-SBRG;        https://perma.cc/W52A-2367;        https://perma.cc/VWS3-7P37; https://perma.cc/79RA-4LB4; https://perma.cc/SP2F-Z27U.

threatening, or abusive language," "[d]iscriminatory language," "[e]ndorsements of commercial products," "[r]epetitive posts," "[s]pam," and "[o]ff-topic" content. *Id.*

53.     The NIH's comment moderation policy is located on its official website. When the Complaint was filed, NIH's Facebook and Instagram pages did not directly link to the NIH's comment moderation policy. As of January 7, 2022, URL information for the NIH's comment moderation policy may now be found on its Facebook and Instagram pages. A visitor to the NIH's Facebook page can access the URL for the comment moderation policy by clicking on the "About" tab, and then the "Details about the National Institutes of Health (NIH)." A screenshot can be found below.



A visitor to the NIH's Instagram page can access the URL for the comment moderation policy by viewing the NIH's profile header. A screenshot can be found below.

JA073



54.     In its separate "Web Policies and Notices" page, a direct link to which has been available on the NIH's Facebook and Instagram accounts since before the time Plaintiffs filed the Complaint, the NIH has stated that "as a practice, comment moderator policy requires the removal from NIH Facebook pages of any comments that contain spam or are improper, inflammatory, off-topic or offensive." *Web Policies and Notices – Privacy Policy – How NIH.gov Uses Third-Party Web Sites and Applications – Facebook*, National Institutes of Health (Jan. 14, 2021), https://perma.cc/BC7R-ZFME. A visitor to the NIH's website can find this sentence by clicking on "Web Policies and Notices," and then "Privacy Policy," and then "Third-Party Web Sites and Applications," and then "Facebook." A link to the "Web Policies and Notices" page can be found on NIH's Facebook page by clicking on the "About" tab, and then "Privacy and Legal Info." This URL information can also be found on NIH's Instagram page in the header.

55.     The NIH's comment moderation guidelines apply only to NIH's Facebook and Instagram pages at issue here, and other websites administered by NIH. They do not prevent any party from posting any content in other forums, including other forums on Facebook and Instagram. The guidelines would not apply to commenting on Facebook or Instagram pages operated by other NIH Institutes, Centers, or Offices, or PETA. PETA operates its own Facebook and Instagram pages through which it can post comments concerning animal testing. *See PETA*

*(People for the Ethical Treatment of Animals)*, Facebook, https://perma.cc/6EHD-M743; *peta*, Instagram, https://www.instagram.com/peta (last accessed Feb. 9, 2022).

### The NIH's use of keyword filtering on its social media accounts

56.      The NIH, through individuals acting as administrator(s) and/or account manager(s), has enabled the "Profanity Filter" to apply to its Facebook account. Facebook "determines what to hide [through the Profanity Filter] by using the most commonly reported words and phrases marked offensive by the community."[8] Comments filtered through this function remain visible only to the comment's author and their Facebook friends. The NIH can turn this filter off, but Facebook controls what words or phrases are included in the filter.

57.      The NIH, through individuals acting as administrators and/or account managers(s), has enabled the "Hide Comments" filter to apply to NIH's Instagram account. Instagram's "Hide Comments" filter hides comments containing "common offensive words, phrases, or emojis." All Instagram users can see comments hidden by Instagram's "Hide Comments" filter if they click "view hidden comments" at the bottom of a post. While the filter is enabled by default by Instagram, the NIH can turn this filter off. Instagram controls what words or phrases are included in the filter.

58.      The NIH, through individuals acting as administrator(s) and/or account manager(s), uses custom keyword filters on its Facebook and Instagram pages to hide comments containing certain keywords. As of the date Plaintiffs filed the Complaint, the NIH included the following words on its Instagram and Facebook page keyword filter lists. It asserts that these keywords were

---

[8] *See How do I turn the profanity filter on and off for my Facebook Page?*, Facebook Help Center, https://perma.cc/L3WZ-7RTW.

JA075

selected to target comments frequently made on NIH's social media pages that the NIH believes would violate its comment moderation guidelines:

| **Facebook** | **Instagram** |
|---|---|
| PETA, PETALatino | PETA |
| Suomi,[9] Harlow[10] | #stopanimaltesting |
| Animal(s), animales, animalitos | #stoptesting |
| Cats, gatos | #stoptestingonanimals |
| Chimpanzee(s), chimp(s) | Animal(s) |
| Hamster(s) | Chimpanzee(s), chimps |
| Marmoset(s) | Monkey(s)[11] |
| Monkey(s), monkies | Experiment |
| Mouse, mice | Hurt(ing) |
| Primate(s) | Kill |
| Sex experiments | Stop |
| Cruel, cruelty | Test(ing), testing facility |
| Revolting | Tortur(ing) |
| Torment(ing) | |
| Torture(s), torturing | |

59.     The NIH also uses keyword filters for certain other terms, including profane and racist terms, names of certain illicit drugs, domains of other websites or applications, and the term #believemothers. *See* Compl., Attachments 1 & 2. The NIH asserts that these terms are likewise calculated to capture frequently made comments that violate its comment moderation guidelines. The NIH also believes that it has the authority to add additional keywords to its keyword filter lists if they are calculated to capture comments that violate the NIH's comment guidelines.

---

[9] Stephen J. Suomi is currently the Chief of the Laboratory of Comparative Ethology at the Eunice Kennedy Shriver National Institute of Child Health and Human Development. He has conducted extensive research on behavioral development by researching on monkeys and other nonhuman primates. PETA led an extensive public campaign related to Dr. Suomi's work, which involved animal experiments.

[10] Harry Harlow was an American psychologist known for conducting maternal deprivation experiments on monkeys to determine how early environment shapes their behavior. The Harlow Center on Biological Psychology, named for Mr. Harlow, is affiliated with the Wisconsin National Primate Research Center and houses the monkeys and nonhuman primates used in experiments. *Harlow Center for Biological Psychology*, University of Wisconsin Madison, https://perma.cc/N9B7-RENQ. After Dr. Harlow died in 1981, PETA campaigned against the NIH's continuation of his work and frequently mentions Dr. Harlow in its advocacy against animal testing. *Psychological Torture Experiments at NIH Must Stop*, PETA, https://perma.cc/956S-ZKQS.

[11] The NIH's Instagram filter list also includes two emojis depicting monkeys and an emoji with an expletive face.

25

60.     On December 3, 2021, the NIH removed "PETA" and "PETALatino" from its list of blocked keywords on Facebook and removed "PETA" from its list of filtered keywords on Instagram. On December 7, 2021, the NIH also removed "#stopanimaltesting," "#stoptesting," and "#stoptestingonanimals" from its list of filtered keywords on Instagram. All other terms listed in the preceding paragraphs remain blocked.

61.     The NIH believes that it has the authority to manually review any and all comments before and after they are posted to the NIH's social media accounts. However, in practice, only comments containing the NIH's filtered keywords or from Facebook or Instagram's own filters are automatically hidden from users' public view. Prior to the filing of Plaintiffs' Complaint, the NIH engaged in limited efforts to manually hide comments that it believed violated its comment moderation guidelines after they were posted, and these efforts became especially limited due to the resource constraints of the COVID-19 pandemic. As such, the NIH principally relied upon its keyword filters to moderate comments that the NIH asserts violate its comment moderation guidelines. If the NIH had the resources to manually moderate its social media accounts on a more consistent basis, it would have done so. Once Plaintiffs' Complaint was filed, the NIH paused its efforts to manually hide comments consistent with its comment moderation guidelines. The NIH intends to resume manual comment moderation following a resolution of the parties' summary judgment motions, if consistent with the Court's order resolving those motions.

### PLAINTIFFS' COMMENTS ON THE NIH'S SOCIAL MEDIA PAGES

#### *PETA*

62.     Certain comments made by multiple PETA employees in response to the NIH's Facebook Live videos and posts—and which contained one or more terms on NIH's Facebook keyword filter list—did not appear on the NIH's Facebook page.

63.     On September 24, 2020, PETA employee Evelyn Wagaman was prevented from posting three comments on a Facebook Live video on the NIH's Facebook page about COVID-19 vaccine research. One read, "Francis Collins, we appreciate all your hard work to search for a COVID vaccine, but why is NIH still wasting money on cruel and ineffective monkey fright experiments?" Ms. Wagaman was unable to post these comments at all. Ms. Wagaman's comment contained the words "cruel" and "monkey," which are on the NIH's Facebook keyword filter list. She saw that the comment had not been posted because it was bordered by a red box, and text below the comment read "Unable to post comment. Try again." A copy of Ms. Wagaman's attempted comments is attached hereto as Exhibit 20. A copy of the Live video post with all comments viewable by users is also attached hereto as Exhibit 21.

64.     On October 8, 2020, Ms. Wagaman again tried to comment on an NIH Facebook Live video about gene editing, but several of her comments were not published, including: "Congratulations, Dr. Doudna! Francis Collins, please end NIH's fright experiments on primates;" and "CRISPR can be used for advanced, non-animal experiments. In light of the many non-animal technologies that are developing, how can NIH continue to conduct experiments on macaques and other primates?" Ms. Wagaman's comments contain the word "primates," which is on the NIH's Facebook keyword filter list. She saw that the comments had not been posted because they were bordered by a red box, and text below the comments read "Unable to post comment. Try again." A copy of Ms. Wagaman's attempted comments is attached hereto as Exhibit 22. A copy of the Live video post with all comments viewable by users is also attached hereto as Exhibit 23.

65.     On May 27, 2021, Ms. Wagaman attempted to post several comments on an NIH Live video featuring Dr. Kizzmekia Corbett, including: "Thank you, Dr. Corbett and Dr. Collins, for your hard work on the COVID vaccines! Why is the NIH still wasting funds on Elisabeth

Murray's monkey fright experiments instead of investing more in important clinical research about COVID-19?" This comment contained the word "monkey," which is on the NIH's Facebook keyword filter list. The comments were hidden from public view and were only viewable by Ms. Wagaman and her Facebook friends. A copy of Ms. Wagaman's comments is attached hereto as Exhibit 24. A copy of the Live video post with all comments viewable by users is also attached hereto as Exhibit 25.

66. On June 4, 2021, PETA employee Brittny Hopwood, using a pseudonymous account, posted a series of comments to an NIH Facebook post about social deprivation and adoption. Ms. Hopwood posted comments containing the following words: "monkey," "cruel," "PETA," "TORTURE," "TORTURING," "TORMENT," "ANIMALS," "NON-ANIMAL," "primates," "tests," "fake spider," "fake snake," "fright," "experiments," "vacuum," and "burn." The comments containing the words "monkey," "cruel," "PETA, "TORTURE," "TORTURING," "TORMENT," "ANIMALS," and "NON-ANIMALS" were all hidden from users' public view. With the exception of the word "non-animals," these words were all on the NIH's Facebook keyword filter list at the time these comments were posted. "PETA" was removed from the NIH's Facebook keyword filter list as of December 3, 2021. A copy of Ms. Hopwood's comments is attached hereto as Exhibit 26. A copy of the post with all comments viewable by users is also attached hereto as Exhibit 27.

