NOT YET SCHEDULED FOR ORAL ARGUMENT

## No. 23-5110

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

───────────────

People for the Ethical Treatment of Animals, Madeline Krasno, and Ryan Hartkopf,

*Plaintiffs–Appellants*,

v.

Lawrence A. Tabak, in his official capacity as Acting Director of the National Institutes of Health, and Xavier Becerra, in his official capacity as Secretary of the U.S. Department of Health and Human Services,

*Defendants–Appellees.*

───────────────

On appeal from the United States District Court for the District of Columbia — No. 1:21-CV-02380 (Howell, B.)

## BRIEF FOR PLAINTIFFS–APPELLANTS

Ashley Ridgway
Asher Smith
Aaron Frazier
People for the Ethical Treatment of
  Animals, Inc.
1536 16th Street NW
Washington, DC 20036
(202) 483-7382
ashleyr@petaf.org

*Counsel for Plaintiff–Appellant People
  for the Ethical Treatment of Animals,
  Inc.*

Stephanie Krent
Katherine A. Fallow
Alexia Ramirez
Jameel Jaffer
Knight First Amendment Institute at
  Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
stephanie.krent@knightcolumbia.org

*Counsel for Plaintiffs–Appellants
(Additional counsel on next page)*

Christopher A. Berry
Animal Legal Defense Fund
525 E. Cotati Ave.
Cotati, CA 94931
(707) 795-2533 ext. 1041
cberry@aldf.org

Caitlin M. Foley
Animal Legal Defense Fund
150 South Wacker Drive, Suite 2400
Chicago, IL 60606
(707) 795-2533 ext. 1043
cfoley@aldf.org

*Counsel for Plaintiffs–Appellants*
   *Madeline Krasno and Ryan Hartkopf*

## Appellants' Certificate as to Parties, Rulings, and Related Cases

Pursuant to D.C. Circuit Rule 28.1(a)(1), Appellants submit this Certificate as to Parties, Rulings, and Related Cases.

**(A)     Parties and Amici.** Appellants, who were plaintiffs in the district court, are People for the Ethical Treatment of Animals, Inc. (PETA), Madeline Krasno, and Ryan Hartkopf. Appellees, who were defendants in the district court, are Lawrence Tabak, in his official capacity as Acting Director of the National Institutes of Health, and Xavier Becerra, in his official capacity as Secretary of the U.S. Department of Health and Human Services. No *amici* or intervenors appeared in the district court. The Electronic Frontier Foundation filed a notice of intent to participate in this appeal as *amicus curiae* on September 8, 2023.

**(B)     Rulings under Review.** On March 31, 2023, United States District Judge Beryl A. Howell issued a memorandum opinion and order denying Plaintiffs–Appellants' motion for summary judgment and granting Defendants–Appellees' cross-motion for summary judgment. *People for the Ethical Treatment of Animals v. Tabak*, No. 21-cv-2380 (D.D.C. Mar. 31, 2023), ECF Nos. 43, 44. The March 31, 2023 opinion is not published in the federal reporter but is available at 2023 WL 2809867 and is attached to Appellants' Notice of Appeal as well as the Joint Appendix, beginning at JA094.

**(C)   Related Cases.** The appealed ruling has not previously been before this Court or any other court. There are no related cases pending before this Court or any other court of which counsel is aware.

## Rule 26.1 Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, undersigned counsel certifies that Appellant People for the Ethical Treatment of Animals, Inc. (PETA) has no parent corporations, and no publicly held corporation owns 10 percent or more of their organization's stock. PETA is a nonprofit, tax-exempt 501(c)(3) corporation. Founded in 1980, PETA is dedicated to establishing and defending the rights of all animals. PETA's public education and campaign activities have a particular focus on animal mistreatment in laboratories, the food industry, the clothing trade, and the entertainment industry, as well as other issues including cruelty to domesticated animals who are often considered "pests."

**Table of Contents**

Appellants' Certificate as to Parties, Rulings, and Related Cases ............................ i

Rule 26.1 Corporate Disclosure Statement ............................................................. iii

Table of Authorities ................................................................................................. vi

Glossary .................................................................................................................... xi

Introduction ............................................................................................................... 1

Statement of Jurisdiction .......................................................................................... 3

Statement of Issues on Appeal .................................................................................. 3

Statement of the Case ................................................................................................ 4

    I.    Facts ................................................................................................................. 4

        A.    The NIH's Facebook page and Instagram account. ........................ 4

            1.    The NIH Facebook page. .................................................... 4

            2.    The NIH Instagram account. ............................................... 6

        B.    Plaintiffs' criticism of the NIH's involvement in animal testing. ......................................................................................... 8

        C.    The NIH's keyword blocking on its Facebook page and Instagram account. ...................................................................... 11

        D.    The NIH's keyword blocking prevents Plaintiffs from publicly criticizing the NIH's involvement in animal testing on the NIH Facebook page and Instagram account. .................... 14

        E.    The NIH's commenting guidelines. ............................................. 16

    II.    Procedural history ................................................................................. 18

Summary of Argument ............................................................................................. 18

iv

Standard of Review.................................................................................... 21

Argument ..................................................................................................... 22

    I.    The NIH's keyword blocking is unconstitutional viewpoint
    discrimination. .................................................................................... 22

        A.    The NIH's lists of blocked keywords discriminate against
        animal advocacy.......................................................................... 23

        B.    The NIH's moderation practices confirm that the NIH's
        conduct is viewpoint-discriminatory............................................ 25

    II.    The NIH's keyword blocking also violates the First Amendment
    because it is an unconstitutional content-based speech restriction.......... 32

        A.    The NIH's keyword blocking is subject to—and fails—strict
        scrutiny....................................................................................... 33

            1.    The NIH's comment threads are open forums................... 33

            2.    The NIH's keyword blocking fails strict scrutiny. ............ 40

        B.    Even if the NIH's comment threads were limited forums, the
        NIH's keyword blocking would be unreasonable and
        therefore unconstitutional. .......................................................... 42

Conclusion .................................................................................................. 48

Certificate of Compliance............................................................................ 50

Certificate of Service .................................................................................. 51

# Table of Authorities

## Cases

*Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of Chi.*, 45 F.3d 1144
(7th Cir. 1995) ....................................................................... 35, 39, 44

*Archdiocese of Wash. v. Wash. Metro. Area Trans. Auth.*, 897 F.3d 314
(D.C. Cir. 2018) ............................................................. 19, 35, 43, 45

*Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011)................................ 41

*Bryant v. Gates*, 532 F.3d 888 (D.C. Cir. 2008)................................... 33

*Bynum v. U.S. Capitol Police Bd.*, 93 F. Supp. 2d 50 (D.D.C. 2000) ................... 44

*Cannon v. District of Columbia*, 717 F.3d 200 (D.C. Cir. 2013) ........................ 27

*Charudattan v. Darnell*, No. 1:18cv109MW/GRJ, 2019 WL 12043587
(N.D. Fla. Feb. 7, 2019)............................................................... 44

*Christian Legal Soc'y v. Martinez*, 561 U.S. 661 (2010) ........................ 25

*Concerned Women for Am., Inc. v. Lafayette Cnty.*, 883 F.2d 32 (5th
Cir. 1989)............................................................................... 37

*Connick v. Myers*, 461 U.S. 138 (1983) ................................................. 22

*Davison v. Plowman*, 247 F. Supp. 3d 767 (E.D. Va. 2017)........................... 43, 44

*Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019) ................................ 34

*Frederick Douglass Found., Inc. v. District of Columbia*, No. 21-7108,
2023 WL 5209556 (D.C. Cir. Aug. 15, 2023)............................................ 24, 29

*Galena v. Leone*, 638 F.3d 186 (3d Cir. 2011)........................................ 38

*Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158 (9th Cir. 2022)............. 33, 35, 41, 43

*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001).................................. 31

*Grace Bible Fellowship, Inc. v. Me. Sch. Admin. Dist. No. 5*, 941 F.2d 45 (1st Cir. 1991) ............................................................... 35, 37, 38

*Hays Cnty. Guardian v. Supple*, 969 F.2d 111 (5th Cir. 1992) .............................. 39

*Hodge v. Talkin*, 799 F.3d 1145 (D.C. Cir. 2015) .................................................... 37

*Hopper v. City of Pasco*, 241 F.3d 1067 (9th Cir. 2001) ........................................ 35

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992) ............. 19

*Jones v. Heyman*, 888 F.2d 1328 (11th Cir. 1989) .................................................. 40

*Kaspersky Lab, Inc. v. DHS*, 909 F.3d 446 (D.C. Cir. 2018) ........................... 26, 27

*Kimsey v. City of Sammamish*, 574 F. Supp. 3d 911 (W.D. Wash. 2021) ........ 38, 41

*Krasno v. Mnookin*, 638 F. Supp. 3d 954 (W.D. Wis. 2022) ................................. 44

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993) ............................................................................................... 30, 31

*Liberty Lobby, Inc. v. Rees*, 852 F.2d 595 (D.C. Cir. 1988) ................................... 21

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994) .................................. 31

*Mahoney v. Babbit*, 105 F.3d 1452 (D.C. Cir. 1997) ............................................. 40

*McConnell v. FEC*, 540 U.S. 93 (2003) .................................................................. 22

*McCready v. Nicholson*, 465 F.3d 1 (D.C. Cir. 2006) ............................................ 21

*McCullen v. Coakley*, 573 U.S. 464 (2014) ........................................................... 40

*Minn. Voters All. v. Mansky*, 138 S. Ct. 1876 (2018) ....................................... 43, 45

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ...................................... 3, 22

*Packingham v. North Carolina*, 582 U.S. 98 (2017) ............................................. 33

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983) ............... 31

*Planned Parenthood Ass'n/Chi. Area v. Chi. Transit Auth.*, 767 F.2d 1225 (7th Cir. 1985) ............................................................... 37

*Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92 (1972) ........................... 22

*Queen v. Schultz*, 747 F.3d 879 (D.C. Cir. 2014) ................................................. 21

*R.J. Reynolds Tobacco Co. v. FDA*, 845 F. Supp. 2d 266 (D.D.C. 2012) ............. 48

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ...................................................... 40

*Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65 (1st Cir. 2004) ..................... 25, 36

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1988)..................... 48

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995)............. 22

*Shurtleff v. City of Boston*, 142 S. Ct. 1583 (2022) ............................................... 25

