ORAL ARGUMENT NOT YET SCHEDULED

Case No. 23-5110

---

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

People for the Ethical Treatment of Animals,
Madeline Krasno, and Ryan Hartkopf,

*Appellants,*

v.

Lawrence A. Tabak, in his official capacity as Acting Director of the National Institutes of Health, and Xavier Becerra, in his official capacity as Secretary of the U.S. Department of Health and Human Services,

*Appellees.*

---

Appeal from the United States District Court for the District of Columbia,
No. 21-cv-2380-BAH
Hon. Beryl A. Howell

---

# BRIEF OF *AMICI CURIAE* ELECTRONIC FRONTIER FOUNDATION AND FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION IN SUPPORT OF APPELLANTS AND REVERSAL

---

Sophia Cope
David Greene
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109-7701
Tel: (415) 436-9333
Fax: (415) 436-9993
sophia@eff.org

*Attorneys for Amici Curiae
Electronic Frontier Foundation and
Foundation for Individual Rights and
Expression*

September 15, 2023

**CERTIFICATE**

**AS TO PARTIES, RULINGS, RELATED CASES AND STATUTES**

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rules 26.1 and 28(a)(1), the Undersigned counsel certifies as follows:

**A.      Parties and *Amici***

Appellants, who were plaintiffs in the district court, are People for the Ethical Treatment of Animals, Inc. (PETA), Madeline Krasno, and Ryan Hartkopf. Appellees, who were defendants in the district court, are Lawrence Tabak, in his official capacity as Acting Director of the National Institutes of Health, and Xavier Becerra, in his official capacity as Secretary of the U.S. Department of Health and Human Services.

No *amici* or intervenors appeared in the district court. The Electronic Frontier Foundation (EFF) and Foundation for Individual Rights and Expression (FIRE) filed an amended notice of intent to participate in this appeal as *amici curiae* on September 14, 2023.

**B.      Rulings Under Review**

On March 31, 2023, United States District Judge Beryl A. Howell issued a memorandum opinion and order denying Plaintiffs–Appellants' motion for summary judgment and granting Defendants–Appellees' cross-motion for summary judgment. *People for the Ethical Treatment of Animals v. Tabak*, No.

i

21-cv-2380 (D.D.C. Mar. 31, 2023), ECF Nos. 43, 44. The March 31, 2023 opinion is not published in the federal reporter but is available at 2023 WL 2809867 and is attached to Appellants' Notice of Appeal as well as the Joint Appendix, beginning at JA094.

**C.    Related Cases**

The appealed ruling has not previously been before this Court or any other court. There are no related cases pending before this Court or any other court of which counsel is aware.

September 15, 2023                           */s/ Sophia Cope*
                                            Sophia Cope

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, *amici* submit the following corporate disclosure statement: *Amici* Electronic Frontier Foundation (EFF) and Foundation for Individual Rights and Expression (FIRE) are donor-funded, nonprofit civil liberties organizations. They have no parent corporations and do not issue stock.


September 15, 2023                    */s/ Sophia Cope*
                                     Sophia Cope

# TABLE OF CONTENTS

**Page**

CERTIFICATE ........................................................i

AS TO PARTIES, RULINGS, RELATED CASES AND STATUTES ..........i

CORPORATE DISCLOSURE STATEMENT ...............................iii

TABLE OF AUTHORITIES ........................................vi

GLOSSARY OF ABBREVIATIONS ....................................x

STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE* AND SOURCE OF AUTHORITY TO FILE.......................................1

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS ....................................................2

INTRODUCTION ................................................3

ARGUMENT ....................................................5

    I.    An "Off Topic" Rule Is Less Reasonable in Digital Limited Public Forums Than Physical Spaces Especially Due to the Risk of Viewpoint Discrimination................................5

    II.    A Keyword Filter's Automated Decision-Making Is an Unreasonable Implementation of an "Off Topic" Rule in a Digital Limited Public Forum That Risks Viewpoint Discrimination ........................................10

    III.    A Keyword Filter That Censors Criticism of the Government Is an Unreasonable Implementation of an "Off Topic" Rule in a Digital Limited Public Forum That Is Unconstitutional Viewpoint Discrimination ..........................................14

    IV.    Underinclusive Enforcement of an "Off Topic" Rule by Any Mechanism Raises Concerns of Unconstitutional Viewpoint Discrimination ..........................................18

    V.    An "Off Topic" Rule in a Limited Public Forum Is Reasonable When Applied to Maximize Opportunities for Individual Speech..........................................21

VI.    Limiting "Off Topic" Rules and Keyword Filters in Digital
Limited Public Forums Will Not Be Detrimental to User
Speech ........................................................................................ 25

CERTIFICATE OF SERVICE ...................................................... 31

CERTIFICATE OF COMPLIANCE .............................................. 32

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Freedom Def. Initiative v. Washington Metro. Area Transit Auth.*,
901 F.3d 356 (D.C. Cir. 2018) ................................................................5, 19

*Americans for Prosperity Foundation v. Bonta*,
141 S. Ct. 2373 (2021) ...........................................................................14

*Bernstein v. Sims*,
No. 5:22-CV-277-BO, 2022 WL 17365233 (E.D.N.C. Dec. 1, 2022) ...15, 23

*Brown v. Ent. Merchants Ass'n*,
564 U.S. 786 (2011) ...............................................................................19

*Charudattan v. Darnell*,
No. 1:18CV109MW/GRJ, 2019 WL 12043587 (N.D. Fla. Feb. 7, 2019) ...15

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994) .................................................................................19

\* *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985).......................................................3, 4, 10, 14, 26, 29

*Davison v. Plowman*,
247 F. Supp. 3d 767 (E.D. Va. 2017) ...............................................5, 24, 25

*Davison v. Randall*,
912 F.3d 666 (4th Cir. 2019) ...................................................................15

\* *Garnier v. O'Connor-Ratcliff*,
41 F.4th 1158 (9th Cir. 2022) ........................................................6, 7, 9, 24