67. On July 2, 2021, Ms. Hopwood posted a series of one-word comments to an NIH Facebook post about cancer research. Ms. Hopwood posted the following words: "experiments," "fright," "fake snake," "fake spider," "tests," "cruel," "primates," "primate," "non-animal," "animals," "torment," "torture," "PETA," "monkeys," and "monkey." The comments containing the words "cruel," "primates," "primate," "non-animal," "animals," "torment," "torture," "PETA,"

"monkeys," and "monkey" were all hidden from users' public view. With the exception of the word "non-animal," these words were all on the NIH's Facebook keyword filter list at the time of these comments. "PETA" was removed from the NIH's Facebook keyword filter list on December 3, 2021. A copy of Ms. Hopwood's comments is attached hereto as Exhibit 28. A copy of the post with all comments viewable by users is also attached hereto as Exhibit 29.

68.   PETA employees have occasionally advocated for animal rights in comments posted to the NIH's Facebook page by modifying the spelling of certain words or by replacing blocked words with words conveying similar meanings. For example, on October 16, 2020, Ms. Wagaman wrote comments on an NIH Facebook Live video about COVID-19 treatment, including: "Francis Collins, thank you for your hard work finding a vaccine for COVID-19. In light of the urgency of devoting resources to find a vaccine and the ineffectiveness of experiments on an1mals, will you please end the fright expts on macaques of Elisabeth Murray?" These comments were not hidden or filtered, and were viewable by Facebook users. A copy of the post with all comments viewable by users is attached hereto as Exhibit 30.

69.   PETA employees wish to continue posting comments about animal testing on the NIH's Facebook page that may contain terms subject to the NIH's Facebook keyword filters.

70.   Plaintiff PETA also wishes to engage with and read the comments of other animal rights advocates on the NIH's Facebook page. PETA, by and through several of its employees, follows the NIH's Facebook page.

71.   PETA has posted about the NIH on its own social media accounts. For example, on September 19, 2021, PETA made an Instagram post about NIMH scientist Elisabeth Murray's experiments on monkeys, which tags the NIH's Instagram account and asks its supporters to take action by "telling @nihgov to end this." A screenshot of the post looks like this:



As another example, PETA has written Instagram posts criticizing the NIH for its funding of research involving experiments on dogs. For example, PETA made an Instagram post on November 9, 2021 on this topic, and tagged the NIH's Instagram account:



*Madeline Krasno*

72.     On April 29, 2021, Ms. Krasno commented on an NIH Instagram post about a study on Alzheimer's disease treatment that was conducted on mice. Ms. Krasno wrote, "It's pretty messed up that you block conversation about animal testing." This comment contained the words "animal" and "testing," which are on the NIH's Instagram keyword filter list. It was hidden from public view. A copy of Ms. Krasno's comment is attached hereto as Exhibit 31. A copy of the post with all comments viewable by users is also attached hereto as Exhibit 32.

73.     On May 3, 2021, Ms. Krasno commented on an NIH Instagram post of a cell infected with COVID-19, writing "It's time we had an open conversation about all the animal testing you fund. What a waste of life and resources." This comment contained the words "animal" and "testing," which are on the NIH's Instagram keyword filter list. It was hidden from public view. A copy of Ms. Krasno's comment is attached hereto as Exhibit 33. A copy of the post with all comments viewable by users is also attached hereto as Exhibit 34.

74.     On May 5, 2021, Ms. Krasno commented on an NIH Instagram post about Public Service Recognition Week 2021, saying "If you're wanted to actually extend life and reduce illness and disability, you'd directly put funding in the hands of those who need it now and stop wasting billions of dollars torturing animals in labs throughout the US like @uwmadison." This post contained the words "torturing" and "animals," which are on the NIH's Instagram keyword filter list. It was hidden from public view. A copy of Ms. Krasno's comment is attached hereto as Exhibit 35. A copy of the post with all comments viewable by users is also attached hereto as Exhibit 36.

75.     On May 6, 2021, Ms. Krasno posted substantially the same comment on a similar NIH Facebook post about Public Service Recognition Week 2021. She wrote: "@National Institutes of Health (NIH), If you actually wanted to extend life and reduce illness and disability,

31

you'd directly put funding in the hands of those who need it now and stop wasting billions of dollars torturing animals in labs throughout the US like @University of Wisconsin-Madison." The comment includes the words "torturing" and "animals," which are on the NIH's Facebook keyword filter list. The comment was hidden from the NIH's Facebook page, and only Ms. Krasno and her Facebook friends could view the comment. A copy of Ms. Krasno's comment is attached hereto as Exhibit 37. A copy of the post with all comments viewable by users is also attached hereto as Exhibit 38.

76.     On May 29, 2021, Ms. Krasno commented on an NIH Instagram post about diversity in science. She wrote: "How about the victims of 'science'? Going to highlight them too? Why are you still funneling billions of dollars into animal testing? Its archaic, unsuccessful, and cruel. @nihgov." The comment contained the words "animal" and "testing," which are on the NIH's Instagram keyword filter list, and was hidden. A copy of Ms. Krasno's comment is attached hereto as Exhibit 39. A copy of the post with all comments viewable by users is also attached hereto as Exhibit 40.

77.     On June 13, 2021, Ms. Krasno commented on the NIH's Facebook page, writing: "I was diagnosed with PTSD after working at @University of Wisconsin-Madison's Harlow Primate Lab which receives funding from you, the @National Institutes of Health (NIH), to torture animals in the name of science. Its despicable that you continue to harm animals and call it progress when so many people are without the means to access mental healthcare, general healthcare, and medication that already exists." The comment contained the words "torture," "animals," and "Harlow," which are on the NIH's Facebook keyword filter list. It was hidden from public view, although Ms. Krasno and her Facebook friends could view the comment. A copy of Ms. Krasno's

32

comment is attached hereto as Exhibit 41. A copy of the post with all comments viewable by users is also attached hereto as Exhibit 42.

78.    Ms. Krasno has occasionally advocated for animal rights in comments replying to the NIH's Instagram posts by modifying the spelling and spacing of certain words. For example, on April 29, 2021, she commented, "Ok let me try again. It's pretty messed up that you block any conversation about a n I m a l t e s t I n g." This comment was not hidden from view. *See* Ex. 32.

79.    Ms. Krasno wishes to engage with and read the comments of other animal rights advocates on Defendants' social media pages. She follows the NIH on Instagram and Facebook.

### Ryan Hartkopf

80.    On April 24, 2021, Mr. Hartkopf commented on an April 23, 2021 @nihgov Instagram post about "National DNA Day" by stating, "The Wisconsin NPRC is a disgrace. I personally know 2 former employees who were traumatized by their experience as primate caretakers. There is no humane way to keep 1,650 primates in small steel cages for decades without inflicting massive psychological damage. On top of that, the University of Wisconsin has banned any keywords regarding primate testing on their social media pages, meaning any opposition on social media is automatically silenced. They also delete the testimonials of former employees. Why go to all that trouble to silence their own alumni if everything is above-board? We need to reinvest in human-relevant, modern research instead of this barbaric and archaic practice, which does not yield cures to our most deadly diseases!" This comment contained the word "testing," which is on the NIH's Instagram keyword filter list. After checking the post using a different Instagram account and seeing the comment post was not publicly viewable, Mr. Hartkopf deleted this comment. A copy of the post with all comments viewable by users is attached as Exhibit 43.

81.     Mr. Hartkopf then wrote a series of one-word comments on an NIH Instagram post, dated January 28, 2021. Mr. Hartkopf posted: "test," "monkeys," "experiments," "peta," "experimenting," "torture," and "testing." All of these terms, except "experiments" and "experimenting," were on the NIH's Instagram keyword filter list at the time Mr. Hartkopf posted the comments. However, "PETA" was removed from NIH's Instagram keyword filter list on December 3, 2021. None of Mr. Hartkopf's comments were publicly viewable, except that the comments containing the words "experiments" and "experimenting" could be viewed by an Instagram user who selected "view hidden comments" on the NIH's Instagram post. A copy of Mr. Hartkopf's comments immediately after he posted them is attached hereto as Exhibit 44. Mr. Hartkopf later deleted these comments. A copy of the post with all comments viewable by users is attached as Exhibit 45.

82.     Mr. Hartkopf next wrote a series of one-word comments to an NIH Facebook post on IVF conception. Mr. Hartkopf wrote, "peta," "primate," "primates," "monkey," "monkeys," "torture," "torturing," "tortures." All of these comments contained terms on NIH's Facebook keyword filter list at the time he posted the comments. However, "PETA" was removed from NIH's Facebook keyword filter list on December 3, 2021. Mr. Hartkopf's comments were hidden from public view, and were only visible to Mr. Hartkopf and his Facebook friends. A copy of Mr. Hartkopf's comments is attached hereto as Exhibit 46. A copy of the post with all comments viewable by users is attached hereto as Exhibit 47.

83.     On April 29, 2021, Mr. Hartkopf posted substantially the same comment he wrote on April 24, 2021 to an NIH Instagram post about treatment for antibiotic-resistant infections. He commented, "The Wisconsin NPRC is a disgrace. I personally know 2 former employees who were traumatized by their experience as primate caretakers. There is no humane way to keep 1,650

primates in small steel cages for decades without inflicting massive psychological damage. On top of that, the University of Wisconsin has banned any keywords regarding primate testing on their social media pages, meaning any discourse on social media is automatically silenced. They also delete the testimonials of former employees. Why go to all that trouble to silence their own alumni if everything is above-board? We need to reinvest in human-relevant, modern research instead of this barbaric and archaic practice, which does not yield cures to our most deadly diseases!" This comment, which contained a word on NIH's Instagram keyword filter list ("testing"), was also hidden. A copy of Mr. Hartkopf's comments is attached hereto as Exhibit 48. A copy of the post with all comments viewable by users is attached hereto as Exhibit 49.

84.     To confirm that the NIH was preventing comments with certain keywords from being viewed, Mr. Hartkopf filed Freedom of Information Act ("FOIA") requests with the NIH on April 24, 2021, seeking "a screenshot of all keywords that are blocked" on the NIH's Facebook page and the NIH's Instagram account. On April 29, 2021, Mr. Hartkopf received the records responsive to his FOIA request and confirmed that the NIH had blocked several keywords associated with animal testing from appearing in comments on its Facebook and Instagram pages.

85.     Mr. Hartkopf has occasionally advocated for animal rights in comments by modifying the spelling and spacing of certain words. For example, on June 17, 2021, he commented on an NIH Facebook post, "it's ironic that this Facebook page is full of spam and porn links, but the admin only uses keyword blocking to hide comments about testing on a n i m a l s." This comment remains publicly viewable by Facebook users, and a copy of the post with all comments viewable by users is attached hereto as Exhibit 50.

86.     Mr. Hartkopf wishes to engage with and read the comments of other animal rights advocates on Defendants' social media pages. He follows the NIH on Instagram and Facebook.