*Steinburg v. Chesterfield Cnty. Plan. Comm'n*, 527 F.3d 377 (4th Cir. 2008) ...................................................................................................... 38

*Stewart v. D.C. Armory Bd.*, 789 F. Supp. 402 (D.D.C. 1992)............................. 38

*Stewart v. D.C. Armory Bd.*, 863 F.2d 1013 (D.C. Cir. 1988)........ 33, 34, 35, 38, 39

*United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341 (6th Cir. 1998) ..................................................... 35

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015)...................................................................................................... 19

*White v. City of Norwalk*, 900 F.2d 1421 (9th Cir. 1990)...................................... 40

*Women's Health Link, Inc. v. Fort Wayne Pub. Transp. Corp.*, 826 F.3d 947 (7th Cir. 2016) ......................................................................................... 44

*Zukerman v. U.S. Postal Serv.*, 64 F.4th 1354 (D.C. Cir. 2023) ........................... 29

*Zukerman v. U.S. Postal Serv.*, 961 F.3d 431 (D.C. Cir. 2020)................. 22, 24, 25

**Statutes**

28 U.S.C. § 1291 .................................................................................. 3

28 U.S.C. § 1331 .................................................................................. 3

**Other Authorities**

*About Protecting your Business on Instagram*, Instagram Help Center,
    https://perma.cc/XN5T-TVUN ...................................................... 42

Andy Weiss et al., *Zn regulated GTPase metalloprotein activator 1
    modulates vertebrate zinc homeostasis*, 185 Cell 2148 (2022),
    https://perma.cc/TT9S-HS5H ......................................................... 27

Angela Kruse et al., *Combining 'omics and microscopy to visualize
    interactions between the Asian citrus psyllid vector and the
    Huanglongbing pathogen Candidatus Liberibacter asiaticus in the
    insect gut*, PLoS ONE (2017), https://perma.cc/MZG7-F9FA ......................... 27

Francis Collins, *Early Data Suggest Pfizer Pill May Prevent Severe
    COVID-19*, NIH Director's Blog (Nov. 16, 2021),
    https://perma.cc/CSZ5-SEN8 .......................................................... 26

Francis Collins, *Groundbreaking Study Maps Key Brain Circuit*, NIH
    Director's Blog (Dec. 9, 2021), https://perma.cc/GBM4-VPFJ ....................... 26

Katerina V. Djambazova et al., *MALDI TIMS IMS of
    Disialoganglioside Isomers—GD1a and GD1b in Murine Brain
    Tissue*, 95 Analytical Chemistry 1176 (2023),
    https://perma.cc/M3FQ-2VFT ......................................................... 27

Kizzmekia S. Corbett et al., *SARS-CoV-2 mRNA Vaccine Design
    Enabled by Prototype Pathogen Preparedness*, 586 Nature 567
    (2020), https://perma.cc/CB4N-26AZ ................................................ 27

*NIH scientists identify mechanism that may influence infectivity of
    SARS-CoV-2 variants*, NIH News Releases (Nov. 5, 2021),
    https://perma.cc/3P3N-HXTA .......................................................... 26

*NIH, FDA, and 15 private organizations join forces to increase effective gene therapies for rare diseases*, NIH News Releases (Oct. 27, 2021), https://perma.cc/HZT6-57GZ........................................................... 26

Norman E. Sharpless & Ronald A. Depinho, *The mighty mouse: genetically engineered mouse models in cancer drug development*, 5 Nature Reviews Drug Discovery 741 (2006), https://perma.cc/3SD2-VXX4 .......................................................... 27

*Study reveals brain cells that sustain or suppress fearful memories*, NIH Research Matters (June 8, 2021), https://perma.cc/H9KT-4FV3 ................................................................................................... 26

Umut Atakan Gurkan et al., *Comparison of Morphology, Orientation, and Migration of Tendon Derived Fibroblasts and Bone Marrow Stromal Cells on Electrochemically Aligned Collagen Constructs*, 94 J. Biomed. Materials Rsch. 1070 (2010), https://perma.cc/8HVH-HPVL ......................................................... 27

## Glossary

Pursuant to Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief.

| | |
|---|---|
| HHS | U.S. Department of Health and Human Services |
| JA | Joint Appendix |
| JS | Joint Stipulation of Facts |
| NIH | The National Institutes of Health |
| PETA | People for the Ethical Treatment of Animals, Inc. |
| WNPRC | Wisconsin National Primate Research Center |

## Introduction

This case involves a government agency's unconstitutional practice of surreptitiously censoring speech critical of the agency in public forums.

The National Institutes of Health (NIH) uses its Facebook and Instagram accounts to communicate and interact with members of the public. In turn, members of the public use the commenting features associated with those accounts to share their views with one another and with the NIH on a wide range of important and often controversial topics—including the veracity of the NIH's scientific claims, the persistence of racism in the medical community, and the relationship between government health agencies and pharmaceutical companies. But commenters who want to discuss the NIH's extensive role in funding animal testing find their comments hidden from public view, and find themselves excluded from this otherwise vibrant forum. That is because the NIH created custom keyword blocking lists on its Facebook page and Instagram account in order to suppress comments containing words and phrases critical of animal testing—like "PETA," "torture," "hurt," "stop," and "monkey." The NIH's keyword is quintessential viewpoint discrimination that violates the First Amendment.

The district court concluded that the NIH's keyword blocking is a reasonable means of enforcing a viewpoint-neutral prohibition against off-topic speech in a limited public forum, but this was error. There is no dispute that, as a general matter,

a fairly applied off-topic rule may be constitutional. In theory, keyword blocking may also be constitutional, depending on how it is implemented. The Court need not reach that issue, however, because the NIH's keyword blocking is plainly viewpoint-discriminatory and unreasonably suppresses an entire category of political speech intentionally and automatically even when that speech is indisputably on-topic. The words the NIH has blocked express criticism of animal testing or are closely associated with that criticism. The NIH suppresses this type of animal advocacy regardless of whether it is on- or off-topic. And the NIH leaves all other off-topic speech undisturbed. In concluding that the NIH's keyword blocking complies with the First Amendment, the district court glossed over the government's actual practices, which confirm that the NIH is not seeking to fairly enforce an off-topic rule but is instead targeting disfavored speech.

This Court should reverse the decision below. If the decision is upheld, government agencies and officials will have broad power to suppress criticism of government under the guise of enforcing off-topic rules—and they will have this power even if they blatantly single out particular categories of disfavored speech for suppression. Under this view, President Biden could shut down discussion of inflation on his official social media account, then–President Trump could have suppressed any comments relating to impeachment, and then–President Obama could have done the same regarding Benghazi. A local school board could

selectively stifle discussion of "Black Lives Matter" or "no vaccine mandates" on its social media accounts. To avoid these unpalatable and undemocratic outcomes, and to ensure that political discourse remains "uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), the decision below should be reversed.

## Statement of Jurisdiction

The district court had jurisdiction under 28 U.S.C. § 1331 and the U.S. Constitution. On March 31, 2023, the court entered a final order denying Plaintiffs' motion for summary judgment and granting the NIH's cross-motion. JA092–93. Plaintiffs filed a timely notice of appeal on May 11, 2023. JA124–25. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## Statement of Issues on Appeal

Whether the district court erred in ruling that the NIH does not violate the First Amendment when it uses keyword blocking to prevent comments critical of the NIH's involvement in animal testing from appearing publicly on the NIH's Facebook page and Instagram account.

## Statement of the Case

### I.    Facts

#### A.    The NIH's Facebook page and Instagram account.

The NIH is the primary agency of the federal government charged with performing and supporting biomedical and behavioral research. JA054 (JS ¶ 4). It operates social media accounts, including a Facebook page and an Instagram account, to "communicate and interact with citizens." JA067 (JS ¶ 36). Its Facebook page and Instagram account both contain comment sections that allow people to post comments responding to the NIH's posts, as well as to comments posted by others. JA068 (JS ¶ 39); JA069 (JS ¶ 45).

##### 1.    The NIH Facebook page.

The NIH established its official Facebook "page"[1] on October 14, 2008. JA067 (JS ¶ 37). The NIH has registered its page with Facebook as a "Government Organization" page. *Id.* It uses its Facebook page to post agency-related information and public health updates and to host real-time videos featuring NIH employees and researchers. JA068 (JS ¶ 38); JA077 (JS ¶ 62).

The NIH Facebook page is generally accessible to anyone with internet access, although only those with Facebook accounts can see the entirety of the page,

---

[1] A Facebook "page" is an account used by "businesses, brands, organizations, [or] public figures." JA055 (JS ¶ 8).

4

including prior posts and comments that other users have made responding to those posts. JA068 (JS ¶ 38).[2] As of February 2022, approximately 565,515 Facebook users "followed" the NIH Facebook page. *Id.* Any Facebook user can comment on the NIH's posts. *Id.* (JS ¶ 39). Facebook users may also reply to other comments appended to a post or to replies that have been posted by others. JA057–58 (JS ¶ 13). The collection of replies and replies-to-replies is known as a "comment thread." *Id.*

People with Facebook accounts use the NIH Facebook page's comment feature to respond to the NIH's posts and communicate with other users about the NIH's policies and practices. JA068 (JS ¶ 39); JA126–97 (Exs. 1–6). Below is an example of a post to the NIH Facebook page and three of the many comments and replies appended to the post:

---

[2] All internet users in the United States can generally access a selection of recent posts from all public Facebook pages regardless of whether they have a Facebook account. JA056 (JS ¶ 9). Individuals or organizations that have created accounts on the platform are Facebook "users." JA055 (JS ¶ 7).



*See* JA127 (Ex. 1 at *2).

### 2.    The NIH Instagram account.

The NIH launched the Instagram account @nihgov on January 23, 2018. JA068 (JS ¶ 41). The NIH has registered its account with Instagram as a "Government Organization" account, and it selected the NIH logo as its profile picture. JA069 (JS ¶ 42). It uses its account to post content about the agency's work,

including interviews with NIH experts and news about NIH health campaigns, and to post public health updates. *Id.* ¶ 44.