*Garrison v. Louisiana*,
379 U.S. 64 (1964).................................................................................27

*Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*,
452 U.S. 640 (1981)...............................................................................6, 9

*\*Authorities upon which we chiefly rely are marked with asterisks*

*Hopper v. City of Pasco*,
  241 F.3d 1067 (9th Cir. 2001) ........................................................26

*Kimsey v. City of Sammamish*,
  574 F. Supp. 3d 911 (W.D. Wash. 2021).................................7, 19

*Kindt v. Santa Monica Rent Control Bd.*,
  67 F.3d 266 (9th Cir. 1995) ...........................................................9

*Knight First Amend. Inst. at Columbia Univ. v. Trump*,
  928 F.3d 226 (2d Cir. 2019) ...................................................15, 29

* *Krasno v. Mnookin*,
  638 F. Supp. 3d 954 (W.D. Wis. 2022) ....................11, 22, 23, 28

*Mahoney v. Doe*,
  642 F.3d 1112 (D.C. Cir. 2011) ......................................................6

*McCullen v. Coakley*,
  573 U.S. 464 (2014)......................................................................14

* *Minnesota Voters All. v. Mansky*,
  138 S.Ct. 1876 (2018).............................................3, 4, 11, 21, 22

*New York Times Co. v. Sullivan*,
  376 U. S. 254 (1964)......................................................................26

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
  460 U.S. 37 (1983)...........................................................................3

*Price v. Garland*,
  45 F.4th 1059 (D.C. Cir. 2022)........................................................3

*Reno v. ACLU*,
  521 U.S. 844 (1997)........................................................................6

* *Ridley v. Massachusetts Bay Transp. Auth.*,
  390 F.3d 65 (1st Cir. 2004)........................................4, 5, 14, 15, 19, 20, 21

*Seattle Mideast Awareness Campaign v. King County*,
  781 F.3d 489 (9th Cir. 2015) ........................................................21

*Snyder v. Phelps*,
  562 U.S. 443 (2011)..................................................................27

*Southeastern Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975)..................................................................21

*Stewart v. D.C. Armory Bd.*,
  863 F.2d 1013 (D.C. Cir. 1988)....................................................3

*Zukerman v. U.S. Postal Service*,
  961 F.3d 431 (D.C. Cir. 2020)....................................................22

### Other Authorities

Andrew Kersley, *The One Problem With AI Content Moderation? It Doesn't Work*, ComputerWeekly.com (Feb. 7, 2023)...............................11

Camille Fischer, *Can the Government Block Me on Twitter?: 2018 Year in Review*, EFF Deeplinks (Dec. 22, 2018).......................................1

Carey Schenkman et al., *Do You See What I See? Capabilities and Limits of Automated Multimedia Content Analysis*, Center for Democracy & Technology (May 2021) ......................................................10, 12

David Greene & Karen Gullo, *When Tweets Are Governmental Business, Officials Don't Get to Pick and Choose Who Gets to Receive, Comment On, and Reply to Them. That Goes for the President, Too*, EFF Deeplinks (Nov. 30, 2017)...........................................................1

Dennis Robinson, *How to Search Facebook Comments*, Real Socialz (May 8, 2023) ...........................................................................8

Facebook Help Center, *How do I block certain words from appearing in comments on my Facebook Page?*...............................................28

Facebook Help Center, *What Most Relevant Means on a Facebook Page Post*...8

FIRE, *No Comment: Public Universities' Social Media Use and the First Amendment* (April 22, 2020) ....................................................17, 18

*Foundational Principles, Human Rights and Due Process*, The Santa Clara Principles on Transparency and Accountability in Content Moderation (2021)......................................................................................12

Jillian C. York & Corynne McSherry, *Automated Moderation Must be Temporary, Transparent and Easily Appealable*, EFF Deeplinks (April 2, 2020) ............................................................................................28

Liesbeth Aerts, et al., *Do we still need animals? Surveying the role of animal-free models in Alzheimer's and Parkinson's disease research*, EMBO J. 2022 Mar 15; 41(6): e110002 ....................................................................13

Oxford English Dictionary, *Off-Topic* ............................................................11

Sydney Li & Jamie Williams, *Despite What Zuckerberg's Testimony May Imply, AI Cannot Save Us*, EFF Deeplinks (April 11, 2018).......................11

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| EFF | Electronic Frontier Foundation |
| FIRE | Foundation for Individual Rights and Expression |
| JA | Joint Appendix |
| NIH | National Institutes of Health |
| PETA | People for the Ethical Treatment of Animals |

## STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE* AND SOURCE OF AUTHORITY TO FILE

The Electronic Frontier Foundation (EFF) is a member-supported nonprofit organization devoted to protecting civil liberties in the digital age. EFF has written extensively on the issues presented in this appeal.[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan, nonprofit organization dedicated to defending the individual rights of all Americans to free speech and free thought—the most essential qualities of liberty.

Each *amicus* has filed *amicus* briefs in similar cases, including the companion cases currently before the U.S. Supreme Court: *O'Connor-Ratcliff v. Garnier* (No. 22-324) and *Lindke v. Freed* (No. 22-611).

Pursuant to D.C. Circuit Rule 29(b), *amici* certify that all parties have consented to the filing of this *amicus* brief.

---

[1] *See, e.g.*, Camille Fischer, *Can the Government Block Me on Twitter?: 2018 Year in Review*, EFF Deeplinks (Dec. 22, 2018), https://www.eff.org/deeplinks/2018/12/can-government-block-me-twitter-2018-year-review; David Greene & Karen Gullo, *When Tweets Are Governmental Business, Officials Don't Get to Pick and Choose Who Gets to Receive, Comment On, and Reply to Them. That Goes for the President, Too*, EFF Deeplinks (Nov. 30, 2017), https://www.eff.org/deeplinks/2017/11/when-officials-tweet-about-government-business-they-dont-get-pick-and-choose-who.