**THE PARTIES' INTERESTS IN SPEECH ON THE NIH'S SOCIAL MEDIA PAGES**

87.    The NIH asserts that it uses Facebook and Instagram to fulfill its congressional mandate to disseminate health information by communicating important public health information, being the voice of factual information in a world of misinformation, and engaging the public for educational purposes about public health. The NIH believes that off-topic and inflammatory comments undermine its goals in operating its social media pages. The NIH believes that permitting any and all comments on its social media pages, regardless of content, would clutter those pages (and any live events) and ultimately dissuade interested citizens from visiting the pages and retrieving helpful public health information. The NIH also believes that comments of this nature disrupt NIH's goals of social media use—e.g., disseminating factual information about a topic—and disrupt NIH's live question and answer events. The NIH has received complaints about off-topic animal rights comments on its social media pages. For example, on a November 16, 2021 Facebook post on COVID anti-viral pills, a Facebook user commented "STOP YOUR CRUEL TESTING ON ANIMALS" and another user responded "TROLL.  THIS COMMENT HAS NOTHING TO DO WITH THIS NEW ANTIVIRAL DRUG." A copy of this comment is attached hereto as Exhibit 51. A copy of the post with all comments viewable by users is also attached hereto as Exhibit 52. On October 3, 2014, NIH held a Twitter chat on the topic of brain health. A commenter stated "#NIHChat Cannot follow chat among distraction>" Someone replied "Good @NIH can stop abusing monkeys if they want protests to end. @peta." Another person replied to the second commenter "No, not good. Your bombardment of a Twitter chat was disrespectful to other participants and harassment of host. #rules." A copy of this tweet, and its replies, are attached hereto as Exhibit 53. Another user commented "@NIH mentioned research about retina issues and Alzheimer's, but I missed those tweets due to @peta — important for my family. #NIHchat." A copy of this tweet is attached hereto as Exhibit 54. A copy of the all tweets from the NIH Twitter

chat event on October 3, 2014, using the hashtag related to the event, #NIHChat, is attached hereto as Exhibit 55. The NIH has also received complaints about comments on its social media pages relating to certain other topics, such as complaints regarding comments discussing the COVID-19 vaccines.

88.     PETA asserts that it uses social media advocacy to raise public awareness of animal testing practices and of the government's funding of animal testing. PETA also asserts that it uses social media advocacy to engage with supporters and other people who express interest in animal rights issues. PETA believes that discussing the ethical implications of animal testing and the NIH's responsibility as a funder of animal testing are relevant topics of discussion in response to NIH messaging. PETA employees believe that commenting directly on the NIH's social media pages is a particularly important form of animal rights advocacy because, in their view, it allows them to speak to individuals who are interested in scientific research and news, but who may not be aware of the NIH's role in the continuation of animal testing. PETA employees also believe that commenting on the NIH's social media pages, in addition to other types of campaigning, is important because, in their view, social media commenting can demonstrate to the NIH the size and passion of the animal rights movement. In the past, PETA has led many social media campaigns that it believes have changed animal testing practices. For example, in 2015, PETA launched an extensive campaign, including the use of social media commenting, to advocate for the closure of Dr. Steven Suomi's laboratory due to his maternal deprivation experiments on monkeys. In December 2015, the NIH announced that it was phasing out funding for Dr. Suomi's work, and stated that it was for financial reasons. *See* David Grimm, *Decision to End Monkey Experiments Based on Finances, Not Animal Rights, NIH Says*, Science (Dec. 14, 2015), https://perma.cc/3D6G-979N. PETA employees believe that the NIH's use of keyword blocking

burdens their ability to communicate on the NIH's Facebook page and to engage the public in this way, because the NIH has blocked numerous words that PETA believes are central to its mission. Although PETA employees have occasionally been able to post comments that evade the NIH's keyword filters, they find this process burdensome, time-consuming, and less effective.

89.     As a former animal care technician at an NIH-funded primate research laboratory, Ms. Krasno asserts that she uses social media advocacy to educate the public about what she considers to be the exploitation of animals in research, to raise awareness about the mental health issues often experienced by animal lab workers, and to advocate for a reallocation of funds in the hope that taxpayer dollars currently funding animal testing would instead be used to make health care more accessible and affordable to those who need them. She believes that biomedical ethics, including the ethical implications of animal testing, and the NIH's financial responsibility are relevant topics of discussion in response to the NIH's messaging. She believes that commenting directly on the NIH's social media pages is an important form of animal rights advocacy because she believes that the NIH's supporters and followers should understand how animals, like the primates Ms. Krasno cared for, are treated in laboratories that are directly funded by the NIH, should understand the impact animal testing has on workers, and should understand how ineffective she believes animal testing actually is. Ms. Krasno believes that community members should have a say in how their tax dollars are spent and that the NIH's keyword blocking prevents those discussions from occurring. She believes that the NIH's use of keyword blocking burdens her ability to communicate on the NIH's Instagram and Facebook pages, and asserts that she finds evading the NIH's filters burdensome and difficult, as she asserts that she does not always know which words will trigger blocking.

90.     Mr. Hartkopf asserts that he uses social media advocacy to raise awareness of the animal abuse by both public and private institutions, and to pressure those institutions to change their policies. He believes that it is vital to raise awareness among those not currently involved in the animal rights movement, as well as those who have some understanding of the animal rights movement but who may not be aware of specific institutions' animal testing practices. Mr. Hartkopf also believes that social media advocacy can signal to potential whistleblowers that they have allies and supporters. He believes that commenting directly on the NIH's social media pages is an important form of animal rights advocacy because, in his view, social media is a powerful platform for citizens to talk about issues with a large number of people who have a mutual interest in scientific research and the NIH. He believes that discussing the NIH's involvement in animal testing is a relevant and important response to news about NIH's research. He believes that the NIH's use of keyword blocking burdens his ability to communicate on the NIH's Instagram and Facebook pages because, in his view, the agency has blocked numerous words related to animal rights advocacy. Although he has occasionally been able to evade the NIH's keyword filters, he asserts that he finds this method of attempting to evade NIH's filters burdensome and difficult.

Dated: February 11, 2022                                    Respectfully submitted,

                                                            */s/ Jameel Jaffer*
BRIAN M. BOYNTON                                            Jameel Jaffer (MI0067)
Acting Assistant Attorney General                          Katherine Fallow, *pro hac vice*
                                                           Stephanie Krent, *pro hac vice*
ERIC BECKENHAUER                                           Alyssa Morones*
Assistant Director, Federal Programs Branch                Knight First Amendment Institute
                                                             at Columbia University
 */s/ Kuntal Cholera*                                       475 Riverside Drive, Suite 302
KUNTAL CHOLERA                                              New York, NY 10115
                                                           (646) 745-8500
                                                           jameel.jaffer@knightcolumbia.org
                                                           *Counsel for Plaintiffs*

Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
Kuntal.Cholera@usdoj.gov

*Attorneys for Defendants*

*/s/ Caitlin M. Foley*
Caitlin M. Foley, *pro hac vice*
Animal Legal Defense Fund
150 South Wacker Drive, Suite 2400
Chicago, IL 60606
(707) 795-2533 ext. 1043
cfoley@aldf.org

Christopher A. Berry (Bar ID CA00106)
Animal Legal Defense Fund
525 E. Cotati Ave.
Cotati, CA 94931
(707) 795-2533 ext. 1041
cberry@aldf.org

*Counsel for Plaintiffs Madeline Krasno and
 Ryan Hartkopf*

*/s/ Asher Smith*
Asher Smith, *pro hac vice*
People for the Ethical Treatment of Animals
1536 16th Street NW
Washington, DC 20036
(202) 483-7382
AsherS@petaf.org

*Counsel for Plaintiff People for the Ethical
 Treatment of Animals*

*\*Not yet admitted to practice law*

40

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, MADELINE KRASNO, and RYAN HARTKOPF, <br><br> Plaintiffs, <br><br> v. <br><br> LAWRENCE A. TABAK, in his official capacity as Acting Director of the National Institutes of Health, and XAVIER BECERRA, in his official capacity as Secretary of the U.S. Department of Health and Human Services, <br><br> Defendants. | Civil Action No. 21-cv-2380 (BAH) <br><br> Judge Beryl A. Howell |

## <u>ORDER</u>

Upon consideration of plaintiffs' Motion for Summary Judgment, ECF No. 30, and defendants' Cross-Motion for Summary Judgment, ECF No. 31, the related legal memoranda in support and in opposition, the Joint Stipulation of Facts and attachments thereto, ECF No. 28, the Notices of Supplemental Authority, ECF Nos. 38 and 40, and responses thereto, and the entire record herein, for the reasons stated in the accompanying Memorandum Opinion issued contemporaneously with this Order, it is hereby

**ORDERED** that, because defendants are entitled to judgment as a matter of law, defendants' Cross-Motion for Summary Judgment, ECF No. 31, is GRANTED; and it is further

**ORDERED** that plaintiffs' Motion for Summary Judgment, ECF No. 30, is DENIED; and it is further

**ORDERED** that the Clerk of Court shall close this case.

**SO ORDERED.**

*This is a final and appealable Order.*

Date: March 31, 2023

_____
BERYL A. HOWELL
U.S. District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

PEOPLE FOR THE ETHICAL
TREATMENT OF ANIMALS, MADELINE
KRASNO, and RYAN HARTKOPF,

            Plaintiffs,

        v.

LAWRENCE A. TABAK, in his official
capacity as Acting Director of the National
Institutes of Health, and XAVIER
BECERRA, in his official capacity as
Secretary of the U.S. Department of Health
and Human Services,

           Defendants.

</td><td>

Civil Action No. 21-cv-2380 (BAH)

Judge Beryl A. Howell

</td></tr>
</table>

### <u>MEMORANDUM OPINION</u>

Pending before this Court is a question at the frontier of courts' application of the First Amendment to the internet—an environment that is challenging to navigate under the strict categorization and spatial reasoning of First Amendment doctrine. The foundational case law of the First Amendment has developed in the quaint setting of sidewalks and parks, schools and public transit, when, by comparison, cyberspace is analogizable to the shifting sands of the Sahara. Here, the architectural guideposts in the form of physical "materials, design, and demarcation from the surrounding area," *Hodge v. Talkin*, 799 F.3d 1145, 1150 (D.C. Cir. 2015), that steer traditional permissible expressive use and access analysis must be found in alternative ways. Courts confronting such issues must tread these sands with caution.

The corner of cyberspace at issue in the instant matter is the official Facebook and Instagram pages maintained by the National Institutes of Health (NIH), where animal-rights activists, including plaintiffs, regularly post comments criticizing the practice of animal testing.

*See* Parties' Joint Stipulation of Facts ("Jt. Stip.") ¶¶ 62–86, ECF No. 28.  Indeed, NIH maintains

that animal-rights activists' comments comprise "the lion's share of the comment thread[s]"

responding to many of the agency's posts.  Defs.' Opp'n Pls.' Mot. Summ. J. & Mem. Supp.

Cross-Mot. Summ. J. ("Defs.' Opp'n") at 12, ECF No. 31-1.[1]  In response to these posts, NIH

uses custom keyword filters to hide comments containing a range of keywords, including words

related to animal testing, such as "animals" and "torture."  Jt. Stip. ¶ 58.  Plaintiffs initiated the

instant litigation challenging NIH's keyword filters as a "patently unconstitutional practice of

surreptitiously censoring speech it does not like."  Pls.' Mem. Supp. Mot. Summ. J. ("Pls.'

Mem.") at 7, ECF No. 30-1.  For the reasons set forth below, the Court agrees with defendants

that NIH's social media pages' comment threads are limited public fora, and NIH's enforcement

of its commenting guidelines through keyword filters is viewpoint-neutral and reasonable.

Accordingly, defendants' cross-motion for summary judgment is granted, and plaintiffs' motion

for the same is denied.

## I.      BACKGROUND

The factual background and procedural history relevant to the pending motions are

described below.