The NIH has made its Instagram account public, meaning that a portion of the page is generally accessible to anyone with Internet access, although only Instagram users can see all of the NIH's previous posts, along with associated comments and replies. *Id* ¶ 43.[3] As of February 2022, the NIH Instagram account had approximately 206,000 followers. *Id*. As with the NIH Facebook page, people with Instagram accounts use the NIH Instagram account's comment feature to respond to the NIH's posts and to communicate with other users about the NIH's policies and practices. JA069–70 (JS ¶ 45); JA198–211 (Exs. 7–11). Some of the NIH's posts have received over 100 comments, including both positive and negative responses. JA069–70 (JS ¶ 45). Below is an example of a post to the NIH Instagram account and some of the comments and replies appended to the post:

---

[3] As with Facebook, all internet users in the United States can generally access a selection of recent posts from all public Instagram accounts regardless of whether they have an Instagram account. JA062 (JS ¶ 23). Individuals or organizations that have created accounts on the platform are Instagram "users." JA061 (JS ¶ 22).



*See* JA199 (Ex. 7 at *2).

**B.     Plaintiffs' criticism of the NIH's involvement in animal testing.**

This case centers on Plaintiffs' efforts to speak out against the NIH's involvement in animal testing. Plaintiffs want the NIH to end its funding of animal testing because they believe it is cruel, immoral, ineffective, and a misuse of public funds. JA052–53 (JS ¶¶ 1–3); JA088–90 (JS ¶¶ 88–90). Commenting on the NIH's official social media accounts is an important part of their efforts to speak out against, and to raise public awareness of, the NIH's involvement in animal testing. *Id*. As described below, all of the Plaintiffs have sought to post comments on the NIH's social media accounts as part of their efforts to stop its funding of animal testing:

8

**PETA**. Founded in 1980, PETA is a nonprofit animal rights organization that is dedicated to establishing and defending the rights of all animals. JA052–53 (JS ¶ 1). PETA frequently engages in social media campaigns to persuade public and private entities to change their animal treatment practices. For example, in 2015, PETA launched a campaign to criticize the NIH's support of Dr. Steven Suomi's laboratory, which conducted maternal deprivation experiments on monkeys. JA088 (JS ¶ 88); JA076 (JS ¶ 58 n.9). PETA's efforts involved advocacy on social media, JA088 (JS ¶ 88), and by the end of that year, the NIH announced that it would phase out funding for Dr. Suomi's work, *id*. One of PETA's current advocacy campaigns focuses on the NIH, and its division the National Institute of Mental Health, for its funding of primate testing, including monkey experiments conducted by Dr. Elisabeth Murray. JA052–53 (JS ¶ 1). As part of this campaign, PETA employees and members have advocated on the NIH's social media pages for the NIH to end its funding of Dr. Murray's experiments and of animal testing more broadly. *Id.*

**Madeline Krasno**. Ms. Krasno is a former animal research technician turned animal advocate. JA053 (JS ¶ 2). As a student at the University of Wisconsin, Ms. Krasno studied zoology and worked as a student primate caretaker at the NIH-funded Harlow Center for Biological Psychology. *Id.* Her firsthand experience with primate testing led her to conclude that animal testing is immoral and compelled her to publicly share the details of her experiences. *Id.* One way Ms. Krasno seeks to bring

attention to the NIH's involvement in animal testing is through social media advocacy. *Id.*; JA089 (JS ¶ 89). Ms. Krasno believes it is vital that the NIH's supporters and followers understand how animals, like the primates she cared for, are treated in laboratories directly funded by the NIH. JA089 (JS ¶ 89). She also shares her views about the limited effectiveness of animal testing, and the many other research endeavors the NIH could support if it did not fund animal testing. *Id*.

**Ryan Hartkopf**. Mr. Hartkopf is an engineer in the digital health field and an animal advocate. JA053–54 (JS ¶ 3). Mr. Hartkopf's opposition to animal testing began in 2018, when he moved to Madison and would pass the NIH-funded Wisconsin National Primate Research Center (WNPRC) on his way to work. *Id.* Mr. Hartkopf was interested and began to learn more about the WNPRC through videos he found on Facebook and PETA campaigns. *Id.* After viewing a post that Ms. Krasno made on Facebook describing her past work at the Harlow Center and her goal of shutting down the lab, Mr. Hartkopf reached out to Ms. Krasno to offer his assistance. *Id.* Since then, he has commented (or sought to comment) on the NIH's social media accounts to engage with others who have an interest in scientific research about animal testing, and to signal to potential whistleblowers that activists would support them if they decided to speak out. JA090 (JS ¶ 90).

### C.     The NIH's keyword blocking on its Facebook page and Instagram account.

Keyword blocking is a feature on both Facebook and Instagram that allows account holders to restrict the comments that appear in otherwise open comment threads. JA060 (JS ¶ 16); JA065 (JS ¶ 30). Account holders can specify words or phrases that cannot appear in comments posted on their pages. *Id*. When an account holder adds a word to one of these lists, all past or future comments containing the word will automatically be hidden from public view. *Id.* On Facebook, a comment hidden through keyword blocking remains visible to the user who posted it and to the user's Facebook "friends,"[4] but other members of the public viewing the page are unable to read or engage with it. JA060 (JS ¶ 16). On Instagram, a comment that is hidden through keyword blocking is visible to the account holder and the user who posted it if they choose to "view hidden comments," but no one else can see, reply to, or engage with the comment. JA065 (JS ¶ 30). On both platforms, a user whose comment is hidden through keyword blocking is generally not notified and remains unaware that their comment is invisible to others. JA060 (JS ¶ 18); JA066 (JS ¶ 34).

In September 2020, Plaintiffs began noticing that when they tried to post comments to the NIH Facebook page and Instagram account that were critical of the NIH's involvement in animal testing, they were unable to post the comments, or the

---

[4] Individual Facebook users can connect with other users by "friending" them; these connected users are called Facebook "friends." JA055 (JS ¶ 7).

comments did not appear publicly. JA078–80 (JS ¶¶ 63–68); JA082–84 (JS ¶¶ 72–77); JA084–86 (JS ¶¶ 80–84). Plaintiffs later discovered through a Freedom of Information Act request filed by Mr. Hartkopf that the NIH had created custom keyword blocking lists to suppress animal advocacy, including dozens of words and phrases related to criticism of animal testing. JA086 (JS ¶ 84). These were the relevant blocked words and phrases:

| **Facebook** | **Instagram** |
|---|---|
| PETA, PETALatino | PETA |
| Suomi,[5] Harlow[6] | #stopanimaltesting |
| Animal(s), animales, animalitos | #stoptesting |
| Cats, gatos | #stoptestingonanimals |
| Chimpanzee(s), chimp(s) | Animal(s) |
| Hamster(s) | Chimpanzee(s), chimps |
| Marmoset(s) | Monkey(s) |
| Monkey(s), monkies | Experiment |
| Mouse, mice | Hurt(ing) |
| Primate(s) | Kill |
| Sex experiments | Stop |
| Cruel, cruelty | Test(ing), testing facility |
| Revolting | Tortur(ing) |
| Torment(ing) | |

---

[5] As described above, *see* Part IB *supra*, PETA led an extensive public campaign related to the NIH's funding of Dr. Suomi's experiments on monkeys and other nonhuman primates. JA088 (JS ¶ 88); JA076 (JS ¶ 58 n.9).

[6] Harry Harlow was an American psychologist known for conducting maternal deprivation experiments on monkeys to determine how early environment shapes their behavior. JA076 (JS ¶ 58 n.10). The Harlow Center on Biological Psychology, named for Dr. Harlow, is affiliated with the WNPRC and houses the monkeys and nonhuman primates used in experiments. *Id.* After Dr. Harlow died in 1981, PETA campaigned against the NIH's continuation of his work and frequently mentions Dr. Harlow in its advocacy against animal testing. *Id.*

Torture(s), torturing

JA076 (JS ¶ 58).

The NIH's custom list of blocked keywords on Instagram also included four emojis:



JA076 (JS ¶ 58 n.11); *see also* JA051 (Compl. Attach. 2).

Nearly all of the NIH's blocked keywords on Instagram related to criticism of animal testing, and approximately one-third of the NIH's blocked keywords on Facebook did, making animal advocacy the largest category of suppressed speech on both platforms. *See* JA044–51 (Compl. Attachs. 1 & 2).[7]

On December 3, 2021, after this lawsuit was filed, the NIH removed "PETA" and "PETALatino" from its list of blocked keywords on Facebook and removed "PETA" from its list of blocked keywords on Instagram. JA077 (JS ¶ 60). On December 7, 2021, the NIH also removed "#stopanimaltesting," "#stoptesting," and "#stoptestingonanimals" from its list of blocked keywords on Instagram. *Id.* All other terms listed above, however, remain blocked. *Id*.

---

[7] The NIH's keyword blocking on Facebook also automatically suppress comments containing certain profane and racist terms, the names of certain illicit drugs, the domains of other websites or applications, and the term #believemothers. JA076 (JS ¶ 59); JA044–51 (Compl. Attachs. 1 & 2). The NIH has also activated Facebook's and Instagram's optional profanity filters. JA075 (JS ¶¶ 56–57).

As long as the NIH's custom keyword blocking lists remain in effect, any user who attempts to post a comment including any of these prohibited words to the NIH Facebook page or Instagram account will have their comments automatically suppressed. *See* JA060 (JS ¶ 16); JA065 (JS ¶ 30).

**D.    The NIH's keyword blocking prevents Plaintiffs from publicly criticizing the NIH's involvement in animal testing on the NIH Facebook page and Instagram account.**

Between September 2020 and June 2021, each of the Plaintiffs attempted to post numerous public comments on the NIH Facebook page or Instagram account but was unable to do so because the comments contained one or more of the blocked keywords. The suppressed comments included the following:

- On September 24, 2020, PETA employee Evelyn Wagaman was prevented from posting three comments on a Facebook Live video on the NIH Facebook page about COVID-19 vaccine research. One read, "Francis Collins, we appreciate all your hard work to search for a COVID vaccine, but why is NIH still wasting money on cruel and ineffective monkey fright experiments?" JA078 (JS ¶ 63); JA267 (Ex. 20 at *3).

- On October 8, 2020, Ms. Wagaman was prevented from posting several comments on an NIH Facebook Live video about gene editing, including "CRISPR can be used for advanced, non-animal experiments. In light of the many non-animal technologies that are developing, how can NIH continue to conduct experiments on macaques and other primates?" JA078 (JS ¶ 64); JA297 (Ex. 22 at *3).