Pursuant to D.C. Circuit Rule 29(d), *amici* certify that this separate *amicus* brief is necessary because *amici* offer the court additional perspectives on the risks of viewpoint discrimination raised by "off topic" rules applied to limited public forums.

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* certify that no party or party's counsel authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting this brief. No person other than *amici*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

## INTRODUCTION

An "off topic" rule that restricts speech in a purported limited public forum, like the interactive spaces of government social media pages at issue here, poses a significant risk of viewpoint discrimination in violation of the First Amendment. This risk is enhanced when the rule is implemented using keyword filters.

Speech restrictions in a limited public forum[2] (or nonpublic forum) must be reasonable and viewpoint neutral. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985). *See also Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983). *Accord Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1016 (D.C. Cir. 1988).

When considering whether a speech restriction in a limited public forum is reasonable, courts must assess the restriction "in the light of the purpose of the forum and *all the surrounding circumstances*." *Cornelius*, 473 U.S. at 809 (emphasis added). *Accord Price v. Garland*, 45 F.4th 1059, 1068 (D.C. Cir. 2022).

A speech restriction in a limited public forum must also further a "permissible objective." *Minnesota Voters All. v. Mansky*, 138 S.Ct. 1876, 1886 (2018). And while "there is no requirement of narrow tailoring in a nonpublic

---

[2] *Amici* support Appellants' argument that the comment threads of the National Institutes of Health's (NIH) social media pages are designated public forums. Appellants' Br. 33. But for purposes of this brief, *amici* assume that they are limited public forums.

forum," the speech restriction must reflect "some sensible basis for distinguishing what may come in from what must stay out." *Id.* at 1888. That is, the government's "discretion must be guided by objective, workable standards … capable of reasoned application." *Id.* at 1891-92.

In the present context, courts must not *assume* that the "off topic" rule is reasonable and viewpoint neutral. Courts must closely scrutinize "all the surrounding circumstances" of the "off topic" rule and its implementation to ensure that it is a permissible speech restriction in a limited public forum under the First Amendment. *See Cornelius*, 473 U.S. at 809.

Reasonableness and viewpoint neutrality need not be analyzed independently. An "off topic" rule may be unreasonable *because* it reflects the government's intent to exclude a certain viewpoint or otherwise presents a significant and undue risk of unconstitutional viewpoint discrimination. *See, e.g.*, *Ridley v. Massachusetts Bay Transp. Auth.,* 390 F.3d 65, 87-90 (1st Cir. 2004) (analyzing reasonableness in holding that transportation agency engaged in viewpoint discrimination by rejecting plaintiff's ads).

That is the case here with the NIH's use of an "off topic" rule, as implemented by keyword filters, which are used on the agency's Facebook and Instagram social media pages to exclude comments from Plaintiffs that are against animal testing in biomedical and other scientific research.

4

Contrary to the district court's holding, NIH's "off topic" rule and its use of keyword filters here is not reasonable and "self-evidently viewpoint neutral." *People for the Ethical Treatment of Animals v. Tabak*, No. 21-cv-2380-BAH, 2023 WL 2809867 (D.D.C. Mar. 31, 2023), JA123 (Op. 30)[3] (quoting *Davison v. Plowman*, 247 F. Supp. 3d 767, 777 (E.D. Va. 2017), *aff'd,* 715 F. App'x 298 (4th Cir. 2018)). Accordingly, this Court should reverse.

## ARGUMENT

### I.    An "Off Topic" Rule Is Less Reasonable in Digital Limited Public Forums Than Physical Spaces Especially Due to the Risk of Viewpoint Discrimination

This Court must scrutinize NIH's "off topic" rule, not automatically accept it as reasonable. This is true even if it appears to be viewpoint-neutral: The "mere recitation of viewpoint-neutral rationales" for restricting speech in a limited public forum—such as an "off topic" rule—"does not immunize those decisions from scrutiny. The recitation of viewpoint-neutral grounds may be a mere pretext for an invidious motive." *Ridley*, 390 F.3d at 86. *Accord Am. Freedom Def. Initiative v. Washington Metro. Area Transit Auth. (WMATA)*, 901 F.3d 356, 365 (D.C. Cir. 2018).

---

[3] Hereinafter, the Joint Appendix cite will be used for the district court opinion in this case.

The interactive spaces of government social media pages are materially different from the public comment periods offered during physical government meetings. *See Reno v. ACLU*, 521 U.S. 844, 851-53 (1997) (discussing how the internet is a "unique medium"). The "special attributes" of these digital forums are "relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 650–651 (1981). *Accord Mahoney v. Doe*, 642 F.3d 1112, 1118 (D.C. Cir. 2011).

The district court erred in two significant, and related, ways in finding the NIH's "off topic" rule reasonable.

First, contrary to the district court's conclusion, the comment sections of government social media pages are not "close analogies" to real-world limited public forums such as city council or school board meetings. JA108 (Op. 15). Physical meetings of a government body have "limited time and space available for public remarks." *Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158, 1181 (9th Cir. 2022) , *cert. granted*, 143 S.Ct. 1779 (2023). Only a certain number of hours are typically set aside for physical meetings to cover a certain number of agenda items, or to complete a specific task such as a vote, in the allotted time. Due to these limitations, not all members of the public are able to speak about what they

6

want for however long they want. "[I]f someone speaks on an issue that's not on the agenda … that eats into the time for the council to consider higher priority agenda items, and it precludes other people from commenting." *Id.* "[L]engthy, irrelevant or repetitious comments interfere with the rights of other speakers or prevent the government from accomplishing its business." *Id.* (internal quotations omitted).