### A.      Factual Background

NIH, the primary federal agency charged with performing and supporting biomedical and

behavior research, maintains verified Facebook and Instagram accounts that are viewable by the

---

[1]       Two memoranda filed in support of the parties' respective motions are filed twice and, to simplify citation, only one of the duplicate memoranda are referenced.  Defendants' memorandum in support of their Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment is docketed at ECF Nos. 31 and 32; only the memorandum at ECF No. 31 is referenced. Similarly, plaintiffs' Memorandum of Law in Opposition to Defendants' Cross-Motion for Summary Judgment and Reply Memorandum in Further Support of Plaintiffs' Motion for Summary Judgment is docketed at ECF No. 34 and 35; only the memorandum at ECF No. 34 is referenced.

public.  *See* Jt. Stip. ¶¶ 4, 36–38, 41–43, ECF No. 28.  Users of both social media platforms are

invited to react to NIH's posts on these platforms—in the case of Facebook, through a spectrum

of "reaction" options, and on Instagram, via the humble "like" reaction—and to post comments.

*Id.* ¶¶ 14, 29, 39, 45.  Both platforms are used by NIH to "'communicate and interact with

citizens' about agency-related updates and public health news," *id.* ¶ 36 (quoting *Web Policies

and Notices*, NATIONAL INSTITUTES OF HEALTH (Jan. 14, 2021), https://perma.cc/BC7R-ZFME),

such as, for example, providing updates on research studies related to COVID-19 vaccines and

sharing a woman's "Alzheimer's Caregiver Story" to promote caregiving resources, *see id.* ¶ 44;

*id.,* Ex. 1, NIH Facebook Post & Viewable Comments (June 4, 2021), ECF No. 28-1; *id.,* Ex. 15,

NIH Instagram Post & Viewable Comments (Nov. 12, 2021), ECF No. 28-15.

### 1.    *NIH's Social Media Moderation Policy*

Comments on NIH's Facebook and Instagram pages are governed by NIH's publicly

available guidelines designed to "encourage respectful and constructive dialogue."  *Id.*, Ex. 19,

NIH Comment Guidelines, ECF No. 28-19.  The guidelines, first posted online in March 2015,

*see* Jt. Stip. ¶ 52, prohibit, *inter alia*, "[v]ulgar, obscene, profane, threatening, or abusive

language," "[r]epetitive posts," and—most relevant to the instant matter—"[o]ff-topic posts,"

NIH Comment Guidelines at 2.  At the time that the parties filed the Joint Stipulation, in

February 2022, NIH's Facebook and Instagram accounts contained direct links to the comment

guidelines.  Jt. Stip. ¶ 53.  The accounts also contained direct links to NIH's separate "Web

Policies and Notices" page, which adds that "as a practice, comment moderator policy requires

the removal from NIH Facebook pages of any comments that contain spam or are improper,

inflammatory, off-topic, or offensive."  *Id.* ¶ 54 (not mentioning NIH's policy vis-à-vis

Instagram).

3

NIH's own comment guidelines supplement content policies maintained by the platforms themselves.  Facebook and Instagram prohibit certain content pursuant to their community standards, including content inciting or facilitating serious violence, hate speech, and spam.  *Id.* ¶¶ 20 & n.2, 35 & n.5.  Content falling within these prohibited categories are removed by the platforms with notice to users.  *Id.* ¶¶ 20, 35.  Instagram also uses an artificial intelligence algorithm to hide automatically comments that are similar to those reported as violating the platform's policies; hidden comments are not deleted, but rather accessible at the bottom of a post by clicking a "view hidden comments" option.  *Id.* ¶ 35.

Both platforms give account-holders tools to moderate the comments on their account pages.  On Facebook, account administrators, like NIH, have the option to "ban" individual users—effectively muting the targeted users by allowing them to access the page but removing their commenting or reacting privileges—and to "block" users, by preventing them from accessing the page altogether.  *Id.* ¶ 19.  Administrators can also moderate their pages comment-by-comment by manually deleting or hiding certain comments, with the latter function resulting in the comment remaining visible only to the comment's creator and that user's friends.  *Id.* ¶ 17.  On Instagram, similarly, account holders can block other users from commenting on or viewing their posts, such that blocked users' comments are rendered invisible to all but the blocked users, who are not notified of the hidden nature of their comments.  *Id.* ¶¶ 33–34.  Instagram also maintains a "restrict comments" feature, allowing account holders to pre-screen particular users' comments before they appear on the account holder's posts.  *Id.* ¶ 32.

Most relevant to the instant litigation are the platforms' keyword filtering functions.  On Facebook, the platform offers comment filtering tools such as a "profanity filter," which account administrators can simply enable to filter all comments containing profanity.  *Id.* ¶ 16.  Account

administrators can add specified words to the filter.  Comments containing filtered words are

removed from public view but still accessible to the user who posted them and the user's friends.

*Id.*  On Instagram, too, account holders can automatically hide all comments containing specified

words or phrases, resulting in the hidden comment only being accessible to the user who posted

it and to the account holder upon choosing to "view hidden comments."  *Id.* ¶ 30.  In addition to

this function permitting customized lists of blocked keywords, Instagram maintains a "Hide

Comments" function that by default identifies comments containing offensive words or phrases

reported to violate the platform's terms of service.  Those comments, unlike those blocked via

the custom keywords list, are still visible to all Instagram users, but they are deprioritized: to

view them, users must scroll to the bottom of a post's comments section and choose to view the

hidden comments.  *Id.* ¶ 31.

NIH primarily enforces its comment guidelines on Facebook and Instagram via the

keyword filtering function, using Facebook and Instagram's default filters, which are

supplemented with NIH's custom keyword lists, discussed *infra* in Part I.A.3.  *Id.* ¶¶ 56–58.

Before plaintiffs initiated this litigation, NIH endeavored manually to hide comments that

violated the guidelines, but those efforts were "limited" by resource constraints, and "especially

limited" in the wake of the further strains created by the COVID-19 pandemic.  *Id.* ¶ 61.  NIH

has advised that the practice of manually hiding comments violating the agency's guidelines will

resume upon the resolution of the instant motions.  *Id.*

### 2.    *Plaintiffs' Anti-Animal Testing Social Media Advocacy*

Plaintiff People for the Ethical Treatment of Animals (PETA) is a non-profit organization

that has launched a social media campaign focusing on NIH's funding of primate testing, and as

part of this campaign, its supporters and employees engage on NIH's social media channels to

protest animal testing.  Jt. Stip. ¶¶ 1, 88.  Individual plaintiffs Madeline Krasno and Ryan

Hartkopf are animal rights advocates, who use social media as a tool to "raise awareness" about

animal testing, NIH's funding of research involving the practice, and "mental health issues often

experienced by animal lab workers"; to pressure institutions including NIH to curtail animal

testing; and to "signal to potential whistleblowers that they have allies."  *Id.* ¶¶ 89–90.  To

achieve these advocacy goals, plaintiffs frequently comment about animal testing on social

media, including NIH's Instagram and Facebook pages.  Pls.' Mem. at 20–21.

>        **3.**     ***NIH's Keyword Filters***

In addition to the default filters offered by Facebook and Instagram, as noted, NIH

maintains customized lists of keywords that, when applied, result in comments containing those

keywords being hidden from public view.  A number of those keywords relate to the topic of

animal testing.  Jt. Stip. ¶ 58.  In April 2021, NIH blocked comments on its Facebook page

containing approximately 100 specified keywords, including the following fifteen keywords (and

variations) related to animal testing:

1. PETA, PETALatino
2. Suomi, Harlow[2]
3. Animal(s), animales, animalitos
4. Cats, gatos
5. Chimpanzee(s), chimp(s)
6. Hamster(s)
7. Marmoset(s)
8. Monkey(s), "monkies"
9. Mouse, mice
10. Primate(s)
11. Sex experiments
12. Cruel, cruelty
13. Revolting

---

[2]        Soumi and Harlow are the last names of scientists who have conducted primate experiments.  Stephen
Soumi is the Chief of the Laboratory of Comparative Ethology at the Eunice Kennedy Shriver National Institute of
Child Health and Human Development, and Harry Harlow is a deceased psychologist who conducted maternal
deprivation experiments on monkeys.  Jt. Stip. ¶ 58 nn.9–10.

6

14. Torment(ing)
15. Torture(s), torturing

Compl., Attachment 1, Dep't of Health & Human Servs. Final FOIA Response Regarding

Facebook Page (April 29, 2021) at 4, ECF No. 1-1.  Other blocked keywords include words that

indicated external links, such as ".org" and "www"; profanity; strings of numbers; the names of

illicit drugs such as "cannabis" and "marijuana"; and a hashtag possibly associated with anti-

vaccine activists, "#believemothers."  *Id.*  On December 3, 2021, NIH removed "PETA" and

"PETALatino" from this list but the remainder of the above-listed words are still blocked.  Jt.

Stip. ¶ 60.

NIH's custom keyword filter on Instagram contains fewer than thirty blocked keywords,

nearly all related to animal testing.  As of April 2021, NIH blocked comments including the

following thirteen keywords (and variations) on Instagram:

1. #stopanimaltesting
2. #stoptesting
3. #stoptestingonanimals
4. Animal, animals
5. Chimpanzees, chimps
6. Experiment
7. Hurt, Hurting
8. Kill
9. Monkey, Monkeys
10. PETA
11. Stop
12. Test, Testing, Testing Facility
13. Torture, Torturing

Compl., Attachment 2, Dep't of Health & Human Servs. Final FOIA Response Regarding

Instagram Account (April 29, 2021) at 4, ECF No. 1-2.  Other blocked keywords include

profanity and monkey emojis.  *Id.*  On December 3 and 7, 2021, NIH removed "PETA,"

"#stopanimaltesting," "#stoptesting," and "#stoptestingonanimals" from its keyword list.  Jt.

Stip. ¶ 60.

7

As a result of these keyword filters, many comments that plaintiffs have attempted to post on NIH's Facebook and Instagram accounts have been hidden from public view. For example, on May 3, 2021, plaintiff Krasno commented on an NIH Instagram post of a cell infected with COVID-19, writing that "It's time we had an open conversation about all the animal testing you fund. What a waste of life and resources." *Id.* ¶ 73. This comment was hidden from public view. *Compare id.*, Ex. 33, Krasno View of Instagram Post, ECF No. 28-33 (showing plaintiff's comment), *with id.*, Ex. 34, Public View of Instagram Post, ECF No. 28-34 (plaintiff's comment not visible). The comments that do appear on this post include reactions like "Fascinating," questions about the post's contents, and the comment "Para de matar animals [Stop killing animals]." *Id.*, Ex. 34, Public View of Instagram Post, ECF No. 28-34. In another example, Krasno responded to an NIH Facebook post about PTSD with the comment that she was diagnosed with PTSD after working at an NIH-funded laboratory that conducted primate testing; this post was also hidden from public view—but when Krasno retyped the same message with spaces between each letter in the blocked words (typing, for example, "t o r t u r e a n i m a l s"), the post was publicly viewable. *Compare id.*, Ex. 41, Krasno View of Facebook Post, ECF No. 29-41 (showing both of Krasno's posts in standard formatting and with the spacing) *with id.*, Ex. 42, Public View of Facebook Post, ECF No. 29-42 (showing only Krasno's post in which the blocked words were broken up with spaces). Employees of PETA and individual plaintiff Hartkopf similarly experienced the blocking of their comments containing keywords on NIH's social media pages, but they too were able to elude the keyword filters by modifying the spelling of blocked words. *See* Jt. Stip. ¶¶ 62–68, 80–85.