- On April 24, 2021, Mr. Hartkopf commented on an NIH Instagram post about "National DNA Day" by stating, "The Wisconsin NPRC is a disgrace. I personally know 2 former employees who were traumatized by their experience as primate

14

caretakers. There is no humane way to keep 1,650 primates in small steel cages for decades without inflicting massive psychological damage. On top of that, the University of Wisconsin has banned any keywords regarding primate testing on their social media pages, meaning any opposition on social media is automatically silenced. They also delete the testimonials of former employees. Why go to all that trouble to silence their own alumni if everything is above-board? We need to reinvest in human-relevant, modern research instead of this barbaric and archaic practice, which does not yield cures to our most deadly diseases!" JA084 (JS ¶ 80). After checking the post using a different Instagram account and seeing that the comment was not publicly viewable, Mr. Hartkopf deleted this comment. *Id.*

- On April 29, 2021, Ms. Krasno commented on an NIH Instagram post about a study on Alzheimer's disease treatment that was conducted on mice. Ms. Krasno wrote, "It's pretty messed up that you block conversation about animal testing." JA082 (JS ¶ 72); JA374 (Ex. 31 at *3).

- On May 27, 2021, PETA employee Ms. Wagaman attempted to post several comments on an NIH Facebook Live video featuring Dr. Kizzmekia Corbett, including: "Thank you, Dr. Corbett and Dr. Collins, for your hard work on the COVID vaccines! Why is the NIH still wasting funds on Elisabeth Murray's monkey fright experiments instead of investing more in important clinical research about COVID-19?" JA078–79 (JS ¶ 65); JA317 (Ex. 24 at *2).

*See also* JA079 (JS ¶ 66) & JA349–54 (Ex. 26); JA079–80 (JS ¶ 67) & JA358–63 (Ex. 28); JA082 (JS ¶ 73) & JA383 (Ex. 33 at *2); JA082 (JS ¶ 74) & JA390 (Ex. 35 at *2); JA082–83 (JS ¶ 75) & JA396 (Ex. 37 at *2); JA083 (JS ¶ 76) & JA407 (Ex. 39 at *3); JA083–84 (JS ¶ 77) & JA415 (Ex. 41 at *3); JA085 (JS ¶ 81) & JA436 (Ex. 44 at *2); JA085 (JS ¶ 82) & JA442 (Ex. 46 at *2); JA085–86 (JS ¶ 83) &

JA448 (Ex. 48 at *3) (additional comments blocked under the NIH's keyword blocking).

As a result of the NIH's keyword blocking, Plaintiffs are restricted in their ability to express their views about animal testing, including their criticism of government policy on this matter, in comments on the NIH Facebook page and Instagram account. JA080 (JS ¶ 69); JA088–90 (JS ¶¶ 88–90). The NIH's keyword blocking also burdens Plaintiffs' ability to engage with and read the comments of other animal advocates. JA080 (JS ¶ 70); JA084 (JS ¶ 79); JA086 (JS ¶ 86).

### E. The NIH's commenting guidelines.

 Since March 30, 2015, the NIH has published guidelines on its official website for those interested in commenting on its social media accounts. JA072–73 (JS ¶¶ 51–52); JA262–64 (Ex. 19). The guidelines "encourage[]" members of the public "to share [their] thoughts and ideas" on any NIH-administered social media account or website "where commenting is supported." JA263 (Ex. 19). They state that the NIH's social media accounts and websites "are not intended to serve as public forums." *Id.* Seeking to "encourage respectful and constructive dialogue," the guidelines prohibit, among other things, "[v]ulgar, obscene, profane, threatening, or abusive language," "[d]iscriminatory language," "[e]ndorsements of commercial products," "[r]epetitive posts," "[s]pam," and "[o]ff-topic" content. *Id.*

16

The guidelines were not posted on the NIH's Facebook page or Instagram account until after this lawsuit was filed, although both accounts did previously provide links to a separate "Web Policies and Notices" page that included a different set of commenting rules. JA073–74 (JS ¶¶ 53–54). Even today, nothing in the guidelines or on the relevant accounts mentions keyword blocking, let alone indicates which words the NIH has prohibited.

Keyword blocking is currently the only tool the NIH uses to suppress comments that it believes violate its guidelines. JA077 (JS ¶ 61). The NIH says it reserves the right to manually review comments before they are posted to its Facebook page and Instagram account, but it has never done so. *Id*. The NIH also says it reserves the right to manually review comments after they are posted, but prior to the filing of this lawsuit, the NIH had done this only in a "limited" or "especially limited" way. *Id.* Today it does not manually review comments at all; it relies exclusively on keyword blocking. *Id*. Thus, only comments containing words specified on the NIH's custom keyword blocking lists or its profanity filters are suppressed.

The NIH says its keyword blocking permissibly suppresses animal advocacy because that speech is frequently off-topic. JA075–76 (JS ¶ 58); JA087–88 (JS ¶ 87). There is no evidence that the NIH has ever hidden a comment on the basis of being

17

"off-topic" unless it relates to animal advocacy and includes one or more blocked keywords.

## II.    Procedural history

Plaintiffs filed this lawsuit on September 9, 2021, alleging that the NIH's keyword blocking violates the First Amendment. JA004.[8] In lieu of discovery, the parties filed a joint stipulation of facts and cross-motions for summary judgment. JA008–9. On March 31, 2023, the district court granted the NIH's motion for summary judgment and denied Plaintiffs' motion for summary judgment. The court concluded that the NIH's keyword blocking does not violate the First Amendment because it is a viewpoint-neutral and reasonable speech restriction in a limited public forum. JA095 (Op. at 2).

On May 11, 2023, Plaintiffs timely filed a notice of appeal. JA124–25.

### Summary of Argument

The NIH's keyword blocking violates the First Amendment. This is so even if the Court concludes that the NIH's conduct was content-based rather than

---

[8] Plaintiffs also alleged that the U.S. Department of Health and Human Services relied on unconstitutional keyword blocking. *See* JA011–12 (Compl. ¶ 1). The parties stipulated prior to filing cross-motions for summary judgment that the motions would concern only the NIH's keyword blocking, and not HHS's. *See* Joint Status Report, *People for the Ethical Treatment of Animals v. Tabak*, No. 21-cv-2380, (D.D.C. 2021), ECF No. 29.

viewpoint-based, and even if it concludes the NIH's comment threads are limited rather than open public forums.[9]

First, the NIH's keyword blocking discriminates based on viewpoint and therefore violates the First Amendment regardless of the nature of the forum. The NIH has blocked, and in many cases continues to block, the use of words that on their face express a critical viewpoint on animal testing—including "#stopanimaltesting," "stop," "hurt," and "torture." The NIH also blocks additional words associated with criticism of animal testing. By choosing to suppress these words, the NIH discriminates against the disfavored views held by Plaintiffs and many others who advocate on behalf of animals. The NIH's keyword blocking also prevents Plaintiffs and others in the forum from publicly criticizing the NIH and

---

[9] As the district court noted, there is "considerable confusion" about the terminology used to refer to various public forums. *See* JA106 (Op. 13 n.3) (quoting *White Coat Waste Proj. v. Greater Richmond Trans. Co.*, 35 F.4th 179, 196 n.13 (4th Cir. 2022)). Limited public forums are those that have been opened only "for certain groups or for the discussion of certain topics." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015). Courts have sometimes referred to limited public forums as a subset of designated forums, *see Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992), as a distinct fourth category of public forum, *see Walker*, 576 U.S. at 215, or as a synonym or subset of nonpublic forums, *see Archdiocese of Wash. v. Wash. Metro. Area Trans. Auth.*, 897 F.3d 314, 322, 331 (D.C. Cir. 2018). For clarity, Plaintiffs use the phrase "open designated public forum" or "open forum" to refer to a designated public forum that has not been limited to speech by certain speakers or for certain topics, and "limited public forum" or "limited forum" to refer to forums open for expressive activity but only by certain speakers or for certain topics.

from sharing a perspective on animal testing as a way of responding to the topics raised in the NIH's posts. The NIH claims that its keyword blocking is not viewpoint-discriminatory because the agency is enforcing a general rule against off-topic speech. But even if it is enforcing a viewpoint-neutral rule, the First Amendment forbids the NIH from enforcing it in a viewpoint-discriminatory manner. That is precisely what the NIH is doing. It cannot claim to be enforcing its rule in a viewpoint-neutral manner when its keyword blocking singles out animal advocacy for suppression, regardless of whether it is on- or off-topic, and leaves every other category of political speech untouched. The NIH has shown that it is intentionally suppressing critical viewpoints, not limiting off-topic speech.

Second, the NIH's keyword blocking also fails constitutional scrutiny as a content-based restriction on speech in an open forum. The comment threads on NIH's Facebook page and Instagram account are open forums because the NIH has made them available for speech on virtually any subject matter. The NIH's consistent practice of allowing speech on every topic except animal advocacy, including off-topic speech, contradicts its claim that it has created a limited forum. Content-based restrictions in open forums are subject to strict scrutiny, and the NIH has not even attempted to show that this test is satisfied, for good reason. The NIH cannot articulate a compelling interest for singling out animal advocacy for suppression, and its keyword blocking is neither narrowly tailored to—nor the least

restrictive means of achieving—any legitimate interest the NIH may be able to identify.

Third, even if the comment threads are public forums limited to on-topic speech, the NIH's keyword blocking violates the First Amendment because it is not reasonable in light of the purposes of the forums. Fundamentally, it is not reasonable for the NIH to ban animal advocacy as "off-topic" when this kind of speech is frequently *on*-topic. The district court surmised that most of the off-topic speech in the NIH's comment threads is animal advocacy, but there is no support for that conclusion in the parties' joint stipulation. In any event, the NIH's targeting of animal advocacy would be unreasonable even if it were true that animal advocacy comprises most of the off-topic speech in the comment threads, because it is unreasonable for the NIH to suppress *all* animal advocacy on that basis.

### Standard of Review

This Court's review of the district court's decision is *de novo*. *McCready v. Nicholson*, 465 F.3d 1, 7 (D.C. Cir. 2006). The Court must interpret the summary-judgment record in "the light most favorable to the non-moving party," *Queen v. Schultz*, 747 F.3d 879, 882 (D.C. Cir. 2014), and it "has an obligation to 'make an independent examination of the whole record.'" *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 598 (D.C. Cir. 1988) (citation omitted).