On a government social media page, by contrast, there is unlimited time and space—anyone and everyone can share their views without the business of the government agency being thwarted.[4] Whatever is happening in the comments section, comments "do not significantly detract from or overwhelm the original post" as "the content of the original post remains prominent and unaffected." *Garnier*, 41 F.4th at 1179, 1181. *See also Kimsey v. City of Sammamish*, 574 F. Supp. 3d 911, 921 (W.D. Wash. 2021) ("any comments—whether 'on' or 'off topic'—add substantial volume to a post but do not obscure or impede the public's ability to review the public safety information contained in the original post"). Additionally, users "can, with the flick of a finger, simply scroll past repetitive or irrelevant comments." *See Garnier*, 41 F.4th at 1181. On Facebook, users have three options to filter comments: "most relevant" (the default setting), "newest"

---

[4] There might be digital forums that are identical to physical spaces in how the government must approach public comment, such as a virtual livestreamed city council meeting. A government social media page remains distinct from both.

(in reverse chronological order), and "all comments."[5] On both Facebook and Instagram, users can sign into the web versions, click on a post within a page, and do a keyword search within the comments under a post (using *CTRL+F* on Windows or *Command+F* on Mac) to find comments they are interested in.[6] *See also* Appellants' Br. 42 (discussing "pinning" comments on Instagram).

Second, despite these differences, the district court wrongly concluded that "NIH has strong legitimate interests in maintaining on-topic discussions in the comment threads of the agency's social media posts." JA115 (Op. 22).

The core differences between physical meetings and government social media pages lessen NIH's interests, as summarized by the district court, in applying an "off topic" rule to its Facebook and Instagram pages: The social media accounts are used to "communicate and interact with citizens about agency-related updates and public health news," and the comment threads have the "purpose of fostering productive dialogue" without the inclusion of "distracting" or "disruptive" comments "that may discourage interested citizens from viewing the pages at issue." JA115-117 (Op. 22-24) (internal quotations omitted).

---

[5] *See* Facebook Help Center, *What Most Relevant Means on a Facebook Page Post* ("most relevant" means "you're more likely to see high-quality comments"), https://www.facebook.com/help/539680519386145.

[6] *See* Dennis Robinson, *How to Search Facebook Comments*, Real Socialz (May 8, 2023), https://realsocialz.com/how-to-search-facebook-comments/.

Given the unlimited capacity and user tools discussed above, the government's interest in enforcing an "off topic" rule in the comments sections of its Facebook and Instagram pages is less reasonable than in a physical forum, because there is a weak nexus between NIH's interests and purposes in operating its social media pages and applying an "off topic" rule to their interactive spaces, and the "special attributes" of those digital forums. *See Heffron*, 452 U.S. at 650–651. *See also* Appellants' Br. 43.

In contrast to the comment threads of government social media pages, in a physical limited public forum such as a government meeting there is "a meaningfully different risk of disruption." *Garnier*, 41 F.4th at 1181. Speech restrictions in a physical limited public forum, such as limiting public commentary to that which is relevant to an agenda item (i.e., that which is *on topic*) or limiting the amount of time a member of the public may speak, "are the kind of reasonable time, place, and manner restrictions that preserve a [government agency's] legitimate interest in conducting efficient, orderly meetings." *See Kindt v. Santa Monica Rent Control Bd.*, 67 F.3d 266, 271 (9th Cir. 1995).

NIH's purported interest in blocking "distracting," "disruptive," and "unproductive" comments on its social media pages is particularly worrisome for free speech and raises the specter that the "off topic" rule "is in reality a facade

9

for viewpoint-based discrimination." *See Cornelius*, 473 U.S. at 811. *Cf. id.* at 812 (seeking to avoid "controversy … may conceal a bias against the viewpoint advanced by the excluded speakers"). The government is more likely to label a comment it disagrees with as "distracting," "disruptive," or "unproductive" and thus "off topic." This risk exists despite the limitless nature of the digital forum providing everyone the time and space to share their views and the tools to find the comments they want to engage with, making NIH's concerns less relevant.

## II. A Keyword Filter's Automated Decision-Making Is an Unreasonable Implementation of an "Off Topic" Rule in a Digital Limited Public Forum That Risks Viewpoint Discrimination

Keyword filters, such as those deployed by NIH in this case to implement the "off topic" rule, are a generally unreasonable form of automated content moderation because they are imprecise and preclude the necessary consideration of context and nuance.[7] Courts should closely scrutinize and be skeptical of government social media pages that enforce an "off topic" rule with keyword filters. Keyword filters do not reflect "objective, workable standards" or "some sensible basis for distinguishing what may come in from what must stay out"

---

[7] *See* Carey Schenkman et al., *Do You See What I See? Capabilities and Limits of Automated Multimedia Content Analysis*, Center for Democracy & Technology, 29-30 (May 2021) ("Automated tools perform poorly when tasked with decisions requiring judgment or appreciation of context."), https://cdt.org/wp-content/uploads/2021/05/2021-05-18-Do-You-See-What-I-See-Capabilities-Limits-of-Automated-Multimedia-Content-Analysis-Full-Report-2033-FINAL.pdf.

because they are not "capable of reasoned application." *See Mansky*, 138 S.Ct. at 1881, 1888, 1892.

The term "off topic" commonly means that which is not relevant to the subject in question.[8] But what is "relevant" is open to interpretation and requires the consideration of "content and context." *See Krasno v. Mnookin*, 638 F. Supp. 3d 954, 976 (W.D. Wis. 2022). To apply an "off topic" rule, "one needs an objectively sufficient understanding of the substance and scope of the underlying topic. Even then, interpreting whether a comment is *off* this topic necessarily will involve a fair amount of interpretive discretion…." *Id.* (emphasis in original).

Content moderation tools based on artificial intelligence so far lack the sophistication to consistently understand whether user-generated content falls within permissible categories or not, and much simpler keyword filters fare no better.[9] Automated content moderation tools are so problematic that civil society groups (including *amicus* EFF) developed voluntary principles for social media

---

[8] *See* Oxford English Dictionary, *Off-Topic*, https://www.oed.com/search/dictionary/?scope=Entries&q=off+topic.