### B.    Procedural Background

In September 2021, plaintiffs initiated the instant lawsuit, claiming that defendants' practice of blocking comments on NIH's Facebook and Instagram accounts based on the use of

certain words related to animal testing violated plaintiffs' First Amendment rights.  *See generally*

Compl., ECF No. 1.  The parties subsequently submitted, on February 11, 2022, a joint

stipulation of facts setting out an extensive narrative of agreed-upon facts in the matter.  *See*

*generally* Jt. Stip. Plaintiffs then moved for summary judgment, *see* Pls.' Mot. Summ. J., ECF

No. 30, and defendants have cross-moved for summary judgment, *see* Defs.' Cross-Mot. Summ.

J., ECF No. 31.  Both motions are now ripe for resolution.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[a] party is entitled to summary judgment

only if there is no genuine issue of material fact and judgment in the movant's favor is proper as

a matter of law."  *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Ctr.*

*for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006)); *see*

*also* FED. R. CIV. P. 56(a).  When parties file cross-motions for summary judgment, each motion

is viewed separately, in the light most favorable to the non-moving party, with the court

determining, for each side, whether the Rule 56 standard has been met.  *See Baylor v. Mitchell*

*Rubenstein & Assocs., P.C.*, 857 F.3d 939, 952 (D.C. Cir. 2017) (when considering "cross-

motions for summary judgment, [courts] must accord both parties the solicitude owed non-

movants"); *see also CEI Wash. Bureau, Inc. v. DOJ*, 469 F.3d 126, 129 (D.C. Cir. 2006) (per

curiam) (noting that "[i]t is of no moment that the parties filed cross-motions for summary

judgment and that neither party explicitly argued that there are genuine disputes about material

facts" because "[a] cross-motion for summary judgment does not concede the factual assertions

of the opposing motion"); *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989)

("The rule governing cross-motions for summary judgment . . . is that neither party waives the

right to a full trial on the merits by filing its own motion; each side concedes that no material

facts are at issue only for the purposes of its own motion." (quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982))).

## III. DISCUSSION

The First Amendment provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." First Amendment freedoms "are delicate and vulnerable, as well as supremely precious in our society." *NAACP v. Button*, 371 U.S. 415, 433 (1963). Thus, the Supreme Court has warned that "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Id.* Nonetheless, "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985). Acknowledging that the government, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated," *id.* at 800 (quoting *Greer v. Spock*, 424 U.S. 828, 836 (1976)), the Supreme Court "has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes," *id.*; *see also Hodge*, 799 F.3d at 1157 (explaining that "the Supreme Court's 'forum analysis'" is used to "determine when a governmental entity, in regulating property in its charge, may place limitations on speech" (quoting *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 679 (2010) (cleaned up))).

Here, defendants rightly do not dispute that plaintiffs' comments censored by the keyword filters were protected by the First Amendment. *See generally* Defs.' Opp'n.; Defs.' Reply Supp. Cross-Mot. Summ. J. ("Defs.' Reply"), ECF No. 37.  Consequently, the parties urge that a forum analysis be applied to NIH's Facebook and Instagram comment threads as the threshold issue in evaluating the constitutionality of the agency's use of keyword filters.  That forum analysis of NIH's Facebook and Instagram comment threads is addressed first and, upon determining that the threads constitute a limited public forum, NIH's keyword blocking practice is evaluated for whether that practice is reasonable in light of the forum's purpose, and whether it is viewpoint-neutral.

### A.      Forum Analysis

In conducting a forum analysis, the Court "proceed[s] in three steps: first, determining whether the First Amendment protects the speech at issue, then identifying the nature of the forum, and finally assessing whether the [government's] justifications for restricting . . . speech 'satisfy the requisite standard.'"  *Mahoney v. Doe*, 642 F.3d 1112, 1116 (D.C. Cir. 2011) (quoting *Cornelius*, 473 U.S. at 797).  For purposes of this analysis, government property is divided into three categories—the traditional public forum, designated public forum, and nonpublic forum.  *Id.*  The category "determines what types of restrictions will be permissible" on that property.  *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 685 F.3d 1066, 1069 (D.C. Cir. 2012).  First, a traditional public forum, such as a public street or park, is government property "that has 'by long tradition or by government fiat . . . been devoted to assembly and debate.'"  *Id.*  (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)); *see also Snyder v. Phelps*, 562 U.S. 443, 456 (2011) ("[W]e have repeatedly referred to public streets as the archetype of a traditional public forum, noting that time out of mind public streets and sidewalks have been used for public assembly and debate." (internal quotation marks

and citations omitted)).  Any restriction based on the content of speech in a public forum "must

satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling

government interest."  *Christian Legal Soc'y Chapter of the Univ. of Cal.*, 561 U.S. at 679 n.11

(internal quotation marks and citations omitted); *Pleasant Grove City v. Summum*, 555 U.S. 460,

469 (2009) (noting that in a traditional public forum, "[r]easonable time, place, and manner

restrictions are allowed . . . but any restriction based on the content of the speech must satisfy

strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government

interest" (citations omitted)).

    Second, a designated public forum is "property that 'the State has opened for use by the

public as a place for expressive activity.'"  *Initiative & Referendum Inst.*, 685 F.3d at 1069

(quoting *Perry Educ. Ass'n*, 460 U.S. at 45).  "Although a state is not required to indefinitely

retain the open character of the facility, as long as it does so it is bound by the same standards as

apply in a traditional public forum."  *Perry Educ. Ass'n*, 460 U.S. at 46.  Designated public fora

are created only when the government "intentionally open[s] a nontraditional forum for public

discourse"—not "by inaction or by permitting limited discourse."  *Cornelius*, 473 U.S. at 802.

To determine whether the government intended to designate a place as a public forum, courts

examine the "policy and practice of the government," as well as "the nature of the property and

its compatibility with expressive activity."  *Id.*

    Finally, a nonpublic forum is "not by tradition or designation a public forum."

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.,* 897 F.3d 314, 322 (D.C. Cir. 2018).

In a nonpublic forum, the government "may reserve the forum for its intended purposes,

communicative or otherwise, as long as the regulation on speech is reasonable and not an effort

to suppress expression merely because public officials oppose the speaker's view."  *Id.* (quoting

12

JA105

*Perry Educ. Ass'n*, 460 U.S. at 46).  The stepchild of this category is the limited public forum,

which is defined as a forum that "is limited to use by certain groups or dedicated solely to the

discussion of certain subjects," *Am. Freedom Def. Initiative v. King Cnty., Wash.*, 577 U.S. 1202,

1202 (2016) (Mem.) (Thomas, J., dissenting from denial of cert.) (quoting *Summum*, 555 U.S. at

470); *accord Walker v. Texas Div., Sons of Confederate Veterans, Inc.,* 576 U.S. 200, 215

(2015), and is subject to the same speech protections as the nonpublic forum, *Price v. Garland*,

45 F.4th 1059, 1068 (D.C. Cir. 2022).[3]

Thus, if the comment threads are determined to be a nonpublic forum or limited public

forum, as defendants urge, "it is . . . black-letter law that . . . the government . . . can exclude

speakers on the basis of their subject matter, so long as the distinctions drawn are viewpoint

neutral and reasonable in light of the purpose served by the forum."  *Davenport v. Wash. Educ.

Ass'n*, 551 U.S. 177, 189 (2007).  By administering a limited public forum, NIH would have the

most leeway in limiting the scope of the comments on its social media pages.  Indeed,

"[l]imitations on expressive activity conducted on this last category of property must survive

only a much more limited review" than would be the case for public or designated public fora.

*Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 678–79 (1992).  On the other hand,

if the comment threads are determined to be a "designated public forum," as plaintiffs urge, any

---

[3]      The Fourth Circuit recently observed that "there is considerable confusion over whether there are three or four types of free-speech forums."  *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 196 n.13 (4th Cir. 2022).  Courts of Appeals have variously treated the limited public forum as a sub-category of the designated public forum, *see, e.g., Hopper v. City of Pasco*, 241 F.3d 1067, 1074–75 (9th Cir. 2001); *Johnson v. Perry*, 859 F.3d 156, 171 (2d Cir. 2017); as synonymous with the nonpublic forum, *see Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*, 640 F.3d 329, 334–35 (8th Cir. 2011); or simply as a distinct fourth category, *see, e.g., OSU Student All. v. Ray*, 699 F.3d 1053, 1062 (9th Cir. 2012)*; see also Walker,* 576 U.S. at 215–16 (addressing the limited public forum as a distinct category from designated public fora and nonpublic fora).  Whatever the proper categorization, the First Amendment analysis is the same for the limited public and nonpublic fora.  *See Price*, 45 F.4th at 1068.  For clarity, this memorandum opinion uses the term "limited public forum."

content-based restrictions on expressive activity must satisfy strict scrutiny, *Archdiocese*, 897 F.3d at 322, requiring that "the restriction must be narrowly tailored to serve a compelling government interest," *Summum*, 555 U.S. at 469.  In either case, defendants' restrictions would be unconstitutional if they are not viewpoint-neutral, that is, if they reveal "an effort to suppress expression merely because public officials oppose the speaker's view."  *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) (quoting *Perry Educ. Ass'n*, 460 U.S. at 46).

The comment threads at issue are limited public fora: virtual spaces opened by the government to the public for the purpose of the discussion of only certain subjects.  To distinguish between a limited public forum and a designated public forum, the "touchstone" is the government's "'intent in establishing and maintaining' that forum."  *Bryant v. Gates*, 532 F.3d 888, 895–96 (D.C. Cir. 2008) (quoting *Stewart v. District of Columbia Armory Bd.*, 863 F.2d 1013, 1016 (D.C. Cir. 1988)).  "[O]bjective indicia of intent" include the nature of the property and its compatibility with expressive activity, as well as the "*consistent* policy and practice of the government."  *Id.* (emphasis in original) (quoting *Stewart*, 863 F.2d at 1016–17). As to this second indicia of intent, to find a limited public forum, courts look for "[s]tandards for inclusion and exclusion" that are "unambiguous and definite."  *Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158, 1178 (9th Cir. 2022) (internal quotations omitted); *see also Christ's Bride Ministries, Inc. v. Se. Penn. Transp. Auth.*, 148 F.3d 242, 248–49 (3d Cir. 1998) (noting that a designated public forum is not created merely because the government allows "limited discourse," requiring examination of the restrictions on the forum).

Thus, to create a limited public forum, the government must "set prospective, categorical, subject-matter rules by which to evaluate private speech" in order to provide "public notice of what speech is permissible and constrain[] the discretion of government actors to pick favorites

on an *ad hoc* basis." *Archdiocese*, 897 F.3d at 337.  In the physical environment, limited public

fora are exemplified by school board meetings and town halls, in which citizens are encouraged

to engage in dialogue—but only to the extent that the dialogue is on-topic to the meeting's

agenda, lest the meetings inevitably devolve into chaos.  *See, e.g., Steinburg v. Chesterfield Cnty.*

*Plan. Comm'n*, 527 F.3d 377, 385 (4th Cir. 2008) (county planning commission was limited

public forum); *Barrett v. Walker Cnty. Sch. Dist.,* 872 F.3d 1209, 1225 (11th Cir. 2017) (same

for school board meeting); *Galena v. Leone*, 638 F.3d 186, 198–99 (3d Cir. 2011) (same for

public commentary portion of county council meeting).  The comment threads at issue are close

analogies to such government-hosted gatherings in the virtual environment.