## Argument

### I. The NIH's keyword blocking is unconstitutional viewpoint discrimination.

It is "axiomatic" that the government may not discriminate against speech "based on its substantive content or the message it conveys." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995); *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972) (holding that the government may not "deny use [of a forum] to those wishing to express less favored or more controversial views"). Discrimination against disfavored viewpoints in a public forum is always unlawful, regardless of whether the forum is considered open or limited. *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 444 (D.C. Cir. 2020).

The animal advocacy at issue in this case is political speech that "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation omitted). And it is not just political speech—it is criticism of the government itself, as the NIH plays a central role in funding and perpetuating the animal testing Plaintiffs and others wish to criticize on the NIH's comment threads. Censoring disfavored speech that criticizes the government "strikes at the very center of the constitutionally protected area of free expression." *New York Times Co.*, 376 U.S. at 292; *see also McConnell v. FEC*, 540 U.S. 93, 248 (2003) (Scalia, J., dissenting in part) (explaining that "the right to criticize the government" is "the heart of what the

22

First Amendment is meant to protect"), *overruled by Citizens United v. FEC*, 558 U.S. 310 (2010). By intentionally suppressing this advocacy, the NIH discriminates on the basis of viewpoint and violates the First Amendment.

A.    **The NIH's lists of blocked keywords discriminate against animal advocacy.**

To find viewpoint discrimination, the Court need look no further than the NIH's custom lists of blocked keywords. The NIH blocks keywords that on their face are used to *criticize* the NIH's role in animal testing. Most importantly, the NIH blocks words like "cruelty," "revolting," "torment," "torture," "hurt," "kill," and, tellingly, "stop." JA075–76 (JS ¶ 58). These words are typically used to criticize animal testing and the NIH's role in funding it, not to discuss animal testing generally. The NIH also blocks the names of two past NIH-funded researchers, Steven J. "Suomi" and Harry "Harlow," whose animal experiments have been the target of long-running criticism by animal advocates. *Id*. Even the animal-related words the NIH blocks, like "monkeys" and "primates," are associated with criticism of animal testing, rather than animal testing as a subject matter, as the NIH does not block more clinical terms that are likely to appear in comments supportive of animal testing, like "livestock," "donors," or "subjects."

The NIH's intent to discriminate against animal advocacy is further evidenced by the additional words that the NIH originally blocked but removed after Plaintiffs filed this suit. These words are unambiguously associated with animal advocacy—

23

including "PETA," "PETALatino," "#stopanimaltesting," "#stoptesting," and "#stoptestingonanimals," JA075–77 (JS ¶¶ 58, 60)—which is why the NIH itself recognized below that these phrases "may have signaled a certain viewpoint." *See* Gov't Br. 26, *People for the Ethical Treatment of Animals v. Tabak*, No. 21-cv-2380 (D.D.C. 2021), ECF No. 31. The district court dismissed the relevance of this censorship to Plaintiffs' viewpoint-discrimination claim because the NIH had stopped blocking the terms, and because the terms stemmed (in the court's view) from "overzealous" content moderation rather than discrimination, JA122 (Op. 29 n.13). The court was wrong. First, the NIH's blocking of these terms is relevant here because the agency has not disclaimed the right to block these terms, or similar ones, in the future. *See Zukerman*, 961 F.3d at 442 ("[A]s a general rule, voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot." (internal quotation omitted)). Second, the NIH's keyword blocking is viewpoint-discriminatory even if one assumes (in the absence of record evidence) that the discrimination was the result of an "overzealous" social media manager who acted without malice. The focus of the viewpoint discrimination inquiry is on whether the government has intentionally drawn lines that discriminate against certain perspectives, not on whether it was motivated by ill will. *See Frederick Douglass Found., Inc. v. District of Columbia*, No. 21-7108, 2023 WL 5209556, at *1 (D.C. Cir. Aug. 15, 2023) ("The

First Amendment prohibits discrimination on the basis of viewpoint irrespective of the government's motive."); *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1593 (2022) (finding viewpoint discrimination even though the city's stated motive was merely to comply with the Establishment Clause).

The NIH's custom lists of blocked keywords therefore demonstrate that the NIH is impermissibly "singl[ing] out a subset of messages for disfavor based on the views expressed" in violation of the First Amendment. *Zuckerman*, 961 F.3d at 446.

## B.     The NIH's moderation practices confirm that the NIH's conduct is viewpoint-discriminatory.

The NIH's central argument in this case is that its keyword blocking does not discriminate against a particular viewpoint, but merely tamps down on "off-topic" speech in general. The NIH's overall course of conduct, however, demonstrates that it intentionally targets animal advocacy for disfavored treatment, regardless of whether that speech is on- or off-topic, while ignoring all other types of off-topic speech. Its focus is not on blocking off-topic speech, but on suppressing critical viewpoints. *See Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004) (explaining that "the government rarely flatly admits it is engaging in viewpoint discrimination" and that "suspicion that viewpoint discrimination is afoot is at its zenith when the speech restricted is speech critical of the government"); *cf. Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 697–98 (2010) (remanding for consideration

of whether the university's stated "all-comers" policy was pretext for viewpoint discrimination against Christian student group).

Most glaringly, the NIH suppresses animal advocacy even when that speech is indisputably on-topic. The NIH regularly refers to animal testing in its own posts, and yet it makes no exception to its keyword blocking for comments in response to those posts that are critical of animal testing. Thus, when the NIH presents an "image of a mouse liver," JA201 (Ex. 8 at *2), or the eye of "an anesthetized adult zebrafish," JA203 (Ex. 9 at *2), discusses experiments conducted on animals, JA194–97 (Ex. 6); JA207–211 (Ex. 11); JA256–61 (Ex. 18); JA379 (Ex. 32 at *2); JA413–18 (Ex. 41); JA459–526 (Ex. 52); JA582 (Ex. 56 at *2); JA588 (Ex. 57 at *2),[10] or highlights researchers who have conducted animal experiments, JA215–40

---

[10] Although not mentioned directly in the Facebook or Instagram posts, the studies the NIH discussed in Exhibits 6, 11, 41, and 52 all involved research conducted on animals. *See* Francis Collins, *Groundbreaking Study Maps Key Brain Circuit*, NIH Director's Blog (Dec. 9, 2021), https://perma.cc/GBM4-VPFJ; *NIH scientists identify mechanism that may influence infectivity of SARS-CoV-2 variants*, NIH News Releases (Nov. 5, 2021), https://perma.cc/3P3N-HXTA; *Study reveals brain cells that sustain or suppress fearful memories*, NIH Research Matters (June 8, 2021), https://perma.cc/H9KT-4FV3; Francis Collins, *Early Data Suggest Pfizer Pill May Prevent Severe COVID-19*, NIH Director's Blog (Nov. 16, 2021), https://perma.cc/CSZ5-SEN8. And the Bespoke Gene Therapy Consortium announced in Exhibit 18 involves research on "animal models of disease." *See NIH, FDA, and 15 private organizations join forces to increase effective gene therapies for rare diseases*, NIH News Releases (Oct. 27, 2021), https://perma.cc/HZT6-57GZ. The Court may take judicial notice of this information contained on the NIH's website. *See Kaspersky Lab, Inc. v. DHS*, 909 F.3d 446, 464 (D.C. Cir. 2018) (noting that courts may take judicial notice of readily-determined facts not subject to reasonable dispute); *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C.

(Ex. 13); JA250–55 (Ex. 17); JA320–48 (Ex. 25); JA364–65 (Ex. 29),[11] users on

Facebook cannot criticize the NIH's decision to fund studies on "mice," and cannot,

on either Facebook or Instagram, share their belief that what the NIH refers to as a

"study" is actually "torture." *See* JA075–76 (JS ¶ 58).

Even where the NIH does not itself raise the issue of animal testing, animal

advocacy is nonetheless often relevant and yet remains suppressed because of the

NIH's keyword blocking. When the NIH posted a study relating to PTSD and

anxiety disorders, for example, it suppressed Ms. Krasno's comment describing her

---

Cir. 2013) (taking judicial notice of information in a document on a government board's website).

[11] Dr. Angela Kruse, Ex. 13, Dr. Umut Gurkan, Ex. 17, Dr. Kizzmekia Corbett, Ex. 25, and Dr. Ned Sharpless, Ex. 29, have all used animal testing in their research. *See* Angela Kruse et al., *Combining 'omics and microscopy to visualize interactions between the Asian citrus psyllid vector and the Huanglongbing pathogen Candidatus Liberibacter asiaticus in the insect gut*, PLoS ONE (2017), https://perma.cc/MZG7-F9FA; Andy Weiss et al., *Zn regulated GTPase metalloprotein activator 1 modulates vertebrate zinc homeostasis*, 185 Cell 2148 (2022), https://perma.cc/TT9S-HS5H; Katerina V. Djambazova et al., *MALDI TIMS IMS of Disialoganglioside Isomers—GD1a and GD1b in Murine Brain Tissue*, 95 Analytical Chemistry 1176 (2023), https://perma.cc/M3FQ-2VFT; Umut Atakan Gurkan et al., *Comparison of Morphology, Orientation, and Migration of Tendon Derived Fibroblasts and Bone Marrow Stromal Cells on Electrochemically Aligned Collagen Constructs*, 94 J. Biomed. Materials Rsch. 1070 (2010), https://perma.cc/8HVH-HPVL; Kizzmekia S. Corbett et al., *SARS-CoV-2 mRNA Vaccine Design Enabled by Prototype Pathogen Preparedness*, 586 Nature 567 (2020), https://perma.cc/CB4N-26AZ; Norman E. Sharpless & Ronald A. Depinho, *The mighty mouse: genetically engineered mouse models in cancer drug development*, 5 Nature Reviews Drug Discovery 741 (2006), https://perma.cc/3SD2-VXX4. The Court may take judicial notice of this information. *See Kaspersky Lab, Inc.*, 909 F.3d at 464; *Cannon*, 717 F.3d at 205 n.2.

own PTSD diagnosis following her work in the NIH-funded Harlow Primate Lab. *See* JA083–84 (JS ¶ 77); JA415 (Ex. 41 at *3); *see generally* JA413–22 (Exs. 41–42). When it hosted a live question and answer session on COVID-19, it suppressed a PETA employee's question about why the NIH was not diverting funds from animal experiments to "clinical research about COVID-19." *See* JA078–79 (JS ¶ 65); JA317 (Ex. 24 at *2); *see generally* JA316–48 (Exs. 24–25). The NIH has allowed commenters to respond to announcements about the COVID-19 vaccine by raising concerns that they were being experimented on like "lab rats," *see* JA134 (Ex. 1 at *9), but its keyword blocking does not allow commenters to raise concerns about whether the COVID-19 vaccine was tested on "animals," *see* JA075–76 (JS ¶ 58).