[9] *See, e.g.*, Andrew Kersley, *The One Problem With AI Content Moderation? It Doesn't Work*, ComputerWeekly.com (Feb. 7, 2023) (stating "some kind of human oversight in the system is necessary"), https://www.computerweekly.com/feature/The-one-problem-with-AI-content-moderation-It-doesnt-work. *See also* Sydney Li & Jamie Williams, *Despite What Zuckerberg's Testimony May Imply, AI Cannot Save Us*, EFF Deeplinks (April 11, 2018), https://www.eff.org/deeplinks/2018/04/despite-what-zuckerbergs-testimony-may-imply-ai-cannot-save-us.

companies to follow (to the extent they directly moderate user-generated content on their platforms). The *Santa Clara Principles* provide: "Companies should only use automated processes to identify or remove content or suspend accounts, whether supplemented by human review or not, *when there is sufficiently high confidence in the quality and accuracy of those processes*."[10] The government would do well by First Amendment rights if it followed this same principle—and courts must ensure that it does.

Keyword filters are generally unreasonable because they are blunt tools that are overinclusive, censoring *more* speech than the "off topic" rule was intended to block. A user comment that references COVID-19 "testing" would be rejected, for example, even if that comment was in response to an NIH social media post about COVID-19 generally or COVID-19 testing specifically.[11] *See* JA099-100 (Op. 6-7) (listing keywords used by NIH).

NIH's keyword filters assume that words related to animal testing will *never* be used in an on-topic comment to a particular NIH post. But this is false. Animal testing is certainly relevant to NIH's work. Just last year, NIH published an article on its website titled, "*Do we still need animals? Surveying the role of*

---

[10] *Foundational Principles, Human Rights and Due Process*, The Santa Clara Principles on Transparency and Accountability in Content Moderation (2021) (emphasis added), https://santaclaraprinciples.org/.

[11] *See* Carey Schenkman et al., *supra* n.7, at 9 ("Insufficient understanding of context can lead to overbroad limits on speech…").

*animal-free models in Alzheimer's and Parkinson's disease research*" that concluded that "calls to halt all animal experiments appear premature."[12] If NIH had posted a link to this article on its social media pages, a comment responding to that article would be directly on topic. Yet NIH's keyword filters would censor comments to that post that contained the words "animal" or "testing." *See* JA099-100 (Op. 6-7). *See also* Appellants' Br. 26-27.

Keyword filters are also underinclusive by failing to censor speech that is clearly "off topic" but does not contain a prohibited keyword—for example, a comment advertising a product. *See infra* Part IV.

The district court correctly acknowledged that NIH's keyword filters are both over- and underinclusive. JA117 (Op. 24). Keyword filters are more appropriate for words that are inherently problematic and require no consideration of context, such as profanity, which was fairly included in NIH's keyword lists. *See* JA100 (Op. 7).

This Court should not be swayed by the claim that *manual* moderation, as an alternative to keywords, is difficult on social media due to the large volume of comments. *See* JA119 (Op. 26) (discussing the "impracticability of comment-by-

_____

[12] Liesbeth Aerts, et al., *Do we still need animals? Surveying the role of animal-free models in Alzheimer's and Parkinson's disease research*, EMBO J. 2022 Mar 15; 41(6): e110002, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8922267/.

comment review"). Although, as NIH admits, keyword filters provide an "efficient, though imperfect, way of targeting impermissible comments," *see* JA115 (Op. 22), the government may not sacrifice users' free speech rights in the name of efficiency. "[T]he prime objective of the First Amendment is not efficiency." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014). *See also Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (holding that "mere administrative convenience" does not justify First Amendment burden).

**III.  A Keyword Filter That Censors Criticism of the Government Is an Unreasonable Implementation of an "Off Topic" Rule in a Digital Limited Public Forum That Is Unconstitutional Viewpoint Discrimination**

NIH's keyword filters are direct evidence of the agency's unconstitutional viewpoint discrimination because the keywords themselves reflect criticism of the government.

In evaluating the reasonableness of a speech restriction in a limited public forum—in this case, the "off topic" rule itself and its implementation via keyword filters—courts must scrutinize the "reasons" why the government sought to censor Plaintiffs' speech, to ensure the government's explanation is not "merely a pretext for viewpoint discrimination." *See Cornelius*, 473 U.S. at 797.

"Suspicion that viewpoint discrimination is afoot is at its zenith when the speech restricted is speech *critical* of the government, because there is a strong risk that the government will act to censor ideas that oppose its own." *Ridley*, 390

14

F.3d at 86 (emphasis added). In *Ridley*, the First Circuit was "especially wary of viewpoint discrimination" because the ads that the transportation agency rejected reflected "core political speech that [was] critical of existing governmental policy." *Id.*

And as the Fourth Circuit held, the government's decision to ban an individual from the government's Facebook page "because of his allegation of governmental corruption constitutes black-letter viewpoint discrimination." *Davison v. Randall*, 912 F.3d 666, 687 (4th Cir. 2019).

Similarly, the Second Circuit held that former President Donald Trump engaged in viewpoint discrimination when he blocked the plaintiffs from accessing his Twitter page because they criticized him. *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 239 (2d Cir. 2019), *cert. granted, judgment vacated sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S.Ct. 1220 (2021) ("*Knight*"). *See also Charudattan v. Darnell*, No. 1:18CV109MW/GRJ, 2019 WL 12043587, at \*7 (N.D. Fla. Feb. 7, 2019) (deletion of plaintiff's "comment reviewing the Sheriff's Office raises questions of viewpoint discrimination"); *Bernstein v. Sims*, No. 5:22-CV-277-BO, 2022 WL 17365233, at \*4-5 (E.D.N.C. Dec. 1, 2022) (on a motion for preliminary injunction, holding that county board of elections violated plaintiff's First Amendment rights when it banned her from attending public meetings held at the

board's operations center, a limited public forum, because the ban appeared to be "an unreasonable restriction based on viewpoint").