As to the nature of the forum, social media is undoubtedly the site of "a wide array of

protected First Amendment activity on topics 'as diverse as human thought,'" constituting "vast

democratic forums." *Packingham v. North Carolina*, 582 U.S. 98, 104–105 (2017) (quoting

*Reno v. ACLU*, 521 US. 844, 852, 868 (1997)).  Public comment threads on Facebook and

Instagram are "compatible with expressive activity," as plaintiffs argue, Pls.' Mem. at 27–30, but

this is far from the end of the inquiry.  "[T]he mere fact that an instrumentality is used for the

communication of ideas does not make a public forum."  *Perry Educ. Ass'n*, 460 U.S. at 49 n.9;

*see also* Defs.' Opp'n at 26–27.[4]

The cases plaintiffs cite in arguing that "nearly every court . . . has concluded that the

interactive components of government-run social media accounts are public forums," Pls.' Mem.

at 33, underscore the key role of the next consideration—the government's policy and practice

---

[4]      Plaintiffs urge that the "comment threads' undisputed compatibility with expressive activity cannot be
discounted," Pls.' Reply Supp. Mot. Summ. J. & Opp'n Defs.' Cross-Mot. Summ. J. ("Pls.' Opp'n") at 17, ECF No.
34, in reliance on the following quoted language from *One Wisconsin Now v. Kremer* that "[i]f defendants truly had
no intention to create a space for public interaction and discourse, they would not have created public [social media]
accounts in the first place." *Id.* (quoting 354 F. Supp. 3d 940, 954 (W.D. Wisc. 2019)).  This is an overly facile
view of social media.  The fact that the government created a space for public interaction does not mean that this
platform was intended for unbridled public interaction about any topic imaginable.

15

with respect to the forum.  Where courts have found interactive spaces on social media to constitute publica fora, the government actors "made [their] interactive features accessible to the public without limitation."  *Knight First Amendment Inst. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019), *vacated as moot,* 141 S. Ct. 1220 (2021) (Mem.) (regarding former President Trump's Twitter account); *see also Garnier*, 41 F.4th at 1178–79 (school board trustees' social media pages with "[n]o policy statement" restricting the form or content of comments); Pls.' Mem. at 33 (citing *Davison v. Randall*, 912 F.3d 666, 687 (4th Cir. 2019) (Facebook page administered by county board of supervisors chair expressly open to "ANY" user to post on "ANY issues"); *Faison v. Jones*, 440 F. Supp. 3d 1123, 1128, 1134–35 (E.D. Cal. 2020) (county sheriff's Facebook page that used the profanity filter and had banned users and blocked comments, but appeared to have no stated engagement policy); & *One Wisconsin Now v. Kremer*, 354 F. Supp. 3d 940, 954 (W.D. Wisc. 2019) (Twitter accounts for which administrating Wisconsin state officials took no steps to "limit[] access by the general public" or otherwise control the interactive space)).[5]  *Cf. Krasno v. Mnookin*, Case No. 21-cv-99, 2022 WL 16635246, *12 (W.D. Wisc. Nov. 2, 2022) (holding that social media pages' comment threads were limited public fora or nonpublic fora due to policy prohibiting "off-topic" comments); *Charudattan v. Darnell*, 2019 WL 12043587, *6 (N.D. Fla. Feb. 7, 2019) (same); *Davison v. Plowman*, 247 F. Supp. 3d 767, 776 (E.D. Va. 2017), *aff'd by* 715 F. App'x 298 (4th Cir. 2018) (same).  *But see Kimsey v. City of Sammamish*, 574 F. Supp. 3d 911, 918–20 (W.D. Wash. 2021) (concluding Facebook page prohibiting "off topic" comments but with inconsistent enforcement was designated, rather than limited, public forum).

---

[5]      Few of these cases proceeded to determining what type of public forum the social media pages constituted, instead finding that viewpoint discrimination rendered the censorship at issue unconstitutional regardless.  *See Knight,* 928 F.3d at 237–38; *Davison*, 912 F.3d at 687; *Faison*, 440 F. Supp. 3d at 1135–36 (in preliminary injunction context, holding that plaintiffs were likely to succeed in showing viewpoint discrimination).

Here, by contrast, NIH did not throw open its Instagram and Facebook pages to indiscriminate public engagement.  Instead, the agency has maintained a publicly viewable commenting policy with "prospective, categorical, subject-matter rules," *Archdiocese*, 897 F.3d at 337, requiring that comments remain on-topic—a key difference between the social media comment threads at issue and those considered in plaintiffs' proffered above-cited cases.  *See supra* Part I.A.1 (describing the relevant guidelines).  *Garnier* provides an illustrative contrast. *See* Pls.' Notice of Suppl. Authority, ECF No. 38 (notifying Court of Ninth Circuit decision); Defs.' Resp. to Pls.' Notice of Suppl. Authority at 3–4, ECF No. 39 (distinguishing *Garnier's* social media pages for lacking commenting rules).  In this recent Ninth Circuit case, two school board trustees who maintained social media pages on Twitter and Facebook to interact with their constituents "never adopted any formal rules of decorum or etiquette for their pages," 41 F.4th at 1178; *see also id.* at 1165.  When the Garniers, two especially vocal parents critical of the Board, began posting long and repetitive comments about the school district to the trustees' social media pages—in one instance, posting nearly identical comments on 42 separate Facebook posts made by a trustee—the trustees began deleting or hiding the Garniers' comments on Facebook.  *Id.* at 1166.  Eventually, the trustees blocked the Garnier parents altogether from their pages.  The trustees weakly urged that their actions were pursuant to "an unspoken policy" against repetitive comments, which the Ninth Circuit dismissed as failing to "satisfy the requirement that standards for inclusion and exclusion must be unambiguous and definite."  *Id.* at 1178 (cleaned up).  The nature of the government actors' control over the space proved dispositive, however: when the trustees later effectively blocked all comments on Facebook by using keyword filters for common words, they "'exercise[d] the clear and consistent control' over the interactive portions of their Facebook pages [necessary] 'to maintain a limited public forum.'"  *Id.* at 1179 (quoting

17

JA110

*Hopper v. City of Pasco*, 241 F.3d 1067, 1080 (9th Cir. 2001)).[6]  So too here: NIH's commenting policy is public—not a mere "unspoken policy"—and clearly prohibits off-topic comments.[7]

Plaintiffs contend that, whatever NIH's stated commenting guidelines, those guidelines were "essentially unenforced," rendering them a mere "paper policy."  Pls.' Reply Supp. Mot. Summ. J. & Opp'n Defs.' Cross-Mot. Summ. J. ("Pls.' Opp'n") at 20, ECF No. 34.  Certainly, "[m]ere statements of policy, if consistently contradicted by practice, are not dispositive." *Stewart*, 863 F.2d at 1021.  At the same time, courts' examination of the government's actual practice in enforcing its policy is not a gotcha game; rather it is a tool to smoke out the government's "intent" with regard to the forum's purpose—the "touchstone" of the forum inquiry.  *Bryant*, 532 F.3d at 895–96.  As a result, the government is not held to the standard of perfection in administering its policy.  Consequently, even if enforcement is "erratic," so long as defendants "consistently limit[ed] [speech] it saw as in violation of its policy . . . [it] evidenced its intent not to create a designated public forum."  *Ridley v. Mass. Bay Transp. Auth*., 390 F.3d 65, 78 (1st Cir. 2004).  *See also Hodge*, 799 F.3d at 1162 (holding that Supreme Court Police's failure to enforce the relevant policy perfectly did not transform the Supreme Court plaza into a public forum, given the "usual practice of strict enforcement").

---

[6]     Defendants urge that *Garnier* supports their arguments because NIH uses keyword filters, the use of which the Ninth Circuit found to have rendered the trustees' Facebook pages limited public fora.  This argument is unconvincing: the trustees used keyword filters effectively to block *all* comments on their pages—one of the trustees added around 2,000 commonly used words to his filter, 41 F.4th at 1166.  NIH's keyword filter list, by contrast, is far more targeted and does not gag public discourse entirely.  Defendants' discounting of the expansiveness of the trustees' keywords as "irrelevant" is blind to the practical realities of the trustees' use of such an extensive keyword filter to block all comments.  Defs.' Resp. to Suppl. Notice at 3, ECF No. 39.  Nor does defendants' argument that NIH's keyword filters are similarly broad go the distance, where NIH's keyword filters are plainly tailored to block primarily animal-testing-related commentary, external websites, and references to marijuana.  *Id.*

[7]     Plaintiffs point out that, prior to the filing of the instant lawsuit, links to NIH's commenting guidelines were not provided on the agency's social media pages.  Pls.' Mem. at 32 n.13; Pls.' Opp'n at 18.  True, but the comment guidelines were available on NIH's website, under a page titled "Social Media and Outreach." Defs.' Reply at 11–12.  Moreover, the pages did link to a privacy policy that also prohibited, *inter alia,* spam and "off-topic" speech.  *See* Jt. Stip. ¶ 54.

Where courts have held that inconsistent enforcement of a governing policy would favor a finding of a designated public forum, rather than a limited one, they often have done so in the context of ambiguous, contradictory, or non-existent *ex ante* guidelines.  The D.C. Circuit's decision in *Stewart* illustrates such a determination.  There, the administrators of RFK Stadium in Washington, D.C. had removed banners proclaiming "John 3:16," purportedly pursuant to the stadium's policy prohibiting signs unrelated to the stadium's scheduled events.  863 F.2d at 1014.  At the same time, contradictory evidence was presented as to the prevailing sign policy, since the stadium had apparently also expressed a policy of permitting *all* banners except the obscene and commercial.  *Id.* at 1019.  Confronted with conflicting evidence of the stadium's policy—none publicly stated before the censorship of the religious banners—the D.C. Circuit advised the trial court, on remand, that "[r]esolving the dimensions of the policy . . . is crucial to the threshold question of whether or not RFK Stadium is a public forum."  *Id.* at 1021.  There, the key concern was that the stadium may have used an on-paper-only policy as "*ex post* justification*" for the exclusion of the religious banners.  *Id.* at 1020; *see also Christ's Bride Ministries, Inc.*, 148 F.3d at 250–53 (finding a designated public forum where public transit authority retained authority to exclude advertisements for any reason, but then permitted "at least 99% of all ads" without objection, including those on the same topic as the excluded anti-abortion ad at issue); *Hopper*, 241 F.3d at 1078 (finding a city hall art gallery a designated public forum where city broadly prohibited "controversial" art, but "established no specific criteria for exclusion of art from the program" and did not always exclude controversial art).

Where NIH has attempted to enforce its policy, even if off-topic comments still appear on its pages' comment threads, this failure of perfect enforcement does not fatally undermine its intent for the comment threads to pertain to only relevant subjects.  Plaintiffs have pointed out a

number of comments in the record that are off-topic but not removed by NIH's administrators, such as a political post urging "BRING BACK CHRIS CUOMO" in response to NIH's post about brain activity, *see* Jt. Stip., Ex. 5, NIH Facebook Post (Dec. 2, 2021), ECF No. 28-5, and nonsensical comments in response to a post about "Public Service Recognition Week," *see id.*, Ex. 38, NIH Facebook Post (May 5, 2021), ECF No. 28-38 (comments saying "hi," "resist devil really love no one your self," and "You are so friendly, Prety").