The NIH's intent to discriminate against animal advocacy is underscored by its failure to take any steps to block any other category of off-topic speech. Indeed, off-topic comments on other topics abound on the NIH's comment threads. While advocates cannot post comments telling the NIH that its experiments on mice cause "hurt" or "torment," the NIH has allowed members of the public to weigh in on those posts with wholly irrelevant comments, like "It's IVERMECTIN!!," JA021 (Ex. 8 at *2), "ALLAHU AKBAR," *id.*, and "I'm paying $5,250 to the first 10 people to hit me up now with 'STRUGGLING' stay blessed y'all," JA584 (Ex. 56 at *4). The NIH suppressed Ms. Krasno's comment about PTSD and the Harlow Primate Lab,

28

but it left untouched comments suggesting that "the m a g n e t challenge is real" and "I just received my profit, contact the best Manager by clicking the name Below." *See* JA421 (Ex. 42 at *3). These are not individual examples of off-topic comments that happened to slip through the cracks. Off-topic comments of all sorts are ubiquitous on the NIH's comment threads, *see, e.g.*, JA134 (Ex. 1 at *9); JA144 (Ex. 2 at *2); JA192 (Ex. 5 at *3); JA203 (Ex. 9 at *2); JA205 (Ex. 10 at *2); JA210 (Ex. 11 at *4); JA303 (Ex. 23 at *2); JA333 (Ex. 25 at *14); JA356 (Ex. 27 at *2); JA368 (Ex. 30 at *3); JA394 (Ex. 36 at *3); JA400 (Ex. 38 at *3); JA403–04 (Ex. 38 at *6–7); JA411 (Ex. 40 at *2); JA421 (Ex. 42 at *3). The only speech the agency attempts to suppress is animal advocacy—it presented no evidence that it engages in automatic keyword blocking or manual comment review to exclude other types of off-topic speech. That the NIH does not treat equally offending comments in the same way demonstrates that it is intentionally discriminating against a viewpoint. *Frederick Douglass Found.*, 2023 WL 5209556, at *9; *Zukerman v. U.S. Postal Serv.*, 64 F.4th 1354, 1359 (D.C. Cir. 2023).

Because the record demonstrates that the NIH targets animal *advocacy*, the district court erred in concluding the NIH's keyword blocking is a subject-matter limitation. *See* JA121–23 (Op. 28–30). Indeed, the very cases on which the court relied demonstrate why the NIH's conduct here is viewpoint-discriminatory. In *Lamb's Chapel*, for example, a school district argued that its decision to prohibit a

religious group from screening a film series about "traditional, Christian family values" was not viewpoint-discriminatory, and was instead a permissible subject-matter limitation, because of the district's policy prohibiting use of school property for religious purposes. *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 388, 393 (1993). The Supreme Court expressly rejected this argument, concluding that even though the policy applied to "all religions," the school board discriminated against religious perspectives as a whole because it prohibited religious groups from discussing family issues "from a religious standpoint." *Id*. at 393. The NIH's actions are even more blatantly viewpoint-discriminatory. Rather than ban all speech related to animal testing equally, it has specifically targeted animal advocacy by blocking terms like "#stopanimaltesting," "torture," "hurt," and "stop." And to the extent that some of the terms on the NIH's custom keyword blocking lists could be used by supporters as well as critics of animal testing, its keyword blocking fails for the same reason the ban in *Lamb's Chapel* failed: it targets animal testing not merely as a subject matter of discussion, but also as a perspective. Commenters may want to mention the impact of animal advocacy or animal testing when discussing "otherwise permissible" subjects—like biomedical ethics, experiences with PTSD or other mental health issues, and research studies conducted through animal experimentation—but the NIH's keyword blocking prevents them from doing so. This is precisely what *Lamb's Chapel* states the

30

government may not do. *See* 508 U.S. at 394; *see also Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 108–12 (2001).

The district court characterized the NIH's targeting of animal advocacy as incidental, relying on cases like *Madsen v. Women's Health Center, Inc.* and *Perry Education Association v. Perry Local Educators' Association*, JA122–23 (Op. 29–30), but these cases are inapposite. *Madsen* involved a content-neutral injunction limiting the time, place, and manner of the petitioners' speech. 512 U.S. 753, 759–61 (1994). The Court limited the scope of the injunction to protect the petitioners' anti-abortion speech, ensuring it would be suppressed only when it was in direct conflict with the government's interest in protecting women seeking medical care. *Id*. at 769–76. Here, in contrast, the NIH suppresses animal advocacy because of the content of that speech, JA075–76 (JS ¶ 58); JA087–88 (JS ¶ 87)—and it does so even when that speech would not violate the NIH's asserted off-topic rule.

*Perry* is equally inapposite. In that case, the Court condoned a school board's practice of allowing the union that exclusively represented the district's teachers to use school mailboxes, while denying access to a challenging union, because the practice was "based on the *status* of the respective unions rather than their views." 460 U.S. 37, 49 (1983). Had the school board instead issued a rule analogous to the one here, ostensibly prohibiting all speech unrelated to the school, while in practice suppressing all speech by the challenging union even when it related to school

31

activities and hosting all speech by the representative union even when it did not, the Supreme Court surely would have reached a different decision. In neither *Madsen* nor *Perry* were the speech restrictions targeted at particular viewpoints, even if their effects fell more harshly on speakers with certain views. In contrast, the NIH's keyword blocking does not merely "disproportionately burden[] one viewpoint," JA123 (Op. 30), it is *designed* to burden animal advocacy and animal advocacy alone. For this reason, it is textbook viewpoint discrimination and violates the First Amendment, regardless of whether the comment threads are considered open or limited public forums.

## II.     The NIH's keyword blocking also violates the First Amendment because it is an unconstitutional content-based speech restriction.

Even if the NIH's keyword blocking were not viewpoint-discriminatory, it would still be unconstitutional because it suppresses animal advocacy on the basis of its content. The NIH's keyword blocking cannot survive the strict scrutiny necessary to sustain such a restriction in an open designated public forum. Indeed, it fails even the reasonableness standard that applies in limited forums, because it is unreasonable in light of the purpose of the comment threads.

A.    **The NIH's keyword blocking is subject to—and fails—strict scrutiny.**

1.    **The NIH's comment threads are open forums.**

The "touchstone" of the public forum inquiry is "the government's intent in establishing and maintaining the property." *Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1016 (D.C. Cir. 1988). To determine intent, this Court looks to objective factors, including "the nature of the property, its compatibility with expressive activity, and the *consistent* policy and practice of the government." *Bryant v. Gates*, 532 F.3d 888, 896 (D.C. Cir. 2008) (quoting *Stewart*, 863 F.2d at 1016–17). Each of those factors favors the conclusion that the NIH's comment threads are open designated public forums.

There is no question that the first two public forum factors—the nature of the space and its compatibility with expression—weigh in favor of finding that the NIH's comment threads are open forums. Comment threads on social media sites are not just compatible with expressive activity—expressive activity is the entire point. Social media "offers relatively unlimited, low-cost capacity" for a "wide array of protected First Amendment activity on topics as diverse as human thought." *Packingham v. North Carolina*, 582 U.S. 98, 104–05 (2017) (internal quotation omitted). That the NIH chose to open social media accounts "to communicate and interact with citizens," *see* JA067 (JS ¶ 36), demonstrates its intent to open forums for communication with and by members of the public. *See*, *e.g.*, *Garnier v.*

33

*O'Connor-Ratcliff*, 41 F.4th 1158, 1178 (9th Cir. 2022) (concluding these factors favored finding comment threads were public forums), *cert petition granted on other grounds*, No. 22-324, 2023 WL 3046119 (Apr. 24, 2023); *Davison v. Randall*, 912 F.3d 666, 682 (4th Cir. 2019) (same).

The evidence in the record confirms the NIH's intent to create open, not limited, public forums. The NIH posts publicly on an array of topics, including COVID-19, maternal mortality, family care, and medical research. *See, e.g.*, JA126–50 (Exs. 1–2); JA355–57 (Ex. 27); JA378–81 (Ex. 32). It allows anyone to comment on these posts without preapproval, JA077 (JS ¶ 61), fostering discussion on a range of issues including medical ethics, *see* JA134 (Ex. 1 at *9); JA285 (Ex. 21 at *16); JA334 (Ex. 25 at *15); JA428 (Ex. 43 at *6); JA469 (Ex. 52 at *11), politics, *see* JA147 (Ex. 2 at *5); JA278 (Ex. 21 at *9), and social issues, *see generally* JA143–53 (Exs. 2–3). This type of unfettered, indiscriminate, and "boisterous" First Amendment activity that the NIH fosters in its comment threads is strong "evidence of compatibility bearing on the government's intent." *Stewart*, 863 F.2d at 1019–20.

Pointing to its commenting guidelines, the NIH argued below that it had opened only limited forums for speech, and the district court agreed, JA110–14 (Op. 17–21). The court was wrong to reach this conclusion. The undisputed record shows that the guidelines are largely unenforced and that the agency targets only animal advocacy. In practice, the NIH operates its comment threads as open forums.

First, until this lawsuit was filed, the NIH did not publicize the guidelines on its Facebook page or Instagram account, which meant it was nearly impossible for commenters to identify the "standards for inclusion and exclusion," *Garnier*, 41 F.4th at 1178, that are necessary to restrict a forum. Even now, the NIH does not disclose on its Facebook page or Instagram account that it uses keyword blocking, does not publicize its custom lists of blocked keywords, and does not say when purportedly off-topic speech will be suppressed. The NIH's failure to explain its purported forum-limiting policies undermines its claim that the comment threads are limited forums. *See Archdiocese of Wash. v. Wash. Metro. Area Trans. Auth.*, 897 F.3d 314, 324–25 (D.C. Cir. 2018) (explaining that the forum doctrine requires the government to "prospectively and categorically set subject matter regulations").