NIH's keywords reflect a position *against* animal testing: *cruelty*, *revolting*, *tormenting*, *torture*, *hurt*, *kill*, and *stop*. JA099-100 (Op. 6-7). Also, most of the other keywords—words indicating external links, profanity, strings of numbers, and illegal drugs—do not reflect a single side of a debate as the animal testing keywords do. *See* JA100 (Op. 7).[13] Yet despite this transparent attempt to censor Plaintiffs' viewpoint, the district court granted unwarranted deference to the agency, concluding that the keyword filters "merely target[] a subject matter—animal testing—that defendants, as administrators of a limited public forum, are entitled to exclude." JA122 (Op. 29).

The district court erroneously minimized NIH's actions in initially including among its banned words *PETA*, *PETALatino*, *#stopanimaltesting*, *#stoptesting*, and *#stoptestingonanimals* "as an overzealous attempt by a[n] NIH social media manager to tamp down irrelevant posts." JA122 (Op. 29 n.13). The district court failed to acknowledge that the removal was an obvious move to obscure NIH's intent to discriminate against Plaintiffs' position on animal testing.

As NIH's remaining keywords show, courts should consider the actual

---

[13] The one exception appears to be words "associated with anti-vaccine activists." JA100 (Op. 7).

vocabulary or terminology used—in addition to whether the words on their face reflect criticism of the government—and should not assume that keyword filters simply reflect viewpoint-neutral subject matter restrictions. Certain terminology may be used by those on only one side of the debate, thus bans on those terms are evidence of the government's intent to engage in impermissible viewpoint discrimination. Those *in favor* of animal testing in scientific research, for example, do not typically use words like *cruelty*, *revolting*, *tormenting*, *torture*, *hurt*, *kill*, and *stop*. JA099-100 (Op. 6-7). *See also* Appellants' Br. 23. The same is true for other controversial subjects: on abortion, those on one side of the debate say *pro-choice* and those on the other side say *pro-life*; on immigration, some say *undocumented immigrants* while others say *illegal aliens*; on children's access to library books, some say *book banning* and others say *parental choice*; on COVID-19, some say *pandemic* and others say *plandemic*.

Concern about critical keywords is not limited to this case. In 2020, *amicus* FIRE collected and reported on public records from over 200 state colleges and universities and found that 87 percent blocked users and 30 percent crafted unique keyword filters, often to censor criticism unique to that institution.[14] For example, the University of Kentucky blocked the words "birds," "chicken," and "chickens"

---

[14] FIRE, *No Comment: Public Universities' Social Media Use and the First Amendment* 7–12 (April 22, 2020), https://perma.cc/3G4E-86WY.

from its Facebook account to censor animal advocacy directed toward its dining services provider.[15] The University of North Carolina at Chapel Hill blocked comments mentioning "Silent Sam," a confederate monument on campus that was removed in 2018.[16] Clemson University blocked a professor's name, seeking to hide comments criticizing the professor for referring to Republicans as "racist scum."[17]

That a government agency censors comments with words associated with only one side of a debate in a limited public forum should be straightforward evidence of unconstitutional viewpoint discrimination.

## IV.    Underinclusive Enforcement of an "Off Topic" Rule by Any Mechanism Raises Concerns of Unconstitutional Viewpoint Discrimination

Underinclusive enforcement of an "off topic" rule in a limited public forum, regardless of how the rule is implemented, may be evidence of unconstitutional viewpoint discrimination, even in the absence of direct evidence. *See supra* Part III.

Inconsistent and, in particular, underinclusive enforcement of a speech restriction is a red flag for prohibited viewpoint discrimination in a limited public forum, and is not just a data point relevant to whether an ostensibly limited public

---

[15] *Id.* at 10.

[16] *Id.* at 10–11.

[17] *Id.* at 11.

forum is actually a designated public forum. *See* JA112 (Op. 19); *Kimsey*, 574 F. Supp. 3d at 920. Thus, "where the government states that it rejects something because of a certain characteristic"—in this case, based on the "off topic" rule— "but other things possessing the same characteristic are accepted, this sort of underinclusiveness raises a suspicion that the stated neutral ground for action is meant to shield an impermissible motive." *Ridley*, 390 F.3d at 87. *Accord Am. Freedom Def. Initiative*, 901 F.3d at 366.

The Supreme Court has acknowledged this risk: "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011). *See also City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994) (underinclusiveness "may represent a governmental attempt to give one side of a debatable public question an advantage in expressing its views to the people") (internal quotations omitted).

Underinclusiveness with its risk of viewpoint discrimination is a concern when keyword filters are *solely* used to implement an "off topic" rule. *Cf. Ridley*, 390 F.3d at 85-89 (holding that a rule prohibiting advertisements within a municipal transportation system that "promote illegal activity" was not unconstitutional on its face, but its *implementation* against the plaintiffs was viewpoint discriminatory). Suspicion of viewpoint discrimination "arises where

the viewpoint-neutral ground"—in this case, the "off topic" rule—"is not actually served very well by the specific governmental action at issue"—in this case, the keyword filters—"where, in other words, the fit between means and ends is loose or nonexistent." *See id.* at 87. As explained above, the fit between NIH's "off topic" rule and its use of keyword filters is "loose" due to the over- and underinclusiveness of the keyword filters. *See supra* Part II.

Underinclusive enforcement as evidence of viewpoint discrimination is even more of a concern where the NIH has used both keyword filters *and* manual content moderation. *See* JA098 (Op. 5). Although manual content moderation allows for *more* precision, significant *imprecision* appears to remain. *See* Appellants' Br. 28-29. *See also* JA112–113 (Op. 19-20) ("Plaintiffs have pointed out a number of comments in the record that are off-topic but not removed by NIH's administrators….").[18]

Crucially, NIH's keywords related to animal testing reflect a position *against* animal testing. *See supra* Part III. Evidence that NIH was rejecting comments on *both sides* of the animal testing debate might mitigate concerns

---

[18] NIH has complained that manual content moderation has been "limited by resource constraints." JA098 (Op. 5) (internal quotations omitted). But this does not immunize NIH's inconsistent enforcement of its "off topic" rule, whether via keyword filters or manual review, from being closely scrutinized for impermissible viewpoint discrimination.

about viewpoint discrimination raised by underinclusive enforcement of the "off topic" rule. *See Seattle Mideast Awareness Campaign v. King County*, 781 F.3d 489, 502 (9th Cir. 2015) ("The County's decision to reject [plaintiff's] ad as part of a single, blanket decision to reject all submitted ads on the Israeli–Palestinian conflict negates any reasonable inference of viewpoint discrimination."). But this evidence does not exist.