Here, the particular context of cyberspace is particularly relevant: "The interactive comment threads on social media pages are a unique type of fora, able to host [] an almost unlimited amount of expression by an unlimited number of unknown users." *Mnookin*, 2022 WL 16635246 at *12. This infinite supply of commentary from individuals anywhere in the world makes "100% consistency" an impossible task, *id.,* such that the failure of perfect policing of non-compliant content on the agency's social media pages does not evince the government's intent. In addition, NIH has exercised control over the comment threads via manual moderation—which though stopped in response to this lawsuit, the agency intends to resume— and keyword filtering, the latter of which targets off-topic posts regarding animal testing as well as comments containing profanity or linking to external websites in violation of its policy. *See* Defs.' Reply at 10.

Finally, requiring perfect enforcement of commenting guidelines for the government to maintain social media pages' status as limited public fora would result in perverse outcomes for free expression. As the Supreme Court has explained, the distinction between the designated public forum and the limited public forum (or nonpublic forum) "furthers First Amendment interests" by "encourag[ing] the government to open its property to some expressive activity in cases where, if faced with an all-or-nothing choice, it might not open the property at all."

*Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 680 (1998).  Holding that a forum which the government intends to limit to only certain subjects is in fact a public forum would "result in less speech, not more," because "faced with the prospect of cacophony, on the one hand, and First Amendment liability, on the other, a [platform] might choose not to" permit speech at all.  *Id.* at 680–81.[8]  The outcome in *Garnier* illustrates this risk: the Ninth Circuit held that the school board trustees had created a limited public forum only once the trustees effectively closed their social media pages to public discourse by precluding all comments.  41 F.4th at 1179.

Resultantly, the comment threads in NIH's Facebook and Instagram pages are limited public fora.

### B.     Reasonableness

Restrictions on speech in limited public fora need only be "reasonable in light of the purpose which the forum at issue serves,"  *Perry Educ. Ass'n*, 460 U.S. at 49—a significantly lighter burden than the strict scrutiny applied to traditional or designated public fora.  "Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity," which "distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property."  *Id.*  In making such distinctions, "[t]he [g]overnment's decision to restrict access to a nonpublic forum need only be *reasonable*; it need

---

[8]     Defendants go so far as to argue in favor of a "presumption against finding government-run forums to be public forums" based on this language in *Arkansas Educational Television Commission*, but they but cite no cases that actually espouse such a broad rule.  Defs.' Opp'n at 17–18.  Plaintiffs vigorously criticize this argument, urging that *Arkansas Educational Television Commission* merely explains "*why* courts scrutinize restrictions in limited or nonpublic forums less skeptically," Pls.' Opp'n at 15, and insisting that courts engage in forum analysis "based on objective factors, not pro-government presumptions."  *Id.*  Plaintiffs' criticism is well-placed: objective factors must guide the forum analysis, with a focus on the First Amendment principles undergirding the forum doctrine.  Thus, defendants' proffered presumption to avoid altogether a forum analysis is a shortcut that is legally unsupportable.

not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808

(emphasis in original).  The reasonableness standard is a "relatively low bar," but it still

"requires something more than the toothless 'rational basis' test used to review the typical

exercise of a state's police power." *Price*, 45 F.4th at 1072 (citations omitted).  In order to show

that a speech restriction is "reasonable," the government must show that its restraint: (1) furthers

a "permissible objective;" and (2) contains "objective, workable standards" that are "capable of

reasoned application." *Mansky*, 138 S. Ct. at 1886, 1891–92.

NIH argues that the keyword filtering furthers the governmental interest of preventing

"disruptive" comments that "may discourage interested citizens from viewing" the pages at

issue.  Defs.' Opp'n at 35.  Filtering comments containing keywords related to animal testing,

defendants urge, provides an "efficient, though imperfect, way of targeting impermissible

comments," Defs.' Reply at 25, particularly, they contend, because plaintiffs have alternative

channels by which to make their opposition to animal testing heard, *id.* at 26; Defs.' Opp'n at

36–37.  Plaintiffs counter that the keyword filtering is unreasonable by "target[ing] animal

advocacy, and animal advocacy alone, in a way that is completely 'unmoored' from the interests

allegedly motivating its speech restrictions," reflecting inconsistent enforcement of the

commenting guidelines.  Pls.' Opp'n at 25 (quoting *Mansky*, 138 S. Ct. at 1888); *see also id.* at

24–27.

NIH has strong legitimate interests in maintaining on-topic discussions in the comment

threads of the agency's social media posts.  These social media accounts are used to

"'communicate and interact with citizens' about agency-related updates and public health news,"

Jt. Stip. ¶ 36 (quoting *Web Policies and Notices*, NATIONAL INSTITUTES OF HEALTH (Jan. 14,

2021), https://perma.cc/BC7R-ZFME).  The clutter of off-topic comments detracts from the

comment threads' purpose of fostering productive dialogue; after all, the "failure to effectively moderate a public discussion may be as deleterious to dialogue in [a limited public] forum as censorship." *Davison*, 247 F. Supp. 3d at 778.  Examples of NIH's posts and their attached comment threads in the record illustrate the problem: for example, in response to an NIH post about caregiving for an Alzheimer's patient, the vast majority of comments advocated against animal testing, most prominently urging NIH to "FREE THE BEAGLES."  Jt. Stip., Ex. 15, NIH Instagram Post & Viewable Comments (Nov. 12, 2021), ECF No. 28-15.  The few relevant comments interacting with the post—such as a commenter applauding caregivers as "the unsung heroes of medicine!"—are so buried in the repetitive animal advocacy comments as to be drowned out.  *See also id.*, Ex. 43, NIH Instagram Post & Viewable Comments (April 23, 2021), ECF No. 28-43 (NIH post about National DNA Day flooded with comments encouraging the closure of National Primate Research Centers, burying relevant comments such as those encouraging NIH to "provide more information about Henrietta Lacks" when discussing HeLa cells).

The *Garnier* Court held that the disruption threatened by online comments pales in comparison to the effect of irrelevant remarks in real-world forums, such as "physical city hall meetings, where there is limited time and space available for public remarks."  *Garnier*, 41 F.4th at 1181.  Viewers of the social media pages, the Court said, "can, with the flick of a finger, simply scroll past repetitive or irrelevant comments."  *Id.*  This is certainly correct, up to a point. Social media pages' seemingly infinite amount of space for public commentary does not mean, however, that administrators of those pages and the users who hope to view and engage in meaningful dialogue have the infinite time, resources and patience to sift through the cacophony

to find relevant information.[9]  Confronted with a forum overwhelmed with irrelevant commentary, many users will simply choose not to engage or even view at all.  NIH could "reasonably conclude" that the distracting comments detracted from the purpose of the fora, *Cornelius*, 473 U.S. at 809.[10]

Plaintiffs' main contention is that the keyword filtering is unreasonable due to its results, allowing inconsistent enforcement of NIH's stated commenting guidelines, particularly the prohibition of off-topic comments.  *See* Pls.' Mem. at 46; Pls.' Opp'n at 24–27.  As plaintiffs correctly observe, NIH's keyword filtering mechanism is both overinclusive, by excluding comments about animals even when those comments may be relevant to a specific post by NIH, and underinclusive, by hiding off-topic comments protesting animal testing but leaving visible off-topic comments about other subjects.  Pls.' Opp'n at 26–27.  Plaintiffs cite *Mansky* for the principle that "unfair or inconsistent enforcement," 138 S. Ct. at 1891, renders speech restrictions unreasonable.  Pls.' Mem. at 46; Pls.' Opp'n at 25, 27.  This argument merely reflects a repackaging of the same inconsistent-enforcement justification already rejected in the forum analysis, however, and the argument fails in this stage for parallel reasons.  In *Mansky*, the

---

[9]      The record demonstrates that on-topic engagement was also stymied by animal advocates' commentary on NIH's Twitter.  In one instance, NIH hosted a "chat" on Twitter on the topic of brain health, to which members of the public replied that they could not "follow chat among distraction," which another person described as a "bombardment" of the chat that was "disrespectful to other participants."  Jt. Stip. ¶ 87.  Another member of the public noted that, as a result of the flood of animal advocacy commentary, she "missed" NIH's tweets about "retina issues and Alzheimer's" that were "important for [her] family."  *Id.*  This data point provides evidence that off-topic and repetitive comments can be disruptive in cyberspace, even where the physical restraints of in-person engagement do not apply.  Although NIH's Twitter page is not at issue in the present case, this evidence is useful for that point alone.  *See* Defs.' Resp. Suppl. Auth. at 5, ECF No. 39.

[10]      Plaintiffs correctly note that the *Garnier* Court concluded that curtailing off-topic comments was not a "significant governmental interest," 41 F.4th at 1181–82, in the specific context of a designated public forum analysis, in which the far more demanding standard of strict scrutiny applied.  *See* Pls.' Notice of Suppl. Authority, ECF No. 38.  The *Garnier* Court suggested that, while the page administrators could not ban the disruptive parents entirely from the social media pages, the administrators could hide or delete the comments, or at least establish clear rules of engagement.  41 F.4th at 1182.

24

Supreme Court held that a Minnesota regulation prohibiting all "political" apparel in polling places on Election Day was unconstitutional as an unreasonable restriction on speech in a nonpublic forum. *Mansky*, 138 S. Ct. at 1888. "The crux of the Court's decision was that the State's discretion in enforcing the statute had to be 'guided by objective, workable standards.' Because the unqualified ban on 'political' apparel did not provide those standards, it was unreasonable." *Am. Freedom Def. Initiative v. Wash. Metro. Transit Auth. ("AFDI")*, 901 F.3d 356, 372 (D.C. Cir. 2018) (quoting *Mansky*, 138 S. Ct. at 1891). Much like the D.C. Circuit's skepticism of the seemingly contradictory banner policy in *Stewart*, *Mansky*'s "indeterminate prohibition" presented an invidious "opportunity for abuse." *Mansky*, 138 S. Ct. at 1891. *See also Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 448–49 (D.C. Cir. 2020) (applying this distillation of *Mansky* to hold that ban of "political" content in stamps was unreasonable); *see also People for the Ethical Treatment of Animals v. Gittens*, 215 F. Supp. 2d 120, 131 (D.D.C. 2002) (holding that arts commission's exclusion of PETA submission from art show, a limited public forum, was "inherently unreasonable" where commission's articulated standard was the amorphous question of whether submissions were "art"—a standard then inconsistently applied).[11]

Unlike in *Mansky* and *Zukerman*, the enforcers of NIH's policy against off-topic commentary—here, NIH's social media managers—have a clear mandate to apply the "objective, workable standard[]" of topicality. *Mansky*, 138 S. Ct. at 1881. As the *Mnookin* Court explained, "although reasonable people may have different degrees of tolerance for when

---

[11]     Plaintiffs cite *Gittens* in urging that NIH's imperfect enforcement of its commenting policy revealed that the agency had engaged in unconstitutional viewpoint discrimination, though this case mainly dealt with the reasonableness inquiry. *See* Pls.' Mem. at 39; Pls.' Opp'n at 12. In arguing that NIH's "dramatic underbreadth" in enforcement "supports the inference that the NIH is suppressing animal testing criticism rather than enforcing a viewpoint-neutral rule, Pls.' Opp'n at 12, plaintiffs repackage the inconsistent-enforcement argument for a third time. It fails for all the same reasons. The Court addresses plaintiffs' other arguments that the keyword filtering policy was viewpoint-motived *infra* in Part III.C.