Second, although the NIH has said that the guidelines establish which categories of speech are permitted in its comment threads, the record demonstrates that those guidelines have been unenforced. *See Hopper v. City of Pasco*, 241 F.3d 1067, 1076 (9th Cir. 2001) ("[C]onsistency in application is the hallmark of any policy designed to preserve the non-public status of a forum."); *United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 352–53 (6th Cir. 1998); *Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of Chi.*, 45 F.3d 1144, 1153 (7th Cir. 1995); *Grace Bible Fellowship, Inc. v. Me. Sch. Admin. Dist. No. 5*, 941 F.2d 45, 47 (1st Cir. 1991); *Stewart*, 863 F.2d at 1020. To name a few examples:

- The guidelines state that the NIH will review all comments "before they can be posted," JA263 (Ex. 19), but the NIH does not follow this policy, JA077 (JS ¶ 61).

- The guidelines prohibit comments containing endorsements of commercial products or other entities, JA263 (Ex. 19), but the NIH makes no meaningful effort to actually limit these comments in practice. *See* JA134 (Ex. 1 at *9), JA211 (Ex. 11 at *5). JA217 (Ex. 13 at *3), JA404 (Ex. 38 at *7), JA420 (Ex. 42 at *2).

- The guidelines prohibit repetitive posts and spam, JA263 (Ex. 19), but these types of comments also appear frequently on the NIH's comment threads without any apparent intervention by the agency. *See* JA126–42 (Ex. 1 at *2, *3, *6, *8, *9, *10, *12), JA199 (Ex. 7 at *2), JA325–26 (Ex. 25 at *6–7).

In particular, the NIH has shown absolutely no interest in limiting off-topic comments other than those containing animal advocacy. As discussed above, the agency does not moderate other types of off-topic speech at all, whether through keyword blocking or manual comment review. *See* Part IB, *supra*; *see also* JA077 (JS ¶ 61) (explaining that the NIH has not engaged in manual comment moderation of any kind for years, and that it has never engaged in anything more than "limited" review).

The NIH's failure to moderate any other type of purportedly off-topic speech is not a matter of minor inconsistency at the margins of an otherwise adequately enforced policy. *See Ridley*, 390 F.3d at 78 (explaining that "one example of a seemingly contradictory enforcement of [a] policy" is insufficient against evidence of otherwise "stringent mechanisms" to ensure compliance with speech policy);

36

*Hodge v. Talkin*, 799 F.3d 1145, 1162 (D.C. Cir. 2015) (explaining that the presence of protestors on the Supreme Court plaza "for a quarter of an hour" did not overcome a "practice of strict enforcement" of a policy generally prohibiting demonstrations). There is no baseline of consistent enforcement here at all, since the NIH did not "cite an example within memory of a refusal" to host any other type of off-topic speech. *Grace Bible Fellowship, Inc.*, 941 F.2d at 47 (finding an open forum despite the school district's policy purportedly limiting use to events "reasonably compatible with the mission and function of the school district" and its practice of excluding religious activities); *see also Planned Parenthood Ass'n/Chi. Area v. Chi. Transit Auth.*, 767 F.2d 1225, 1230 (7th Cir. 1985) (rejecting the argument that transit authority had a "long-standing and consistently enforced" policy when it pointed to only two instances of enforcement outside the challenged rejection); *Concerned Women for Am., Inc. v. Lafayette Cnty.*, 883 F.2d 32, 34–35 (5th Cir. 1989) (explaining that where a library allowed use of its facilities to diverse groups but did not grant access to religious or political groups, it had created a public forum). Because the NIH has chosen not to enforce its off-topic rule in any even-handed way, the district court's concern about holding the NIH "to the standard of perfection," JA111 (Op. 18), was misplaced.

The district court also excused the NIH's lack of enforcement of its guidelines by suggesting that a government's enforcement of its speech policy primarily

matters when its written policies are "ambiguous, contradictory, or non-existent." JA112 (Op. 19). But that is not correct: in all public forum cases, "actual practice speaks louder than words." *Grace Bible Fellowship, Inc.*, 941 F.2d at 47; *see also Stewart*, 863 F.2d at 1020 (holding that "the consistent policy and practice of the [government] in controlling the uses of the [forum] are key indicators of the government's intent"); *Stewart v. D.C. Armory Bd.*, 789 F. Supp. 402, 405–06 (D.D.C. 1992) (holding, in a later case brought by the same plaintiffs, that RFK stadium was an open forum despite the existence of an explicit policy to the contrary); *Kimsey v. City of Sammamish*, 574 F. Supp. 3d 911, 920 (W.D. Wash. 2021) (finding comment threads on a social media page were open forums despite the existence of commenting guidelines, including a rule prohibiting off-topic speech). In any event, the NIH's guidelines are the sort of "ambiguous" rules, JA112 (Op. 19), that courts must scrutinize closely. The NIH's written policy prohibits off-topic speech, but as discussed above, the policy it enforces is radically different. For that reason, this case is far afield from those involving public meetings, where an agenda is set in advance and participants are on notice of topics they should or should not discuss. *Steinburg v. Chesterfield Cnty. Plan. Comm'n*, 527 F.3d 377, 385 (4th Cir. 2008) (explaining that a commission may "limit[] its meeting to a discussion of specified agenda items"); *Galena v. Leone*, 638 F.3d 186, 198–99 (3d Cir. 2011) (concluding that a city council meeting was a limited forum because it "was held for

the limited purpose of governing Erie County and discussing topics related to that governance").

In sum, the NIH's actual practice demonstrates that it has operated essentially wide-open forums for expression of all kinds and has not enforced its commenting guidelines as a whole or its off-topic rule in particular. Allowing the NIH to rely on the fact that it suppresses animal advocacy as the sole evidence for its claim that it has created limited forums would not only be illogical, it would create an end-run around the protections of the First Amendment. *See Stewart*, 863 F.2d at 1017 (explaining that "the very fact that the government *has* restricted speech in the manner challenged in a forum case does *not* of its own weight demonstrate that the government did not intend to designate a public forum"); *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 117 (5th Cir. 1992); *see also Air Line Pilots Ass'n*, 45 F.3d at 1153 ("This factual inquiry into consistent policy and practice . . . guards against the dangers of post-hoc policy formation *or the discretionary enforcement of an effectively inoperative policy*." (emphasis added)). Recognizing that the NIH's comment threads are open forums would not hold the government to an impossibly high standard. Nor would it lead the government to close off forums for speech entirely. The First Amendment doesn't require perfection, but it requires more than what the NIH has done here. Thus, the Court need not fear that enforcing the usual forum analysis in this context would undermine legitimate government interests: to

39

the contrary, it would ensure that the digital public forums that are increasingly important to our democracy do not become warped by censorship.

### 2. The NIH's keyword blocking fails strict scrutiny.

A content-based restriction on speech in an open forum is constitutional only if it (1) "serve[s] compelling state interests," *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); (2) is "narrowly tailored to that end," *id.* at 171; and (3) is the "least restrictive means of achieving" that interest, *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). The NIH has never argued that its keyword blocking could survive this level of scrutiny, and for good reason: it fails all three prongs of the strict scrutiny analysis.

The NIH has no compelling interest in suppressing animal advocacy. To the extent it argues that it is doing so because it believes this speech tends to distract from the NIH's messaging, this is not a compelling state interest. *See Mahoney v. Babbit*, 105 F.3d 1452, 1458–59 (D.C. Cir. 1997) (explaining that the government's desire to prevent protestors from "interject[ing] their convictions and beliefs into a public event on a public forum" was "hardly" a compelling state interest "or, in the face of the First Amendment, any legitimate state interest at all").[12]

---

[12] Some courts have recognized that the need to prevent disruption in a physical meeting can be a legitimate state interest. *White v. City of Norwalk*, 900 F.2d 1421, 1426 (9th Cir. 1990); *Jones v. Heyman*, 888 F.2d 1328, 1332–33 (11th Cir. 1989). But the rationale supporting that interest does not apply in the context of social media, where there are not the same temporal or spatial constraints and members of

Even if the NIH could point to a compelling interest that would support an off-topic rule, its keyword blocking is not narrowly tailored to that goal. As stated above, *see* Part IB, the NIH's keyword blocking is wildly over- and underinclusive, suppressing on-topic animal advocacy while leaving all other off-topic comments undisturbed. The agency's practices thus raise "serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011).

Nor is the NIH's keyword blocking the least restrictive means of achieving its goals. If the NIH's concern is disruption, it has not even tried to address this concern in less speech-restrictive ways. For example, the NIH could have addressed or mitigated concerns about disruption by:

- Actively responding to comments, either to encourage engagement with what it believes to be meaningful conversations or to ask commenters to avoid discussing topics it believes to be irrelevant.

---

the public can "with the flick of a finger, simply scroll past repetitive or irrelevant comments." *Garnier*, 41 F.4th at 1181–82 (questioning whether "concerns about the 'visual clutter' created by" unwanted comments could be a compelling state interest); *Kimsey*, 574 F. Supp. 3d at 921 ("[T]he avoidance of distraction and dilution of public safety messages does not appear to be a compelling government interest."). In any event, for the reasons discussed below, an anti-disruption interest would still have to be furthered in a manner that is narrowly tailored, and the NIH's keyword blocking is not.

- "Pinning" what it believes to be important comments, which would ensure those comments appear first as people scroll through the NIH's comment threads. Pinning is a feature currently available on Instagram.[13]

- Manually reviewing comments to suppress repetitive comments or spam.

- Manually reviewing comments to suppress speech it considers to be actually disruptive on a case-by-case basis.

- Manually reviewing comments to enforce its off-topic rule.[14]

The NIH's complete failure to try less-restrictive options renders its conduct unconstitutional.

## B. Even if the NIH's comment threads were limited forums, the NIH's keyword blocking would be unreasonable and therefore unconstitutional.

Even in limited forums, speech restrictions must be viewpoint-neutral and reasonable. The NIH's keyword blocking fails this scrutiny because it discriminates based on viewpoint. *See* Part I, *supra*. It also fails because it is not reasonable in light of the purposes of the forums. As the Supreme Court has explained, in order to show that a speech restriction is "reasonable," the government must demonstrate that it

---

[13] *See About Protecting your Business on Instagram*, Instagram Help Center, https://perma.cc/XN5T-TVUN; JA061 (JS 10 n.3) (stipulating that the Court may take judicial notice of information published in Instagram's help center).