## V.    An "Off Topic" Rule in a Limited Public Forum Is Reasonable When Applied to Maximize Opportunities for Individual Speech

The government is not completely precluded from applying an "off topic" rule to its social media pages. An "off topic" rule may be reasonably applied if implemented without keyword filters, or other imprecise methods, that reflect bias against a particular viewpoint, *see supra* Parts II-IV, and if applied in a way that broadly construes what is *on topic*.

An "off topic" rule must be "guided by objective, workable standards," *see Mansky*, 138 S.Ct. at 1891, and "bounded by precise and clear standards" to avoid the dangers of "unbridled" government discretion, *see Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). "The danger of excessive discretion … is that it could lead to viewpoint-discriminatory decisions in practice even under a facially neutral regulation." *Ridley*, 390 F.3d at 94.

An undefined "off topic" rule, as is the case here, will be unreasonable because it "necessarily will involve a fair amount of interpretive discretion" by

the government and thus will not lend itself to objective application. *See Krasno*, 638 F. Supp. 3d at 976. Viewpoint discrimination is a great risk with the NIH's "off topic" rule for social media comments, therefore that rule is unreasonable *per se*, particularly as implemented by keyword filters, *see supra* Parts II & III.

This is what the Supreme Court held in *Mansky*: The Court found that a state statute prohibiting "political" paraphernalia inside a polling place on election day—a nonpublic forum—was an unreasonable speech restriction because it was an "expansive" standard that lent itself to "haphazard interpretations" by the state. *Mansky,* 138 S.Ct. at 1888. That is, the state's discretion in regulating polling places was not "guided by objective, workable standards." *Id.* at 1891. Similarly, this Court held that the U.S. Postal Service's custom postage program's ban on "political" postage was an unreasonable speech regulation in a nonpublic forum (the forum being the program) because it did not provide "objective, workable standards of the sort that *Mansky* requires." *Zukerman v. U.S. Postal Service*, 961 F.3d 431, 449 (D.C. Cir. 2020).

An "off topic" rule should only be considered a reasonable speech restriction as applied to a government social media page when *users* are granted substantial leeway—that is, when what is considered *on topic* is broadly construed—in order to mitigate against the risk of viewpoint discrimination. The

government and the courts should employ, at a minimum, "a policy of lenity in borderline cases." *See Krasno*, 638 F. Supp. 3d at 971.

To do this, courts could require that any social media comments be relevant to the *mission* or *authority* of the government body or agency, broadly speaking, rather than only narrowly relevant to a particular social media *post* by the government. *See* JA116 (Op. 23) (erring by discussing "relevant comments interacting with the post"). A user's comment might not be directly responsive to a specific post but might nevertheless be relevant to the agency's operations as a whole.

Lenient application of an "off topic" rule is required not only to avoid viewpoint discrimination, but also to preserve an individual's right to petition the government for a redress of grievances, a right that extends to all aspects of an agency's authority. *See Bernstein*, 2022 WL 17365233, at *4-5 (holding that not only was the plaintiff subject to viewpoint discrimination but the county board of elections impinged on "her ability to petition the government for redress of a grievance").

In this case, Plaintiffs' social media comments against animal testing should be considered *on topic* because they are relevant to NIH's operations, given that NIH is an agency that uses taxpayer money to fund scientific research

23

with the use of animals, from rodents to highly intelligent primates such as chimpanzees. *See* JA098 (Op. 5).

Similarly, the comments at issue in *Garnier* were broadly *on topic* because they related to the authority of the school district. There, the Ninth Circuit held that the school board trustees could not block the plaintiffs from posting "repetitive" comments that were often "not directly responsive to any particular post by the Trustees," but "predominantly dealt with issues related to the [board's] governance of the [school] District," including concerns about race relations and financial wrongdoing by the superintendent. *Garnier*, 41 F.4th at 1172, 1177.

The danger of a narrowly applied "off topic" rule is illustrated by the erroneous decision in *Plowman*, where the plaintiff's comment should have been deemed broadly *on topic* because it related to the authority of the county attorney, rather than "clearly off topic" as the district court held. *See Plowman*, 247 F. Supp. 3d at 777. In that case, in response to an agency Facebook post about special prosecutors, the plaintiff responded with concerns related to his FOIA request and alleged perjury by the local school district. *Id.* at 773. The plaintiff believed his comment to be pertinent to the agency's post because the county attorney's office sought the assignment of a special prosecutor to investigate another FOIA case but had apparently refused to investigate his FOIA case. A leniently interpreted "off topic" rule would lead to the conclusion that the plaintiff's comment was

indeed on topic—it referenced a governmental power that was the topic of the county attorney's Facebook post and sought a redress of grievances from his local government agency.

To mitigate against the risk of viewpoint discrimination, government agencies operating their social media comments sections as limited public forums must apply any "off topic" rule to maximize opportunities for user speech. A social media comment related to items within the government body's purview may reasonably be considered on topic, as opposed to comments that are truly far afield, such as a product advertisement or other statement that is in no way related to the powers or responsibilities of the government entity.