25

something is 'not germane' or 'off topic,' the terms as commonly understood are sufficiently objective to preclude wildly divergent applications."  2022 WL 16635246, at *17.  *See also Davison*, 247 F. Supp. 3d at 778 (holding that prohibition on off-topic comments was not unconstitutionally vague).  As to the keyword filtering and manual deletion practice used to enforce this policy, plaintiffs have not demonstrated that NIH's enforcement is conducted in "arbitrary and unreasonable ways."  *Archdiocese*, 897 F.3d at 330 (quoting brief of appellant). To the contrary, NIH's keyword filter is a reasonable approach to maintaining orderly, on-topic comment threads.  This is so for two reasons.

First, the prevalence of animal testing-related keywords in its filters is not the result of arbitrariness.  As defendants have demonstrated—and plaintiffs have not meaningfully disputed, *see* Pls.' Opp'n at 11–12 —comments about animal testing comprised large shares of off-topic commentary on many of NIH's social media posts, becoming a highly prevalent irrelevant topic in violation of the commenting guidelines.  Defs.' Opp'n at 12–14.  Contrary to plaintiffs' assertion that "there is nothing 'inherently disruptive' about animal advocacy that makes it ripe for categorical treatment," Pls.' Opp'n at 27 (quoting *United States v. Kokinda*, 497 U.S. 720, 732 (1990)), this category of comments stood out for NIH's focused enforcement because this was a flagrant offending subject matter in the comment threads.

Second, the Supreme Court's guidance that reasonableness "must be assessed in the light of the purpose of the forum and all the surrounding circumstances," *AFDI*, 901 F.3d at 370 (quoting *Cornelius*, 473 U.S. at 809), is particularly apt in the context of social media comment threads.  Here, defendants' arguments regarding the impracticability of comment-by-comment review hold sway.  *See* Defs.' Opp'n at 36.  Each of NIH's posts on Facebook or Instagram could garner hundreds of comments.  *See, e.g.,* Jt. Stip., Ex. 25, Facebook Post & Viewable

26

Comments (May 27, 2021) (576 comments); *id.,* Ex. 4, Facebook Post & Viewable Comments
(Nov. 15, 2021) (429 comments); *id.*, Ex. 1, Facebook Post & Viewable Comments (June 4,
2021) (334 comments); *id.,* Ex. 21, Facebook Post & Viewable Comments (Sept. 24, 2020) (328
comments).  The accessibility and ease of internet engagement presents commenting policy
enforcers with a Sisyphean task—one for which the standards of consistency to which the
government is held cannot be so exacting as might be possible on a smaller scale, such as the
enforcement of a public transit's advertisement policy, as in *Archdiocese* and *AFDI*.  Otherwise,
if the standard is perfectly consistent enforcement, it is hard to imagine any social media
commenting policy that would survive the test of reasonableness without severely throttling the
public's *ex ante* access to the forum.

Finally, plaintiffs' access to alternative channels weighs in favor of the reasonableness of
the restriction.  *See Cornelius*, 473 U.S. at 809 ("Rarely will a nonpublic forum provide the only
means of contact with a particular audience.").  Plaintiffs defend the importance of their ability
to comment directly on NIH's social media pages by arguing that such comments (1)
"demonstrate to the NIH the size and passion of the animal rights movement," Jt. Stip. ¶ 88, (2)
reach "a large number of people who have a mutual interest in scientific research and the NIH,"
*id.* ¶ 90, and (3) conveys to "NIH's supporters and followers . . . how animals . . . are treated in
laboratories that are directly funded by the NIH," *id.* ¶ 89.  Baldly violating NIH's commenting
guidelines by filling its social media pages with animal-testing-related comments may be the
most efficient way of achieving those goals, but defendants rightly note that the "First
Amendment does not demand unrestricted access to a nonpublic forum merely because use of
that forum may be the most efficient means of delivering the speaker's message."  Defs.' Opp'n

27

at 37 (quoting *Cornelius*, 473 U.S. at 809).  Plaintiffs can achieve the same goals by creating

other Facebook or Instagram accounts dedicated to their advocacy.

###    C.    Viewpoint Neutrality

The final requirement of speech restrictions in nonpublic fora is viewpoint neutrality.

"The government may not discriminate against speech based on the ideas or opinions it

conveys." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019).  "[I]n determining whether the State

is acting to preserve the limits of the forum it has created so that the exclusion of a class of

speech is legitimate, [courts] have observed a distinction between, on the one hand, content

discrimination, which may be permissible if it preserves the purposes of that limited forum, and,

on the other hand, viewpoint discrimination, which is presumed impermissible when directed

against speech otherwise within the forum's limitations." *Rosenberger v. Rector & Visitors of

Univ. of Va.,* 515 U.S. 819, 829–830 (1995); *see also Cornelius*, 473 U.S. at 806; *Archdiocese*,

897 F.3d at 339 (Wilkins, J., concurring) ("Forum doctrine's boundary between permissible

subject-matter restrictions and impermissible viewpoint discrimination is a load-bearing wall in

the First Amendment's structure.").  Indeed, "[g]overnment discrimination among viewpoints—

or the regulation of speech based on 'the specific motivating ideology or the opinion or

perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination.'"

*Reed v. Gilbert*, 576 U.S. 155, 168 (2015) (quoting *Rosenberger*, 515 U.S. at 829).  No matter

the forum, viewpoint-based discrimination is never permitted.

Plaintiffs urge that NIH's keyword filtering is "axiomatic viewpoint-based censorship,"

designed to "suppress animal advocates' viewpoints by blocking words closely associated with

their efforts to urge NIH to stop animal testing."  Pls.' Mem. at 34–35.[12]  The keyword filter's

---

[12]    Plaintiffs' argument that the keyword filters "suppress[] animal advocacy and not animal-related content
generally" because keywords like "scorpion" and "guinea pig" are not filtered presents a strawman.  Pls.' Mem. at

targeting of words associated with animal testing, however, does not rise to the level of a

viewpoint-based, rather than content-based, restriction.  The Supreme Court's decisions in

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993)*, Rosenberger*, and

*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001), all of which involved prohibitions on

the use of limited public fora for religious purposes, illustrate the distinction.  In those cases, the

Supreme Court identified the restrictions as singling out a "perspective, not [a] general subject

matter."  *Rosenberger*, 515 U.S. at 831.  Rather than prohibit the discussion of the subject matter

of religion, those restrictions targeted "a specific premise, a perspective, a standpoint from which

a variety of subjects may be discussed and considered," *id.* at 828–31; *see also Lamb's Chapel*,

508 U.S. at 392–96; *Good News Club*, 533 U.S. at 107–112.  By contrast, the filtering of words

such as "animal" and "torture" merely targets a subject matter—animal testing—that defendants,

as administrators of a limited public forum, are entitled to exclude.[13]

The fact that only certain perspectives are represented in the subject matter being

restricted—here, animal advocates like plaintiffs—is hardly novel or problematic.  Defendants

contend that a restriction "serv[ing] purposes unrelated to the content [expressed] is deemed

neutral, even if it has an incidental effect on some speakers or messages but not others." Defs.'

Opp'n at 32–33 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), and citing

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 758, 762–63 (1994)).  Plaintiffs' attempt to

---

36.  The subject matter targeted by the filter is animal *testing,* and the particular animals designated by the keyword filter are those that have been the subject of multiple repetitive and off-topic comments.

[13]      Plaintiffs' contention that "PETA," "PETALatino," "#stopanimaltesting," "#stoptesting," and "#stoptestingonanimals" are viewpoint-based keyword restrictions is more persuasive, but defendants have removed those keywords from their filter mechanisms. Pls.' Opp'n at 8–9.  Contrary to plaintiffs' argument that these keywords provide "evidentiary support for the inference that the NIH has chosen to single out an anti-animal-testing viewpoint," *id.* at 9, however, the former inclusion of these keywords is better understood as an overzealous attempt by a NIH social media manager to tamp down irrelevant posts—many of which happened to include these hashtags. *See* Defs.' Opp'n at 31–32.

distinguish *Madsen* and *Ward* by accurately identifying the restriction at issue here—unlike in

*Madsen* and *Ward*—as content-based, Pls.' Opp'n at 11 n.2, but even a content-based restriction

is not necessarily viewpoint-discriminatory merely because it disproportionately burdens one

viewpoint.  In *Perry Education Association*, for example, the Supreme Court upheld an access

policy that had the effect of favoring one viewpoint over another in a nonpublic forum, where

there was "no indication that the [government] intended to discourage one viewpoint and

advance another."  460 U.S. at 49.  "Implicit in the concept of the nonpublic forum is the right to

make distinctions in access on the basis of subject matter and speaker identity."  *Id.*  "[A]

restriction limiting a forum to discussion of selected topics—a common restriction among

limited public forums—is self-evidently viewpoint neutral."  *Davison*, 247 F. Supp. 3d at 777.

As a result, NIH's keyword filtering policy is permissibly based on the comments'

subject matter, rather than viewpoint.

## IV.   CONCLUSION

The comment threads on NIH's Facebook and Instagram pages are limited public fora

subject only to the standards that speech restrictions must be viewpoint-neutral and reasonable in

light of the forum's purposes and circumstances.  Defendants have cleared both of those hurdles.

Accordingly, defendants' Cross-Motion for Summary Judgment is granted; plaintiffs' Motion for

Summary Judgment is denied.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  March 31, 2023

_____
BERYL A. HOWELL
U.S. District Court Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PEOPLE FOR THE ETHICAL
TREATMENT OF ANIMALS, INC.,
MADELINE KRASNO, and RYAN
HARTKOPF,

           Plaintiffs,

    v.

LAWRENCE A. TABAK, in his official
capacity as Acting Director of the Institutes of
Health, and XAVIER BECERRA, in his
official capacity as Secretary of the U.S.
Department of Health and Human Services,

           Defendants.

Civil Action No. 21-2380 (BAH)

## NOTICE OF APPEAL

Notice is hereby given that Plaintiffs People for the Ethical Treatment of Animals, Inc.,

Madeline Krasno, and Ryan Hartkopf appeal to the United States Court of Appeals for the District

of Columbia Circuit from the Memorandum Opinion and Order of this Court entered on March

31, 2023 (ECF Nos. 43, 44), denying Plaintiffs' Motion for Summary Judgment (ECF No. 30) and

granting Defendants' Cross-Motion for Summary Judgment (ECF No. 31).

Respectfully submitted,

 /s/ *Stephanie Krent*
Stephanie Krent, *pro hac vice*
Katherine Fallow, *pro hac vice*
Jameel Jaffer (Bar ID MI0067)
Knight First Amendment Institute
 at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
stephanie.krent@knightcolumbia.org

JA124

*Counsel for Plaintiffs*

 /s/ *Caitlin M. Foley*
Caitlin M. Foley, *pro hac vice*
Animal Legal Defense Fund
150 South Wacker Drive, Suite 2400
Chicago, IL 60606
(707) 795-2533 ext. 1043
cfoley@aldf.org

Christopher A. Berry (Bar ID CA00106)
Animal Legal Defense Fund
525 E. Cotati Ave.
Cotati, CA 94931
(707) 795-2533 ext. 1041
cberry@aldf.org

*Counsel for Plaintiffs Madeline Krasno and
    Ryan Hartkopf*

 /s/ *Asher Smith*
Asher Smith, *pro hac vice*
People for the Ethical Treatment of Animals,
    Inc.
1536 16th Street NW
Washington, DC 20036
(202) 483-7382
AsherS@petaf.org

*Counsel for Plaintiff People for the Ethical
    Treatment of Animals, Inc.*

May 11, 2023