[14] Plaintiffs do not concede that each of these alternatives would necessarily be constitutional in an open forum. The point here is that each of these methods would accomplish the government's asserted goals without burdening nearly as much speech as the NIH's current keyword blocking does.

furthers a "permissible objective" and contains "objective, workable standards" that are "capable of reasoned application." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1886, 1891–92 (2018). The government has not met its burden.

As discussed above, it is unclear whether the NIH's stated objective of limiting speech that "disrupt[s]" the NIH's messaging and "clutter[s]" its comment threads, JA087–88 (JS ¶ 87), is legitimate. *See* Part IIA2, *supra*. At most, those interests are weak here. *Id.*; *see also Garnier*, 41 F.4th at 1181.

But even accepting that preventing clutter and limiting distraction could be a permissible objective in the abstract, the NIH still must show that its keyword blocking *furthers* that objective and remains "consistent with [its] legitimate interest in maintaining the property for its dedicated use." *Archdiocese of Wash.*, 897 F.3d at 330. The focus of this Court's reasonableness analysis must remain on the NIH's actual keyword blocking, not the theoretical reasonableness of an off-topic rule overall. Here, the NIH's implementation of keyword blocking is so arbitrary and unreasonable that it undermines the purposes it purportedly aims to further.

First, the NIH's keyword blocking is unreasonable because it suppresses animal advocacy without any regard to whether that speech is actually on- or off-topic. *See* Part IB, *supra*. Although some courts have approved off-topic rules in the context of social media pages, *see, e.g.*, *Davison v. Plowman*, 247 F. Supp. 3d 767, 777 (E.D. Va. 2017), *aff'd* 715 F. App'x 298 (4th Cir. 2018), no court has ever

approved a practice that blocks an entire category of political speech as being presumably and permanently off-topic.[15] This is for good reason—an off-topic rule, applied neutrally, must be defined by the topic being discussed in a meeting (or comment thread) rather than a selective prohibition on one category of disfavored speech. Here, the NIH's keyword blocking suppresses animal advocacy even when it is germane to an NIH post. Because the NIH's keyword blocking is not logically or in practice tied to the NIH's purported objective of blocking off-topic speech, it is unreasonable. *See Women's Health Link, Inc. v. Fort Wayne Pub. Transp. Corp.*, 826 F.3d 947, 952 (7th Cir. 2016) (holding a transit company's rejection of an ad was unconstitutional because the contents of the ad did not meet any of the government's established reasons for exclusion); *see also Air Line Pilots Ass'n*, 45 F.3d at 1159 (explaining that the reasonableness standard requires the government to determine whether speech "would actually interfere with the forum's stated purposes" (cleaned up)); *Bynum v. U.S. Capitol Police Bd.*, 93 F. Supp. 2d 50, 57 (D.D.C. 2000) (concluding that regulations were unconstitutional because they

---

[15] Because cases like *Davison* focus on the constitutionality of a general prohibition on off-topic speech and not on keyword blocking as a way to enforce that rule, they are inapposite to the resolution of this case. *See Davison*, 247 F. Supp. 3d at 777; *Charudattan v. Darnell*, No. 1:18cv109MW/GRJ, 2019 WL 12043587, at *7 (N.D. Fla. Feb. 7, 2019; *Krasno v. Mnookin*, 638 F. Supp. 3d 954, 977, 979–81 (W.D. Wis. 2022) *appeal filed* No. 22-3170 (7th Cir. Dec. 2, 2022).

"swe[pt] too broadly" in relation "to the legitimate purposes" articulated by the government).

Second, it is not reasonable for the NIH to enforce its off-topic rule by suppressing only animal advocacy, as this approach leaves swaths of off-topic comments unaddressed by design. *See* Part IB, *supra*; *see also Mansky*, 138 S. Ct. at 1891 (explaining that courts should consider whether "unfair or inconsistent enforcement" makes speech restrictions unreasonable); *Archdiocese of Wash.*, 897 F.3d at 330 (explaining that "a challenged regulation may be unreasonable, regardless of the reasons for its adoption, if it is inconsistently enforced"). As currently conceived, the NIH's keyword blocking permits off-topic comments on subjects other than animal advocacy, and the NIH does not attempt to suppress these comments through manual review. JA077 (JS ¶ 61). It therefore unreasonably fails to address—or even attempt to address—any other off-topic content. *See* JA075–76 (JS ¶¶ 58–59).

The suggestion that suppressing animal advocacy alone is justified because it is a "flagrant offending subject matter," *see* JA119 (Op. 26), is misguided. The NIH has never asserted, much less shown, that animal advocacy is the most common type of off-topic speech in its comment threads. And the record demonstrates that there are other frequent types of off-topic speech. For example, off-topic comments about COVID-19 appear to be similarly prevalent on the NIH's Facebook page and

45

Instagram account. *See, e.g.*, JA203 (Ex. 9 at *2) ("ARREST FAUCI . . . biological warfare WUHAN VIRUS" on an NIH Instagram post about human eye disease and disorders); JA245 (Ex. 15 at *2) ("NIH IS A CORRUPT CRIMINAL AGENCY . . . COVID SHOTS ARE NOT SAFE OR EFFECTIVE . . . SHAME ON YOU ALL MURDERERS" on an NIH Instagram post about an Alzheimer's caregiver); JA356 (Ex. 27 at *2) ("H[i], does anyone know where I can make the Janssen Johnson&Johnson vaccine?" on an NIH Facebook post about research on social deprivation among adopted children); JA412 (Ex. 40 at *3) ("IVERMECTIN saves lives" on an NIH Instagram post about the NIH's diversity program).

Although the NIH has asserted that animal advocacy on its comment threads is disruptive, JA087–88 (JS ¶ 87), it conflates disruption with legitimate criticism. For example, the NIH pointed to user complaints about comments criticizing animal testing during a Twitter "live chat," but those comments were both legitimate and relevant: as the NIH itself conceded during the chat, much of the brain research it discussed was conducted through animal testing. JA535 (Ex. 55 at *5); JA539 (Ex. 55 at *9); JA543 (Ex. 55 at *13); JA 545 (Ex. 55 at *15); JA549 (Ex. 55 at *19).[16]

---

[16] Regardless, the NIH's use of hashtags to host live discussions among multiple accounts on Twitter is not relevant to the issues in this case. The NIH did not introduce any examples of users complaining about distraction or disruption on the NIH's Facebook page and Instagram account. It highlighted one reply asserting that a user's criticism of animal testing on an NIH Facebook post was off-topic, *see* JA087–88 (JS ¶ 87); JA457–58 (Ex. 51), but in fact, the development of the anti-

The mere exposure to dissenting views that users would prefer not to hear is neither "distracting" nor "disruptive." Rather, it is an essential part of the exchange of ideas. In any event, animal advocacy is not the only form of speech that has generated user objections. *See* JA087–88 (JS ¶ 87); *see also* JA174–75 (Ex. 4 at *21–22); JA465 (Ex. 52 at *7); JA498 (Ex. 52 at *40); JA514 (Ex. 52 at *56). Accordingly, the NIH's myopic focus on animal advocacy is not justifiable and does not meaningfully further its asserted interests.

The difficulty of implementing keyword blocking and enforcing commenting rules perfectly is no excuse for the NIH's nakedly selective enforcement. The district court suggested that government actors face "a Sisyphean task" of comment-by-comment review, *see* JA120 (Op. 27), but Plaintiffs have never suggested that "reasonableness" requires perfection—only a rational rule, fairly and consistently enforced. The NIH's keyword blocking plainly does not meet this bar. Nor can the NIH wave away its responsibility to enforce any off-topic rule consistently and fairly by pointing to resource constraints. It has failed to show, beyond conclusory statements, that a lack of resources prevents it from policing its comment threads in a constitutional manner. In any event the First Amendment does not allow the government to restrict free speech rights to save money. *See, e.g.*, *R.J. Reynolds*

---

viral pills discussed in the post involved research conducted on animals. *See* n.10, *supra*; *see also* JA459–JA526 (Ex. 52).

*Tobacco Co. v. FDA*, 845 F. Supp. 2d 266, 276 (D.D.C. 2012), *aff'd* 696 F.3d 1205

(D.C. Cir. 2012); *see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S.

781, 795 (1988). For these reasons, the NIH's keyword blocking is unreasonable and

therefore unconstitutional.

### Conclusion

For the foregoing reasons, this Court should reverse the decision below and

remand with instructions to enter judgment in favor of Plaintiffs.

Dated: September 8, 2023                    Respectfully submitted,

   /s/ Stephanie Krent
Stephanie Krent
Katherine A. Fallow
Alexia Ramirez
Jameel Jaffer
Knight First Amendment Institute at
   Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
stephanie.krent@knightcolumbia.org

*Counsel for Plaintiffs–Appellants*

   /s/ Christopher A. Berry
Christopher A. Berry
Animal Legal Defense Fund
525 E. Cotati Ave.
Cotati, CA 94931
(707) 795-2533 ext. 1041
cberry@aldf.org

Caitlin M. Foley
Animal Legal Defense Fund
150 South Wacker Drive, Suite 2400
Chicago, IL 60606
(707) 795-2533 ext. 1043
cfoley@aldf.org

*Counsel for Plaintiffs–Appellants Madeline Krasno and Ryan Hartkopf*

/s/ Ashley Ridgway
_____
Ashley Ridgway
Asher Smith
Aaron Frazier
People for the Ethical Treatment of Animals, Inc.
1536 16th Street NW
Washington, DC 20036
(202) 483-7382
ashleyr@petaf.org

*Counsel for Plaintiff–Appellant People for the Ethical Treatment of Animals, Inc.*

## Certificate of Compliance

This brief complies with the type-volume limitations of Fed. R. App. P. 28.1(e)(2) because it contains 11,582 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as calculated by the word-counting function.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: September 8, 2023                        /s/ Stephanie Krent
                                               Stephanie Krent

**Certificate of Service**

I, Stephanie Krent, certify that on September 8, 2023, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: September 8, 2023

 /s/ Stephanie Krent
Stephanie Krent