**VI.    Limiting "Off Topic" Rules and Keyword Filters in Digital Limited Public Forums Will Not Be Detrimental to User Speech**

Contrary to the district court's view, holding NIH to higher standards will not result in "perverse outcomes for free expression." *See* JA113 (Op. 20). The district court feared that if government agencies cannot manage their social media pages as they see fit, they might not allow any public comments at all. *See* JA114 (Op. 21). And the district court justified NIH's blocking of Plaintiffs' comments by arguing that the "failure to effectively moderate a public discussion may be as deleterious to dialogue in [a limited public] forum as censorship." JA116 (Op. 23) (quoting *Plowman*, 247 F. Supp. 3d at 778).

Yet allowing more people to speak on government social media pages is not a perverse outcome, given our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U. S. 254, 270 (1964). Rather, allowing the government to censor individuals' speech because the government disagrees with their viewpoints *is* the perverse outcome.

While government agencies are free to shut down the interactive spaces of their social media pages, courts should not shy away from closely scrutinizing the reasonableness of speech restrictions in limited public forums due to this possibility. *See Hopper v. City of Pasco*, 241 F.3d 1067, 1082 (9th Cir. 2001) (holding that city-sponsored art gallery limited to "non-controversial" local art violated the First Amendment because standards were not "consistent and clearly articulated," despite dissent's assertion that majority's decision "will discourage cities from experimenting with public art displays"). This is especially important when—in the case of an "off topic" rule applied to government social media pages via keyword filters—all signs point to a substantial and undue risk, if not outright evidence, of the rule being a "pretext" for viewpoint discrimination by the government. *See Cornelius*, 473 U.S. at 797.

Applying an "off topic" rule in a way that maximizes user expression and mitigates against the risk of viewpoint discrimination, *see supra* Part V, advances

26

First Amendment rights more than a highly regulated social media comments section. Under such regulations, some users might have a supposed "productive dialogue," *see* JA116 (Op. 23), but Plaintiffs (and others) are prevented from expressing their views and communicating with their government on topics of public concern, due to NIH's narrow consideration as to what is *on topic*. *See Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) ("speech on matters of public concern is at the heart of the First Amendment's protection") (internal quotations omitted). Moreover, a highly regulated social media comments section that censors Plaintiffs' comments against animal testing gives the false impression that no member of the public disagrees with the agency on this issue. This serves no one, given that "speech concerning public affairs is more than self-expression; it is the essence of self-government." *See Garrison v. Louisiana,* 379 U.S. 64, 74–75 (1964).

The government is not without options if courts hold that an "off topic" rule, including one enforced through automated keyword filters, is unreasonable for a government social media page that is a limited public forum.

If an "off topic" rule is generally impermissible, NIH can still get information out to the public without extraneous comments getting in the way, and social media users have tools to navigate the comments sections on its social media pages. *See supra* Part I.

If keyword filters are impermissible to enforce an "off topic" rule, manual content moderation remains an option. *See* Appellants' Br. 42. If employed without viewpoint bias, manual review can mitigate against the risks of over- and under-inclusiveness by keyword filters (though not eliminate them completely). *See supra* Part II. As *amicus* EFF has written, "automation is not a sufficient replacement for having a human in the loop."[19] *See Krasno*, 638 F. Supp. 3d at 977 (holding that an "off topic" rule is "sufficiently objective to preclude wildly divergent applications," but crucially presuming manual review by "moderators"). *See also id.* at 981 ("the University has the ability to manually 'unhide' comments that it would otherwise deem on-topic but for the keyword filter").[20] In this case, "NIH primarily enforces its comment guidelines on Facebook and Instagram via the keyword filtering function, using Facebook and Instagram's default filters, which are supplemented with NIH's custom keyword lists." JA098 (Op. 5). It remains unclear how much manual review NIH will conduct moving forward. *Id.*

---

[19] Jillian C. York & Corynne McSherry, *Automated Moderation Must be Temporary, Transparent and Easily Appealable*, EFF Deeplinks (April 2, 2020), https://www.eff.org/deeplinks/2020/04/automated-moderation-must-be-temporary-transparent-and-easily-appealable.

[20] *See* Facebook Help Center, *How do I block certain words from appearing in comments on my Facebook Page?* ("You can unhide comments that contain blocked words by going to the comment and clicking Unhide."), https://www.facebook.com/help/131671940241729?helpref=faq_content.

If NIH is prohibited from blocking Plaintiffs' comments on its social media pages yet remains disturbed by Plaintiffs' position against animal testing, NIH also has the option of counter-speech, explaining why Plaintiffs' opposition is misguided. As the Second Circuit stated, "if the First Amendment means anything, it means that the best response to disfavored speech on matters of public concern is more speech, not less." *Knight*, 928 F.3d at 240. But "the government is not permitted to 'amplify' favored speech by banning or burdening viewpoints with which it disagrees." *Id.* at 238.

## CONCLUSION

In light of the foregoing arguments and "all the surrounding circumstances" related to NIH's implementation of its "off topic" rule on its Facebook and Instagram pages, *amici* urge this Court to reverse the district court and rule for Plaintiffs. *See Cornelius*, 473 U.S. at 809.

September 15, 2023                    Respectfully submitted,

                                     By: */s/ Sophia Cope*
                                     Sophia Cope
                                     David Greene
                                     ELECTRONIC FRONTIER FOUNDATION
                                     815 Eddy Street
                                     San Francisco, CA 94109-7701
                                     Tel: (415) 436-9333
                                     Fax: (415) 436-9993
                                     sophia@eff.org

*Attorneys for Amici Curiae Electronic Frontier Foundation and Foundation for Individual Rights and Expression*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 15, 2023 I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


September 15, 2023                    */s/ Sophia Cope*
                                     Sophia Cope

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE
REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(G)(1)**

I hereby certify as follows:

1.      The undersigned certifies under Rule 32(g)(1) that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(b). The brief is printed in proportionally spaced 14-point type, and the brief has 6,309 words according to the word count of the word-processing system used to prepare the brief (excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and with the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Mac 365 in 14-point Times New Roman font.

September 15, 2023                      */s/ Sophia Cope*_____
                                       Sophia Cope

32