**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 23-5110**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS,
MADELINE KRASNO, AND RYAN HARTKOPF,

Plaintiffs-Appellants,

v.

LAWRENCE A. TABAK, in his official capacity as Acting Director of
the National Institutes of Health, AND XAVIER BECERRA, in his
official capacity as Secretary of the U.S. Department of Health and
Human Services,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**BRIEF FOR APPELLEES**

———————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant
  Attorney General*

DANIEL TENNY
JENNIFER L. UTRECHT
  *Attorneys, Appellate Staff
  Civil Division, Room 7710
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 353-9039*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.    Parties and Amici

Appellants, who were plaintiffs in district court, are People for the Ethical Treatment of Animals, Inc., Madeline Krasno, and Ryan Hartkopf.  Appellees, who were defendants in the district court, are Lawrence Tabak, in his official capacity as Acting Director of the National Institutes of Health, and Xavier Becerra, in his official capacity as Secretary of the U.S. Department of Health and Human Services.  No amici or intervenors appeared in the district court.  The Electronic Frontier Foundation and Foundation for Individual Rights and Expression filed an amended notice of intent to participate in this appeal as amicus on September 14, 2023.

## B.    Rulings Under Review

Plaintiffs-appellants seek review of the March 31, 2023 memorandum opinion and order denying their motion for summary judgment and granting defendants-appellees' cross-motion for summary judgment (Dkt. Nos. 43, 44).  The rulings were issued by Judge Beryl A.

Howell in Case No. 21-cv-2380.  The district court's opinion is not published in the federal reporter but is available at 2023 WL 2809867 and is reproduced in the Joint Appendix.

## C.    Related Cases

This case has not previously been before this Court.  There are no related cases of which counsel is aware.

/s/ Jennifer L. Utrecht
Jennifer L. Utrecht

ii

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ................................................................................1

STATEMENT OF JURISDICTION .........................................................3

STATEMENT OF THE ISSUE ..............................................................4

PERTINENT STATUTES AND REGULATIONS ...................................4

STATEMENT OF THE CASE ...............................................................4

    A.    The Facebook and Instagram Social Media Platforms ..........4

    B.    NIH's Social Media Pages ......................................................6

    C.    Factual and Procedural History .............................................9

SUMMARY OF ARGUMENT ..............................................................14

STANDARD OF REVIEW....................................................................19

ARGUMENT ......................................................................................19

I.    This Court Lacks Jurisdiction Over This Appeal Because It
Is Taken from a Non-Final Order.................................................19

II.    NIH Took Reasonable and Viewpoint Neutral Measures to
Restrict Content in a Nonpublic Forum ......................................23

    A.    NIH reasonably responded to the problem of off-topic
posts...................................................................................23

    B.    The District Court Correctly Found that the Comment
Threads on NIH's Social Media Pages Are Nonpublic
Forums................................................................................26

C.    The District Court Correctly Held that NIH's Use of
      Keyword Filters Is Reasonable and Viewpoint Neutral ......35

      1.    The Keyword Filters Are Reasonable...........................36

      2.    The Keyword Filters Do Not Discriminate Based
            on Viewpoint.................................................44

CONCLUSION ........................................................................52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

iv

# TABLE OF AUTHORITIES

**Cases:**                                                                **Page(s)**

*American Freedom Def. Initiative v. Washington Metro Transit Auth.*,
  901 F.3d 356 (D.C. Cir. 2018) ..............................................................41

*Archdiocese of Washington v. Washington Metro. Area Transit Auth.*,
  897 F.3d 314 (D.C. Cir. 2018) ......................12, 29, 30, 31, 32, 36, 44, 50

*Arkansas Educ. Television Comm'n v. Forbes*,
  523 U.S. 666 (1998) ...............................................................................33

*Barrett v. Walker Cty. Sch. Dist.*,
  872 F.3d 1209 (11th Cir. 2017) ............................................................29

*Bauer v. Federal Deposit Ins. Corp.*,
  38 F.4th 1114 (D.C. Cir. 2022) .............................................................19

*Blue v. District of Columbia Pub. Sch.*,
  764 F.3d 11 (D.C. Cir. 2014) ...........................................................22, 23

*Bryant v. Gates*,
  532 F.3d 888 (D.C. Cir. 2008) ..............................................11, 27, 30-31

*Cambridge Holdings Grp., Inc. v. Federal Ins. Co.*,
  489 F.3d 1356 (D.C. Cir. 2007) .............................................................19

*Charudattan v. Darnell*,
  834 F. App'x 477 (11th Cir. 2020) .........................................................33

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
  473 U.S. 788 (1985) .................................. 14-15, 16, 27, 29, 31, 36, 41, 44

*Cunningham v. Hamilton County*,
  527 U.S. 198 (1994) ...............................................................................19

*Davison v. Plowman,*
  247 F. Supp. 3d 767 (E.D. Va. 2017), *aff'd,*
  715 F. App'x 298 (4th Cir. 2018) ................................................. 24, 33

*Davison v. Randall,*
  912 F.3d 666 (4th Cir. 2019) .............................................................. 34

*Dukore v. District of Columbia,*
  799 F.3d 1137 (D.C. Cir. 2015) ................................................ 19, 20, 23

*Frederick Douglass Found., Inc. v. District of Columbia,*
  82 F.4th 1122 (D.C. Cir. 2023) ....................................................... 49, 50

*Galena v. Leone,*
  638 F.3d 186 (3d Cir. 2011) ................................................................ 29

*Garnier v. O'Connor-Ratcliffe,*
  41 F.4th 1158 (9th Cir. 2022), *cert. granted,*
  No. 22-324, 143 S. Ct. 1779 (2023) ................................................ 34, 35

*Hazelwood Sch. Dist. v. Kuhlmeier,*
  484 U.S. 260 (1988) .......................................................................... 27

*Initiative & Referendum Inst. v. U.S. Postal Serv.,*
  685 F.3d 1066 (D.C. Cir. 2012) ........................................................... 26

*Knight First Amendment Inst. at Columbia Univ. v. Trump,*
  928 F.3d 226 (2d Cir. 2019), *vacated as moot,* 141 S. Ct. 1220 (2021) 34

*Krasno v. Mnookin,*
  638 F. Supp. 3d 954 (W.D. Wis. 2022) ................................................ 33

*Lowery v. AmGuard Ins. Co.,*
  84 F.4th 943 (11th Cir. 2023) ............................................................ 22

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994) ............................................................... 45, 46, 51

*Make the Rd. by Walking, Inc. v. Turner,*
  378 F.3d 133 (2d Cir. 2004) .................................................................. 34

*Matal v. Tam,*
  582 U.S. 218 (2017) ............................................................................. 44

*McCullen v. Coakley,*
  573 U.S. 464 (2014) ............................................................................. 48

*Minnesota Voters All. v. Mansky,*
  138 S. Ct. 1876 (2018) .................................................................... 36, 44

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
  460 U.S. 37 (1983) ......................................11, 26, 27, 34, 35, 43, 45, 51

*Pleasant Grove City v. Summum,*
  555 U.S. 460 (2009) ....................................................................... 16, 28

*Ridley v. Massachusetts Bay Transp. Auth.,*
  390 F.3d 65 (1st Cir. 2004) ................................................................. 32

*Robinson-Reeder v. American Council on Educ.,*
  571 F.3d 1333 (D.C. Cir. 2009) ...................................................... 20, 23

*Steinburg v. Chesterfield Cty. Planning Comm'n,*
  527 F.3d 377 (4th Cir. 2008) ............................................................... 30

*Stewart v. D.C. Armory Bd.,*
  863 F.2d 1013 (D.C. Cir. 1988) ........................................................... 27

*United States v. American Library Ass'n,*
  539 U.S. 194 (2003) ............................................................ 28, 32, 42, 43

*United States v. Kokinda,*
  497 U.S. 720 (1990) ....................................................................... 36, 41

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
  576 U.S. 200 (2015) ............................................................................. 31

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) ................................................................ 45, 51

*Women's Health Link, Inc. v. Fort Wayne Pub. Transp. Corp.*,
826 F.3d 947 (7th Cir. 2016) ................................................. 39

*Zukerman v. U.S. Postal Serv.*,
961 F.3d 431 (D.C. Cir. 2020) ............................................. 44, 48

**Statutes:**

28 U.S.C. § 1291 ................................................................... 3, 19

28 U.S.C. § 1291(b) ................................................................. 16

28 U.S.C. § 1331 ..................................................................... 3

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ....................................................... 3

Fed. R. Civ. P. 54(b) ............................................... 3, 16, 20, 21-22

# GLOSSARY

| | |
|---|---|
| NIH | National Institutes of Health |
| HHS | Department of Health and Human Services |
| PETA | People for the Ethical Treatment of Animals |
| JS | Joint Stipulation of Facts |

**INTRODUCTION**

This appeal concerns efforts by the National Institutes of Health (NIH) to moderate its official Facebook and Instagram pages, which NIH uses to share public-health information and agency-related news. To ensure comments on NIH's pages remain civil and relevant to its posts, NIH—like many other federal and state agencies with social media pages—has released guidelines governing the types of comments prohibited on those pages, including off-topic comments, spam and repetitive comments, profanity and threatening language, and commercial endorsements. Because NIH lacks the resources to individually review every comment, however, it relies on keyword filtering—a tool that automatically hides comments containing specified terms—to moderate the comment threads on these pages.

At issue here are certain keyword filters that NIH adopted to address the alarming number of repetitive, off-topic, and sometimes threatening comments regarding animal testing on its Facebook and Instagram pages. As the record here establishes, the animal-testing-related terms that NIH selected to filter—like all other keyword filters that the agency employs—are designed to capture comments that

recurrently violate NIH's commenting guidelines. Indeed, as the district court found, off-topic comments related to animal testing have so overwhelmed the comment threads on NIH's social media posts as to drown out productive, on-topic discussion of those posts. The district court thus appropriately held that the agency is entitled to take reasonable and viewpoint neutral efforts—including by using keyword filters—to preserve those pages for their intended use: on-topic discussion of the agency's public-health-related posts.

Plaintiffs—People for the Ethical Treatment of Animals (PETA) and two individuals who post comments on social media related to animal testing—urge this Court to hold that NIH's decision to address flagrant and recurrent violations of its commenting guidelines through keyword filters is arbitrary and reflects NIH's intention to discriminate against animal advocacy based on viewpoint. Plaintiffs candidly acknowledge that they object to the filters because the filters have successfully prevented plaintiffs from making off-topic comments on NIH's social media pages, such as by responding to posts about Public Service Recognition Week and about diversity in science by criticizing the practice of performing tests on animals. NIH's determination that

2

its keyword filters were necessary and appropriate was a reasonable effort to enforce its content guidelines and did not reflect viewpoint discrimination.  This Court should affirm.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331, alleging First Amendment claims against NIH and the United States Department of Health and Human Services (HHS).  The parties entered into a joint stipulation of facts regarding a subset of plaintiffs' claims and filed cross-motions for summary judgment as to those claims.  On March 31, 2023, the court entered an order denying plaintiffs' motion for summary judgment and granting the government's cross-motion for summary judgment.  JA092-93.  Plaintiffs filed a timely notice of appeal on May 11, 2023.  JA124-25; *see* Fed. R. App. P. 4(a)(1)(B).  As discussed further below, however, *supra* 19-23, the district court did not resolve all claims in plaintiffs' complaint.  The order from which plaintiffs appealed is therefore not a final order within the meaning of Federal Rule of Civil Procedure 54(b) or 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

1.  Whether this Court has appellate jurisdiction.

2.  If so, whether the district court correctly concluded that NIH's use of keyword filters to moderate off-topic commentary on its social media pages does not violate the First Amendment.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    The Facebook and Instagram Social Media Platforms

Facebook and Instagram are social media platforms that allow users—individuals and organizations that have created an account on the platform and agreed to the platform's terms of service—to create customized pages through which they may post content viewable by other social media users.  JA055-57, JA061-62, JA063 (Joint Stipulation of Facts (JS) ¶¶ 7-8, 11, 22-23, 25).  Users may also leave "comments" on posts published on other user's pages, which, if permitted by the original poster, may be seen by other users that access the pages.  JA056-58, JA063, JA064-65 (JS ¶¶ 11, 13, 25, 28).  Users can also reply

4

to other comments or replies posted by others.  JA057-58, JA069-70 (JS ¶¶ 13, 45).

In addition to certain content filters imposed by the platforms, which are not at issue here, JA061 & n.2, JA066-67 & n.5 (JS ¶¶ 20 & n.2, 35 & n.5), both Facebook and Instagram provide account holders with tools to moderate comments on their custom pages, including various means for account holders to manually address particular content or content from particular users, *see* JA060-61, 066 (JS ¶¶ 17, 19, 33-34).  In addition, both Facebook and Instagram provide a "keyword filter" tool, which permits page hosts to automatically hide all comments containing specified words or phrases.  When an account holder adds a word to the keyword filter list, all past or future comments containing the word will be automatically hidden from public view.  JA060 (JS ¶ 16), JA065 (JS ¶ 30).  On Facebook, the hidden comments remain visible to the user who posted and the user's Facebook "friends," but no other members of the public.  JA060 (JS ¶ 17).  On Instagram, the hidden comment remains visible to the owner of the filtering account and the user who posted the comment

upon choosing to "view hidden comments," but is otherwise hidden from public view.  JA065 (JS ¶ 30).

### B.    NIH's Social Media Pages

NIH administers official Facebook and Instagram pages, which it uses to post agency-related information and public health updates. JA067-68 (JS ¶¶ 36-38).  NIH has made these accounts public, meaning that a portion of both pages is generally accessible to anyone with internet access, although only those with Facebook and Instagram accounts can see the entirety of the page, including NIH's previous posts.  JA068-69 (JS ¶¶ 38, 43).  Through these pages, NIH frequently makes posts containing vital health information, including information related to COVID-19.  JA056-57 (JS ¶ 11), JA063 (JS ¶¶ 11, 25-26).

Like many other federal and state agencies, NIH has published guidelines, JA262-64 (JS Ex. 19), governing the types of comments permitted on NIH-administered social media accounts and websites in order "to encourage respectful and constructive dialogue" and ensure that comments left in the comment threads of NIH's posts are "relevant to the specific topic[s]" of NIH's posts, JA263-64 (JS Ex. 19); *see also* JA072-73 (JS ¶¶ 51-52 & n.7) (identifying similar guidelines published

by other federal and state agencies). These guidelines, which have been

publicly available on NIH's official website since March 30, 2015, make

clear that the pages "are not intended to serve as public forums."

JA263 (JS Ex. 19). And they prohibit, among other things, (i) "[o]ff-

topic posts"; (ii) "[r]epetitive posts" and "[s]pam"; (iii) "profane,

threatening, or abusive language"; and (iv) "[e]ndorsements of

commercial products." *Id.* At the time this suit was filed, NIH's

Facebook and Instagram pages did not directly link to the guidelines on

NIH's official website, although the pages did link to a separate "Web

Policies and Notices" pages that similarly provided that, "as a practice,

comment moderator policy requires the removal from NIH Facebook

pages of any comments that contain spam or are improper,

inflammatory, off-topic, or offensive." JA073-74 (JS ¶¶ 53, 54)

(quotation marks omitted).

 NIH has taken, and continues to take, measures to hide comments

on the pages that violate its commenting guidelines. Although NIH has

previously endeavored to manually review and hide comments that

violated the guidelines, its efforts to individually review each of the

thousands of comments on the pages were "limited" by resource

constraints, and "especially limited" in the wake of further strains

imposed by the COVID-19 pandemic. JA077 (JS ¶ 61). NIH therefore

adopted keyword filters "calculated to capture frequently made

comments that violate" the Guidelines. JA076 (JS ¶ 59). These filters

hide, among other things, "profane and racist terms," "domains of other

websites or applications," and terms overwhelmingly used in off-topic

comments, including "names of certain illicit drugs" and "the term

#believemothers." JA076 (JS ¶ 59); JA044-51 (Compl. Attachs. 1, 2)

(including filters for the terms "marijuana," "cannabis," and "www").

NIH also reserves the right to expand its filter list if it is made aware of

other terms used in frequently made, impermissible comments. JA076

(JS ¶ 59).

As relevant here, NIH has also adopted filters to address the

repetitive and overwhelmingly off-topic comments discussing animal

testing. *See* JA075-76 (JS ¶ 58); JA044-51 (Compl. Attachs. 1, 2). In

response to an NIH post directing readers to caregiving resources for

Alzheimer's patients, for example, the vast majority of comments

advocated against animal testing, including numerous comments saying

"FREE THE BEAGLES!!!!!!" JA071 (JS ¶ 48); *see* JA245-46 (JS Ex. 15).

8

Other comment threads reflect similar commentary, illustrating how pervasive the issue of off-topic commentary about animal testing has become. *See, e.g.*, JA215-40, JA250-55, JA256-61 (JS Exs. 13, 17, 18). As with terms recurringly used in other frequently made, impermissible comments, NIH employs filters to automatically hide any post containing the filtered terms, regardless of the viewpoint of that post. The terms NIH selected, which currently include the neutral terms "animal," "testing," "experiment," and the names of certain animals, are—like other keyword filters NIH employs—terms that, in NIH's experience, are overwhelmingly used in comments that violate its comment moderation guidelines.

Before this lawsuit was filed, NIH's keyword filters also included "PETA," "PETALatino," "#stopanimaltesting," "#stoptesting," and "#stoptestingonanimals," which were also words frequently used in posts that violated the content policies.  NIH removed those terms from its lists of filtered terms a few months after the suit was filed.

### C.    Factual and Procedural History

Plaintiffs-Appellants are People for the Ethical Treatment of Animals and two individuals who have accounts with Facebook and

9

Instagram through which they post content on animal testing.  In

September 2021, plaintiffs initiated this suit, alleging, as relevant here,

that NIH's practice of filtering certain words related to animal testing

on its official Facebook and Instagram account violates the First

Amendment.  Plaintiffs' complaint also alleged that the U.S.

Department of Health and Human Services relies on unconstitutional

keyword blocking on its official Facebook page.  *See* JA011-12

(Compl. ¶ 1), JA029-30 (Compl. ¶¶ 53-55), JA032 (Compl. ¶ 58), JA034

(Compl. ¶ 65), JA037 (Compl. ¶ 71); JA041 (Compl. ¶ 78); JA042; *see*

*also* Opening Br. 18 n.8.

In lieu of discovery, the parties agreed to a joint stipulation of

facts.  In a joint status report, the parties "agreed that both the

stipulation and their forthcoming cross-motions for summary judgment

will address the Plaintiffs' allegations relating to the National

Institutes of Health," and would not address plaintiffs' allegations

relating to HHS's use of keywords on its own Facebook page.  Dkt. No.

29.  The parties further stated that the court's resolution of cross-

motions relating to NIH's actions "may obviate the need for further

litigation over the allegations relating to the Department of Health and Human Services." *Id.*

The district court denied plaintiffs' motion for summary judgment and granted the government's cross-motion for summary judgment. JA094-123 (Op.). First, the court concluded that the comment threads on NIH's social media pages are nonpublic forums—"virtual spaces opened by the government to the public for the purpose of the discussion of only certain subjects." JA107 (Op. 14). In a nonpublic forum, the government may restrict speech so long as the restrictions are "reasonable in light of the" forum's purpose. JA114 (Op. 21) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 49 (1983)).

As the court explained, the "touchstone" of the forum inquiry is the government's "intent in establishing and maintaining" the forum. JA107 (Op. 14) (quoting *Bryant v. Gates*, 532 F.3d 888, 895 (D.C. Cir. 2008)). Thus, to decide whether the government has created a nonpublic forum opened for the purpose of discussion of only certain subjects—which is sometimes referred to as a "limited" public forum, *see* JA106 n.3 (Op. 13 n.3)—courts look to objective indicia about the nature

11

of the property, as well as the government's consistent policies and

practices, JA107 (Op. 14).  And here, "NIH did not throw open its

Instagram and Facebook pages to indiscriminate public engagement."

JA110 (Op. 17).  Instead, the agency maintains a "publicly viewable

commenting policy" that requires comments to remain on-topic to the

original posts.  *Id.*  These "prospective, categorical, subject-matter

rules" demonstrate NIH's intent to create a nonpublic forum, *id.*

(quoting *Archdiocese of Washington v. Washington Metro. Area Transit

Auth.*, 897 F.3d 314, 337 (D.C. Cir. 2018)), a conclusion that was

reinforced by NIH's previous attempts to "exercise[] control over the

comment threads via manual moderation" and keyword filtering, JA113

(Op. 20).

     In so holding, the district court acknowledged record evidence

cited by plaintiffs demonstrating that NIH's pages contained several off-

topic comments unrelated to animal testing that had not been removed

by NIH's administrators.  JA112-13 (Op. 19-20).  As the court explained,

although inconsistent enforcement of a governing policy can sometimes,

when viewed against the totality of other evidence, reveal that the

government did not actually intend to create a nonpublic forum, in this

case the "accessibility and ease of internet engagement presents
commenting policy enforcers with a Sisyphean task—one for which the
standards of consistency to which the government is held cannot be so
exacting as might be possible on a smaller scale."  JA120 (Op. 27).
Accordingly, the district court held that, under the totality of the
circumstances, NIH's "failure of perfect enforcement does not fatally
undermine" the strong evidence of NIH's "intent for the comment
threads to pertain to only relevant subjects."  JA112 (Op. 19).

The court further held that NIH has "strong legitimate interests
in maintaining on-topic discussions" on accounts used to communicate
about public health, JA115 (Op. 22), and that NIH's keyword filtering
policy was a reasonable and viewpoint-neutral restriction designed to
serve this interest.  The district court credited record evidence that
"comments about animal testing comprised large shares of off-topic
commentary on many of NIH's social media posts, becoming a highly
prevalent irrelevant topic in violation of the commenting guidelines,"
and concluded that inclusion of keyword filters related to animal
testing—a category of comments that "was a flagrant offending subject
matter"—was a "reasonable approach to maintaining orderly, on-topic

13

comment threads." JA119 (Op. 26). Because that reasonable restriction applied to frequently recurring impermissible subject matter, regardless of viewpoint, the court concluded that NIH's keyword filtering policy satisfied constitutional scrutiny. The court therefore granted the defendants' motion for summary judgment and denied plaintiffs' motion for summary judgment. JA092. Although the parties' motions did not address plaintiffs' claims involving HHS's use of keywords on its official Facebook page and those claims remained unresolved, the district court stated that its order was "final and appealable" and ordered the clerk of the court to close the case. JA092.

## SUMMARY OF ARGUMENT

At issue in this appeal is the government's ability to moderate social media pages created by NIH to "communicate and interact with citizens about agency-related updates and public health news." JA067 (JS ¶ 36) (quotation marks omitted). Plaintiffs candidly acknowledge that they wish to commandeer NIH's social media pages and use them as platforms for speech on animal testing, even when responding to NIH posts on other topics. But "[n]othing in the Constitution requires the [g]overnment freely to grant access to all who wish to exercise their

14

right to free speech on every type of [g]overnment property." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799 (1985). NIH reasonably took steps to counteract that effort, identifying words that were most frequently used in posts that violated their general policy restricting comments to the topics in the original posts and prohibiting comments that contained those words. The district court properly upheld those measures as reasonable, viewpoint-neutral restrictions in a nonpublic forum, and this court should not disturb that determination.

**I.** As an initial matter, however, this Court lacks jurisdiction over this appeal at this time. Plaintiffs' complaint originally raised two First Amendment claims: one against NIH for use of keyword filters on its Facebook and Instagram accounts, and another against HHS for similar actions on its separate Facebook account. The parties' joint stipulation of fact and cross-motions for summary judgment addressed only the first set of allegations. Neither party moved for judgment as to the claim against HHS, and the district court's order granting the parties' cross-motions did not purport to adjudicate that claim.

15

We understand that plaintiffs no longer wish to pursue their claim involving HHS's Facebook page.  But to date, no action has been taken to properly dispose of that claim to secure appellate jurisdiction. Accordingly, the district court's order—although styled as a "final and appealable order"—is not a final decision within the meaning of Federal Rule of Civil Procedure 54(b) or 28 U.S.C. § 1291(b).  We have no objection, however, to plaintiffs taking the necessary steps to formally dispose of the unresolved claim to secure jurisdiction over the already-briefed issues in this appeal.

**II.**  The district court correctly held that NIH's use of keyword filters does not violate the First Amendment.

**A.**  First, the court properly found that NIH maintains its Facebook and Instagram pages as nonpublic forums—forums that "by definition [are] not dedicated to general debate or the free exchange of ideas," *Cornelius*, 473 U.S. at 811, but rather, are limited "to use by certain groups or dedicated solely to the discussion of certain subjects," *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 49 (1983) ("Implicit in the concept of the nonpublic forum is the right to make

16

distinctions in access on the basis of subject matter . . . .").  NIH has
consistently explicitly stated as much and backed up that declaration
with restrictions on certain types of comments—most relevant here, off-
topic comments—and efforts to remove posts that violate those
restrictions.  Most recently, although NIH lacks the resources to
individually review every comment for compliance with its guidelines,
the agency uses keyword filtering based on words that have repeatedly
been used to violate the guidelines to identify and remove violative
comments.

 **B.**  The district court also correctly found that NIH's adoption of
keyword filters was reasonable and viewpoint neutral, and therefore
that use of these filters readily satisfies the forgiving standard
applicable to restrictions in a nonpublic forum.

 As an initial matter, the government has strong legitimate
interests in maintaining on-topic discussions in the comment threads of
an agency's social media posts.  As the district court found, social media
pages are subject to a near "infinite supply of commentary from
individuals anywhere in the world."  JA113 (Op. 20).  And the
government has an interest in ensuring such spaces do not become

17

"overwhelmed with irrelevant commentary," which can drown out on-topic discussion and detract from the intended purpose of the forum. JA117 (Op. 24).

Here, the record establishes that "comments about animal testing comprised large shares of off-topic commentary on many of NIH's social media posts." JA119 (Op. 26). Indeed, on some posts, "the vast majority of comments" discussed animal testing, and these off-topic comments were so repetitive as to "drown[] out" the few relevant comments interacting with the topic of NIH's post. JA116 (Op. 23). NIH thus reasonably concluded that comments discussing animal testing were highly prevalent impermissible comments that detracted from the purpose of the forum and that it could address this pervasive problem through keyword filters.

Plaintiffs identify no basis for prohibiting NIH from engaging in these common-sense measures to eliminate a pervasive form of violative comments. To the extent that the restrictions have the practical effect of limiting speech only on one side of the debate, that is merely because the violative comments have overwhelmingly come from those who oppose animal testing as opposed to those who favor it—a dynamic that

18

the Supreme Court has expressly recognized does not form a proper

basis for a claim of viewpoint discrimination.  This Court should affirm.

## STANDARD OF REVIEW

This Court reviews the district court's adjudication of the parties'

cross-motions for summary judgment de novo.  *Bauer v. Federal Deposit

Ins. Corp.*, 38 F.4th 1114, 1121 (D.C. Cir. 2022).

## ARGUMENT

## I.    This Court Lacks Jurisdiction Over This Appeal Because It Is Taken from a Non-Final Order

This Court's jurisdiction is generally limited to appeals from "final

decisions" of the district courts.  28 U.S.C. § 1291.  A decision "is not

final, ordinarily, unless it ends the litigation on the merits and leaves

nothing for the [district] court to do but execute the judgment."

*Cunningham v. Hamilton County*, 527 U.S. 198, 204 (1994) (internal

quotation marks omitted).  "Accordingly, when a district court resolves

some, but not all, of the claims in a complaint, the judgment is

generally non-final and non-appealable."  *Dukore v. District of

Columbia*, 799 F.3d 1137, 1140 (D.C. Cir. 2015) (citing *Cambridge

Holdings Grp., Inc. v. Federal Ins. Co.*, 489 F.3d 1356, 1359-60 (D.C.

Cir. 2007)).  The only way to take an appeal from such a partial

disposition is if the district court expressly "direct[s] entry of a final judgment as to one or more, but fewer than all, claims or parties" and "expressly determines that there is no just reason for delay" of an appeal on such claims. *Id.* (citing Fed. R. Civ. P. 54(b)); *see also Robinson-Reeder v. American Council on Educ.*, 571 F.3d 1333, 1336-37 (D.C. Cir. 2009). "Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims . . . does not end the action as to any of the claims . . . and may be revised at any time before the entry of a judgment adjudicating all the claims." Fed. R. Civ. P. 54(b).

The district court's March 31, 2023 order granting defendants' cross-motion for summary judgment and denying plaintiffs' cross-motion for summary judgment does not constitute a final and appealable order. As plaintiffs acknowledge (Br. 18 n.8), the parties' cross-motions for summary judgment concerned only a subset of plaintiffs' claims against NIH and HHS—those involving NIH's use of keyword blocking on its official Facebook and Instagram pages. But plaintiffs' complaint also raised a separate First Amendment claim involving HHS's use of keyword filters on its own official Facebook page.

*See* JA011-12 (Compl. ¶ 1), JA029-30 (Compl. ¶¶ 53-55), JA032 (Compl.

¶ 58), JA034 (Compl. ¶ 65), JA037 (Compl. ¶ 71); JA041 (Compl. ¶ 78);

JA042 (Compl. Prayer for Relief).  Because the parties were "readily

able to reach an agreed-upon set of facts relating to" plaintiffs' claims

relating to NIH—but not as to HHS—the parties agreed to enter a joint

stipulation and file cross-motions for summary judgment only as to

those claims.  *See* Dkt. No. 29.  Those motions therefore did not address

plaintiffs' claim relating to HHS's conduct on its own Facebook page,

and the district court's opinion and order granting defendants' cross-

motion and denying plaintiffs' cross-motion did not discuss or purport to

address that claim.

Because the court's decision to grant the defendants' cross-motion

for summary judgment did not address all of plaintiffs' claims, its

decision is not final.  That is true notwithstanding the fact that—

perhaps because the court had addressed all the claims in the parties'

cross-motions—the court designated that order as "final and

appealable" and directed the clerk to close the case.  *See* Fed. R. Civ. P.

54(b) ("[A]ny order or other decision, *however designated,* that

adjudicates fewer than all the claims . . . does not end the action as to
any of the claims or parties[.]") (emphasis added)).

Aside from a brief footnote (Br. 18 n.8) acknowledging that
plaintiffs' complaint concerned allegations not addressed in the parties'
motions for summary judgment, plaintiffs' opening brief is silent on this
jurisdictional wrinkle.  We understand that plaintiffs no longer wish to
pursue their claim related to HHS's Facebook page.  As this Court has
recognized, every circuit permits plaintiffs—at least in some
circumstances—"voluntarily to dismiss remaining claims or remaining
parties from an action as a way to conclude the whole case in the
district court and ready it for appeal."  *Blue v. District of Columbia
Public Schools*, 764 F.3d 11, 17 (D.C. Cir. 2014) (collecting cases); *see
also Lowery v. AmGuard Insurance Company*, 84 F.4th 943, 948 (11th
Cir. 2023) (holding that a partial summary judgment became "final" for
purposes of appellate jurisdiction when the plaintiff filed a notice to
"abandon" the only unresolved claim).  This Court, however, has
typically required that any voluntary dismissal be made "with
prejudice."  *Blue*, 764 F.3d at 17.  Otherwise, "[p]arties could agree to
appeal their suit in stages, periodically dismissing all remaining claims

without prejudice as they went, agreeing to reinstate them once the court of appeals weighed in on individual issues," which would "burden courts and litigants, foster uncertainty, and undermine the salutary aims that Rule 54(b) and the final judgment rule promote." *Id.* at 18; *see also Dukore*, 799 F.3d at 1140-41; *Robinson-Reeder*, 571 F.3d at 1338-40.

Plaintiffs could cure the jurisdictional defect here by obtaining a limited remand for the purpose of requesting that the district court dismiss the unresolved claim against HHS with prejudice. *See Robinson-Reeder*, 571 F.3d at 1340. In the interest of efficiency, we would not oppose any such effort to secure jurisdiction over the arguments already briefed in this appeal. At present, however, this Court lacks appellate jurisdiction.

## II.    NIH Took Reasonable and Viewpoint Neutral Measures to Restrict Content in a Nonpublic Forum

### A.    NIH reasonably responded to the problem of off-topic posts.

NIH uses its Facebook and Instagram pages "to fulfill its congressional mandate to disseminate health information by communicating important public health information, being the voice of

factual information in a world of misinformation, and engaging the public for educational purposes about public health." JA087-88 (JS ¶ 87). To that end, the government has an interest in ensuring those spaces do not become "overwhelmed with irrelevant commentary," which can drown out productive discussion, dissuade citizens from visiting the pages, and ultimately, be as "deleterious to dialogue . . . as censorship." JA116-17 (Op. 23-24) (quoting *Davison v. Plowman*, 247 F. Supp. 3d 767, 778 (E.D. Va. 2017), *aff'd*, 715 F. App'x 298 (4th Cir. 2018) (per curiam)).

To achieve this goal, NIH's longstanding guidelines have prohibited certain types of comments on its social-media pages, including, as most relevant here, comments that do not relate to the topic of the original post. NIH originally enforced this prohibition by manually reviewing posts for compliance. When that became impractical as the agency's available resources could not match the ballooning number of comments, NIH turned to an automated process of using "keyword filters" that prohibit the use of words that have frequently been used in violative posts. These filters include, for example, various profanities, certain commercial website addresses, the

24

names of illicit drugs such as "marijuana" and "cannabis," as well as the term "#believemothers."  JA044-51 (Compl. Attachs. 1, 2); JA076 (JS ¶ 59).

Most relevant here, NIH has adopted several filters to address the alarming number of repetitive, off-topic, and often threatening comments discussing animal testing found on the pages.  As the district court found, the record establishes that off-topic comments on this subject matter are so prevalent that they drown out productive, on-topic discussion of the agency's public-health messages.  To address this problem, NIH selected keywords that, in its experience, were recurrently used in these violative comments.  *See* JA076 (JS ¶ 59).

Although plaintiffs couch their constitutional claims in various doctrinal terms, at bottom they object to NIH's fundamental project of attempting to reserve the comment section of its social media pages for discussion on the topics suggested by the original prompt.  Plaintiffs object, for example, to NIH's using the technological means available to prevent them from using NIH's posts about Public Service Recognition Week and diversity in science to advance their views on animal testing, JA082-83 (JS ¶¶ 75-76), notwithstanding the documented problem of

25

similar off-topic comments drowning out important public-health

information, JA245-46 (JS Ex. 15) (post about caregiving resources for

patients with Alzheimer's disease flooded with a litany of comments

saying "Free the beagles"); JA087-88 (JS ¶ 87) (discussing complaints

about off-topic discussion of animal testing on NIH's pages).  Plaintiffs

are free to, and do, express their views on animal testing and other

important issues of the day on their own social-media pages and in

other forums dedicated to discussions of that kind.  *See* JA052 (JS ¶ 1),

JA080-81 (JS ¶ 71).  But the Constitution does not entitle them to

commandeer NIH's page for their own purposes.

### B.    The District Court Correctly Found that the Comment Threads on NIH's Social Media Pages Are Nonpublic Forums

It is well established that the public's right to access government-

controlled property for expressive conduct "depend[s] on the character of

the property at issue," *Perry Educ. Ass'n v. Perry Local Educators'*

*Ass'n*, 460 U.S. 37, 44 (1983), which "determines what types of

restrictions will be permissible" on that property, *Initiative &*

*Referendum Inst. v. U.S. Postal Serv.*, 685 F.3d 1066, 1070 (D.C. Cir.

2012).  Restrictions on speech in a public forum—that is, a forum open

to the general public for indiscriminate expressive use either by tradition or designation—are subject to strict scrutiny. But restrictions on speech in a nonpublic forum "are subject to a much less stringent test: they must only be reasonable [in light of the purpose of the forum] and not an effort to suppress expression merely because public officials oppose the speaker's view." *Bryant v. Gates*, 532 F.3d 888, 895 (D.C. Cir. 2008) (alteration in original) (quoting *Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1016 (D.C. Cir. 1988)). The district court properly recognized that the NIH social media pages are a nonpublic forum.

1. As the Supreme Court has repeatedly held, "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985). The government will be deemed to have designated its property as a public forum "only if" there is clear evidence of the government's intent to open that property "for indiscriminate use by the general public." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988) (quoting *Perry Educ. Ass'n*, 460 U.S. at 47); *see also id.* at 270 ("[I]n cases in which [the Supreme Court]

27

found public forums to have been created," it found that the evidence "demonstrate[d] the *clear intent* to create a public forum." (emphasis added)); *United States v. American Library Ass'n*, 539 U.S. 194, 206 (2003) ("To create such a [designated public] forum, the government must make an *affirmative choice* to open up its property for use as a public forum." (emphasis added)).

There is no indication of that here.  Rather, as the district court recognized, NIH's social media pages are a classic example of a nonpublic (sometimes called limited public) forum—that is, a forum "limited to use by certain groups or dedicated solely to the discussion of certain subjects."  *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009).  NIH has never "throw[n] open its Instagram and Facebook pages to indiscriminate public engagement," JA110 (Op. 17), but instead has consistently maintained a publicly viewable commenting policy that states that its social media pages "are not intended to serve as public forums" and specifically prohibits several types of comments on its pages, including those that (i) are off-topic or repetitive, (ii) use threatening or abusive language, (iii) endorse commercial products, (iv) contain images or videos, and (v) provide links to external websites,

28

JA262-64 (JS Ex. 19).  These "prospectively and categorically set subject matter regulations" are strong evidence of the government's intent to maintain a nonpublic forum.  *Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 324 (D.C. Cir. 2018); *see also Cornelius*, 473 U.S. at 799 ("Government restrictions on . . . content . . . are relevant to ascertaining the [g]overnment's intent as to the nature of the forum created.").

As the district court found, the pages' comment threads are "close analogies to such government-hosted gatherings" as school board meetings or town halls, "in which citizens are encouraged to engage in dialogue—but only to the extent that the dialogue is on-topic to the meeting's agenda, lest the meetings inevitably devolve into chaos." JA108 (Op. 15); *see, e.g., Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1225 (11th Cir. 2017) (holding that the public-comment portions of school board meetings are "limited public fora because the Board limits discussion to certain topics"); *Galena v. Leone*, 638 F.3d 186, 198-99 (3d Cir. 2011) (holding that council meetings are limited public forums in which "content-based restraints are permitted, so long as they are designed to confine the forum to the limited and legitimate purposes

for which it was created" (quotation marks omitted)); *Steinburg v. Chesterfield Cty. Planning Comm'n*, 527 F.3d 377, 385 (4th Cir. 2008). Plaintiffs' resistance to this analogy (Br. 38) on the ground that the public is not made aware of the topics that are appropriately discussed on NIH's pages ignores the publicly available guidance documents and the common-sense point that comments to a social media post should relate to the post rather than coopting the page for the commenter's own purposes.

This Court has accepted even less definitive evidence to establish that the government had created a nonpublic forum. In *Archdiocese of Washington*, for example, although the Washington, D.C., metro system had previously "treated its advertising space as an open forum," its newly announced policy to disallow ads on "certain subjects" was held to "plainly evince[]" the government's intent to operate the advertising space as "a non-public forum." 897 F.3d at 323. Similarly, in *Bryant*, although a Department of Defense newspaper encouraged interested citizens to submit comments for publication, this Court nevertheless found it "clear" that the "relevant forum" was "nonpublic" because there was no indication that the Department "intended to open the forum for

general expressive use," as evidenced in part by a prohibition on advertising on political or policy issues. 532 F.3d at 895-97.

**2.** NIH's guidelines are not empty gestures; to the contrary, NIH has consistently endeavored to enforce them. As noted above, although NIH lacks sufficient resources to individually review each comment on the pages to ensure that it complies with the guidelines, NIH uses keyword filters to consistently and automatically hide comments that contain terms that, in NIH's experience, are overwhelmingly used in comments that violate the commenting guidelines. In addition, when resources permit, NIH has attempted to manually hide impermissible comments that are not captured by the automatic filters, and it reserves the right to renew that practice in the future. JA077 (JS ¶ 61). This preservation of the right to decide for itself what topics may be discussion on NIH's pages is inconsistent with any intent to create an open forum for unfettered, unmoderated discussion. *Cornelius*, 473 U.S. at 804; *see also Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 216 (2015) (the "exercise[]" of "final authority over" speech "militates against a determination that" the government intended to "create[] a public forum").

31

The fact that content-moderation efforts have not been entirely successful in warding off violative comments does not convert the pages into public forums.  *See, e.g.*, *Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 78 (1st Cir. 2004) (holding that the defendant's consistent efforts to limit speech "it saw as in violation of its policy[] . . . evidenced its intent not to create a designated public forum" even if that enforcement was "erratic").  The Supreme Court recognized as much when it concluded that libraries that used imperfect filters to limit the materials available to patrons using library computers had not created a public forum.  *American Library Ass'n*, 539 U.S. 194.  As the Court explained, "[a] library's failure to make . . . judgments about all the material it furnishes from the Web does not somehow taint the judgments it does make."  *Id.* at 208.  And to conclude otherwise would require the government to choose "between opening non-public forums to almost any private speech or to none."  *Archdiocese of Washington*, 897 F.3d at 325; *id.* at 337 (Wilkins, J., concurring) ("Without reasonable control over the content of private speech in nonpublic forums, government may elect to close a forum entirely rather than deal with the administrative burden or floodgate consequences of accepting

32

private speech without effective subject-matter restrictions."); *see also Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 680 (1998) (recognizing nonpublic forums preserve the government's ability to "open its property to some expressive activity in cases where, if faced with an all-or-nothing choice, it might not open the property at all"). The First Amendment does not require that choice.

**3.** Other courts have held in similar cases that government's adoption and enforcement of rules for decorum on social media pages is strong evidence that it never intended for those pages to be open to indiscriminate public expression. *See, e.g.*, *Davison*, 247 F. Supp. 3d at 775-76 (holding that public officials' page was a not a public forum because it the official "reserve[d]" the "right to remove comments" that were deemed "clearly off topic") (quotation marks omitted), *aff'd*, 715 F. App'x 298 (4th Cir. 2018); *Charudattan v. Darnell*, 834 F. App'x 477, 480 (11th Cir. 2020) (per curiam) (holding that a public official's Facebook page was not a public forum because he had a "policy preclud[ing] [certain types of] comments" including those that are "clearly off the intended topic of discussion" (quotation marks omitted)); *Krasno v. Mnookin*, 638 F. Supp. 3d 954, 969-70 (W.D. Wis. 2022).

33

Plaintiffs' contrary view that something about social media pages makes them inherently likely to be public forums ignores these precedents, as well as the more general principle that "the mere fact that an instrumentality is used for the communication of ideas does not make a public forum." *Perry Educ. Ass'n*, 460 U.S. at 49 n.9. The relevant question is not whether NIH's social media pages are generally open to all speakers, but rather whether NIH intended to permit those speakers to use that forum "for unbridled public interaction about any topic imaginable." JA108 n.4 (Op. 15 n.4); *Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 144 (2d Cir. 2004) ("[T]he fact that members of the public are permitted for freely visit a forum . . . does not abrogate its nonpublic status if the visitors are not permitted to express themselves freely in that forum." (quotation marks omitted)). It did not.

The pages at issue here thus do not resemble those at issue in cases in which government actors made the interactive features of social-media pages "accessible to the public without limitation." *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019), *vacated as moot*, 141 S. Ct. 1220 (2021); *Davison v. Randall*, 912 F.3d 666, 687 (4th Cir. 2019). In *Garnier v. O'Connor-*

34

*Ratcliffe*, 41 F.4th 1158, 1178 (9th Cir. 2022), *cert. granted*, No. 22-324, 143 S. Ct. 1779 (2023), for example, the Ninth Circuit held that the social media pages of two school board trustees were designated public forums in significant part because the government officials "never adopted any formal rules of decorum or etiquette for their pages." *Id.* at 1178.  The court made clear, however, that these social media pages could be maintained as nonpublic forums if the officials set forth "unambiguous and definite" standards for comment inclusion and exclusion, *id.* at 1178-79 (quotation marks omitted), as NIH has done through its publicly available commenting guidelines.  Indeed, the Ninth Circuit found that the relevant accounts were converted into a nonpublic forums based on the defendants' use of keyword filters to moderate the pages.  *Id.* at 1179.

### C.     The District Court Correctly Held that NIH's Use of Keyword Filters Is Reasonable and Viewpoint Neutral

Because the comment threads on NIH's social media pages are nonpublic forums, its efforts to restrict speech on those pages survive constitutional scrutiny so long as they are viewpoint neutral and "reasonable in light of the purpose which the forum at issue serves."

*Perry Educ. Ass'n*, 460 U.S. at 49. The district court correctly held that NIH's use of keyword filters satisfies this standard.

### 1.    The Keyword Filters Are Reasonable

In order to show that a speech restriction is "reasonable," the government must show that the restraint (i) furthers a "permissible objective," and (ii) contains "objective, workable standards" that are "capable of reasoned application." *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1886, 1891-92 (2018). Notably, however, the government's restrictions need only be "reasonable," they "need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808. A restriction that "rings of 'common-sense'" is sufficient "under reasonableness review." *United States v. Kokinda*, 497 U.S. 720, 734-35 (1990).

NIH's practice of using keyword filters to hide recurring off-topic comments readily satisfies this "forgiving test." *Archdiocese of Washington*, 897 F.3d at 331-32 (quoting *Mansky*, 138 S. Ct. at 1888). As the district court appropriately found, the government has "strong legitimate interests in maintaining on-topic discussions in the comment threads of the agency's social media posts." JA115 (Op.22).

36

Plaintiffs' and amici's primary response is to suggest that the endeavor is pointless unless NIH manages to eliminate all off-topic posts or that the keyword filters fail to reasonably advance that goal. But as the district court found—and as plaintiffs do not meaningfully dispute—the record establishes that "comments about animal testing comprised large shares of off-topic commentary on many of NIH's social media posts." JA119 (Op. 26). Indeed, on some posts, "the vast majority of comments" discussed animal testing, and these off-topic comments were so repetitive as to "drown[] out" the few relevant comments interacting with the topic of NIH's post. JA116 (Op. 23).

In response to an NIH post about caregiving for an Alzheimer's patient, for example, the vast majority of comments advocated against animal testing, effectively burying the few relevant comments interacting with the topic of the post. JA244-46 (JS Ex. 15). Similarly, an Instagram post displaying a picture of a human retina with the caption "#immunoflourescence microscopy image of a human retina from Dr. Angela Kruse at Vanderbilt University," received a bombardment of comments related to animal testing, such as "Save the Beagles!!!," "#animalcruelty," "#nuremberg2," "MURDERER!!!! GO TO

37

HELL!!!," "You should all have your head put in those cages," "[t]hey should have their vocal cords surgically removed . . . while beagle puppies watch," and "BURN IN HELL."  JA215-40 (JS Ex. 13).  The record is replete with similar examples of pervasive—and sometimes threatening—off-topic discussion of animal testing, JA250-55, JA256-61, JA423-34 (JS Exs. 17, 18, 43), as well as evidence that this bombardment of off-topic animal advocacy stymies engagement with NIH's content, JA087 (JS ¶ 87) (noting that one member of the public "missed" NIH's posts about "retina issues and Alzheimer's" that were "important for [her] family" as a result of a flood of off-topic animal advocacy on NIH's Twitter page).

It is reasonable to attempt to address this issue, and the keyword filters are a reasonable way to achieve that goal.  Indeed, plaintiffs' primary complaint is that the keyword filters preclude them from raising concerns about animal testing in connection with posts that have nothing to do with animal testing, an argument that is difficult to square with their contention that the keyword filters do not meaningfully limit off-topic content.  *See, e.g.*, JA082-83 (JS ¶¶ 75-76) (describing efforts to post comments relating to animal testing in

response to posts about Public Service Recognition Week and diversity in science).

The record thus amply supports the district court's conclusion that NIH's keywords capture terms recurrently used in comments that make no attempt to remain relevant to the topic of NIH's posts. Plaintiffs thus do not advance their argument that NIH acted arbitrarily (Br. 44) through reliance on cases such as *Women's Health Link, Inc. v. Fort Wayne Public Transportation Corp.*, 826 F.3d 947 (7th Cir. 2016), which stand for the general proposition that public officials who open a limited public forum for certain purposes may not arbitrarily restrict speech that falls within the permissible limitations of that forum. *See id.* at 953 ("Once a government entity has created a facility . . . for communicative activity, it 'must respect the lawful boundaries it has itself set.'"). Plaintiffs do not dispute that the overwhelming majority of comments captured by the filtered terms are not responsive to the topics of NIH's posts and are therefore impermissible under NIH's commenting guidelines. This supports the district court's conclusion that NIH's use of keyword filters to moderate pervasive off-topic commentary was reasonable.

Plaintiffs and amici correctly observe that keyword filters will not identify off-topic posts with 100% accuracy and will instead be over- and underinclusive. As to overinclusion, plaintiffs' fundamental complaint is not that the occasional on-topic post will inadvertently be blocked, but rather, that the filters successfully stymie their efforts to overwhelm the NIH pages with posts on their own preferred topics. Plaintiffs' strained attempts to identify a handful of public-health-related posts that can, in plaintiffs' view, plausibly be understood to invite comment on the ethics of animal testing thus do not establish that use of keyword filters to target a frequent source of off-topic and repetitive comments is unreasonable.

As to underinclusion, plaintiffs make no attempt to show that other off-topic posts share common words or phrases such that keyword filters would be an effective tool for moderating these off-topic comments. They identify (for the first time on appeal), Br. 45-46, a trend of off-topic posts relating to COVID-19. But plaintiffs made no attempt in district court to show that off-topic discussion of COVID-19 is nearly as prevalent as off-topic discussion of animal testing. And it should be self-evident that using keyword filters to moderate off-topic

40

discussion of COVID-19 would be impractical, as it would also prohibit large swaths of productive, on-topic discussion of the agency-related news and public-health information posted on NIH's pages.

In any event, "there is no requirement that regulations limiting access to a nonpublic forum must be precisely tailored." *Cornelius*, 473 U.S. at 812. "Whether or not the [government] permits other forms of speech, which may or may not be disruptive, it is not unreasonable to prohibit [a category of speech] on the ground that it is unquestionably a particular form of speech that is disruptive. . . ." *Kokinda*, 497 U.S. at 733; *see also id.* at 735-36 ("Even if more narrowly tailored regulations could be promulgated, however, the [government] is only required to adopt *reasonable* regulations, not 'the most reasonable or the only reasonable' regulation possible." (emphasis in original)).

Moreover, as the district court explained, the reasonableness of a restriction on speech "must be assessed in the light of the purpose of the forum and all the surrounding circumstances." *American Freedom Def. Initiative v. Washington Metro Transit Auth.*, 901 F.3d 356, 370 (D.C. Cir. 2018) (quoting *Cornelius*, 473 U.S. at 809). And here, the "accessibility and ease of internet engagement," JA120 (Op. 27), means

41

that each of NIH's posts garners hundreds of comments, JA119-20 (Op.

26-27); JA320-48 (JS Ex. 25) (post with 576 comments); JA154-89 (JS

Ex. 4) (post with 429 comments); JA126-142 (JS Ex. 1) (post with 334

comments), and NIH does not have the resources to individually review

these comments on a consistent basis, JA077 (JS ¶ 61).  Under these

circumstances, NIH's use of automated keyword filters to target

comments using terms that are recurrently used in repetitive, off-topic

comments provides a reasonable—albeit imperfect—way to enforce

NIH's guidelines.

Indeed, plaintiffs' and amici's argument that NIH cannot employ

keyword filters as a reasonable moderation tool in many respects

resembles the argument rejected by the Supreme Court in *American

Library Association*.  539 U.S. at 208.  As already discussed, the issue in

that case was whether the government could require the use of

automatic software to filter out access to websites containing

pornographic content on public library computers.  Although such

software has a tendency "to 'overblock'—that is, to erroneously block

access to . . . speech that falls outside the categories that software users

intend to block," the Supreme Court nevertheless held that use of filters

42

to "exclude certain categories of content, without making individualized judgments" was a reasonable restriction on speech, in significant part because "the vast quantity of material on the Internet and the rapid pace at which it changes" makes individualized review without the use of automatic software impracticable. *Id.* So too here, NIH's decision to use keyword filters related to animal testing in order to address the overwhelming amount of off-topic discussion that NIH would otherwise be unable to effectively moderate was reasonable in light of the totality of the circumstances, even if those filters occasionally capture comments that are arguably on topic.

Finally, the reasonableness of the limitations on plaintiffs' access to the comment threads on NIH's social media pages is also supported by the "substantial alternative channels that remain open" for plaintiffs to discuss animal advocacy. *Perry Educ. Ass'n*, 460 U.S. at 53. Plaintiffs can, for example, use their own Facebook or Instagram pages to promote animal advocacy, and they likewise can create social media pages dedicated to discussing NIH and the ethics of animal testing. And although "[b]aldly violating NIH's commenting guidelines by filling its social media pages with animal-testing-related comments" may be

43

an efficient means to promote animal advocacy, JA120 (Op.27), the

"First Amendment does not demand unrestricted access to a nonpublic

forum merely because use of that forum may be the most efficient

means of delivering the speaker's message," *Cornelius*, 473 U.S. at 809.

Accordingly, NIH's animal testing filters satisfy the "forgiving test" for

reasonableness. *Archdiocese of Washington*, 897 F.3d at 330 (quoting

*Mansky*, 138 S. Ct. at 1888).

### 2. The Keyword Filters Do Not Discriminate Based on Viewpoint

Plaintiffs also have not shown that NIH's use of keyword filters

discriminates based upon viewpoint. NIH selected its keyword filters

not based on any viewpoint expressed but rather because of their

prevalence in posts that violate NIH's longstanding and concededly

viewpoint-neutral policy of limiting comments to the topic of the

original post. The filters thus do not "single[] out a subset of messages

for disfavor based on the views expressed." *Zukerman v. U.S. Postal

Serv.*, 961 F.3d 431, 447 (D.C. Cir. 2020) (quoting *Matal v. Tam*, 582

U.S. 218, 248 (2017) (Kennedy, J., concurring in part and concurring in

the judgment)). Instead, those filters are calculated to capture terms

overwhelmingly used in frequently recurring, off-topic comments.

44

Because there is no indication that the government's intent in imposing this subject-matter restriction "was to discourage one viewpoint and advance another," the filters are viewpoint neutral, even if they have the incidental effect of favoring one viewpoint over another. *Perry Educ. Ass'n*, 460 U.S. at 49; *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (holding that a speech restriction that "serves purposes unrelated to" content and viewpoint "is deemed neutral, even if it has an incidental effect on some speakers or messages but not others").

The fact that, as a practical matter, the selected keywords might disproportionately filter out speech on one side of a debate results from the prevalence of that side of the debate in violative posts and not from any preferential treatment of a viewpoint. *Madsen v. Women's Health Center, Inc.* illustrates this point. 512 U.S. 753 (1994). There, the Supreme Court rejected a claim that a state court's injunction prohibiting certain anti-abortion protestors from "blocking or interfering with public access to" an abortion clinic amounted to viewpoint discrimination simply because the enjoined protestors all shared the same viewpoint. *Id.* at 758. As the Court explained, the

45

injunction was imposed upon petitioners who incidentally shared the same viewpoint because those individuals "repeatedly violated the court's original order." *Id.* at 763. And the fact that the injunction "did not prohibit activities of those demonstrating in favor of abortion is justly attributable to the lack of any similar" violations by those in favor of abortion. *Id.* at 762.

Here too, although plaintiffs claim that keywords that NIH has used to enforce its policy against off-topic commentary tend to reflect a particular viewpoint, any such correlation is the result of the fact that individuals sharing that viewpoint overwhelmingly engaged in activity that violated NIH's viewpoint-neutral guidelines. Thus, the fact that NIH has not adopted filters for "clinical" terms plaintiffs believe might be used by those defending animal testing (Br. 23) is "justly attributable to the lack of any similar" recurring comments from those espousing such views—indeed, plaintiffs make no attempt to show that these words are used with any regularity in off-topic posts. Thus, the fact that NIH has not filtered for such terms does not call into question NIH's stated justification for adopting the animal testing filters—to

46

help limit the number of repetitive, off-topic comments on its social media pages.

Those selection criteria also explain why NIH initially included keywords more strongly associated with animal advocacy, such as "PETA" and "#stoptesting." As the district court appropriately recognized, these filters were selected not based on any attempt to discriminate against a particular viewpoint, but because NIH wished to select filters that would capture frequent off-topic comments— comments that included these terms. JA122 & n.13 (Op. 29 & n.13). The terms selected by NIH thus reflect the agency's experience regarding common words used in off-topic posts; that those posts all happened to share a particular viewpoint does not reflect invidious discrimination. And most of the terms currently used—such as "animal," "testing," or even "torture"—may readily be used in commentary defending animal testing, such as a comment stating that "animal testing is not torture." Likewise, those who wish to argue that the research methods of Dr. Soumi and Dr. Harlow are safe and humane may understandably use the filtered terms "Suomi" and

47

"Harlow," just as those terms may be used by those who criticize their methods.

There can be no real question that NIH's stated viewpoint-neutral justification for using the challenged filters is genuine. As already discussed, the record shows that scores of NIH social media posts that do not even reference animal testing—such as posts concerning the hardships associated with Alzheimer's disease, sickle cell diagnostic machines, and gene therapies for rare diseases—have been overrun with animal testing comments. JA070-072 (JS ¶¶ 48-50). Moreover, plaintiffs make no attempt to show that their speech has been restricted while others who favor animal testing have been permitted to speak—a strong indication that the filters do not discriminate based on viewpoint. *Cf. Zukerman*, 961 F.3d at 446 (holding that viewpoint discrimination claims may arise when a plaintiff alleges that he was "prevented from speaking . . . while someone espousing another viewpoint was . . . permitted to do so") (quoting *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014)).

Plaintiffs next argue (Br. 25, 28-32) that NIH has arbitrarily singled out animal advocacy for moderation through keyword filtering

48

and does not take action to moderate similarly off-topic speech. But the record establishes that NIH uses keyword filters to screen for other frequently recurring, off-topic comments unrelated to animal testing. *See* JA075-77 (JS ¶¶ 58-59). NIH's filters include, for example, terms referring to certain illicit drugs, such as "marijuana" and "cannabis," JA044-51 (Compl. Attachs. 1, 2), as well as the term "#believemothers," JA076 (JS ¶ 59). Like the filters related to animal testing, these terms were selected because, in NIH's experience, filtering them will capture an overwhelming number of off-topic comments. JA076 (JS ¶ 59). And NIH has expressed that it may adopt additional keyword filters if it determines that doing so will reasonably capture another category of recurring, off-topic comments. JA075-77 (JS ¶ 58, 59). This demonstrates that NIH's use of keyword filters to target recurrently off-topic comments is agnostic to viewpoint.

Plaintiffs do not advance their argument through reliance on *Frederick Douglass Foundation, Inc. v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023), and other cases that broadly stand for the proposition that viewpoint discrimination may sometimes be inferred when the government arbitrarily enforces neutral policies differently

49

against similarly situated individuals.  At issue in *Frederick Douglas* was a claim that the District of Columbia had selectively enforced an ordinance prohibiting vandalism against certain protestors who chalked "Black Pre-Born Lives Matter" on a public sidewalk but did not arrest similarly situated protestors who defaced public property with the message "Black Lives Matter" during the same time period.  *Id.* at 1142.  Because those plaintiffs had adequately alleged that the two groups of protestors were similarly situated, this Court held that plaintiffs had plausibly alleged that the District's selective enforcement of the law targeted a particular viewpoint and, accordingly, that the plaintiffs need not further allege that the District court had a discriminatory motive in order to survive a motion to dismiss.

By contrast, plaintiffs here make no meaningful attempt to identify any other category of off-topic comments that is nearly as pervasive as off-topic commentary related to animal testing.  *See Archdiocese of Washington*, 897 F.3d at 319 (noting that a claim of "discriminatory treatment" cannot be "based on hypothesis").  Indeed, the few examples of unrelated off-topic comments cited in plaintiffs' brief (Br. 28-29) concern disparate topics that do not use common terms

that could be addressed through keyword filters. That NIH's keywords do not capture these comments reflects the fact that NIH's keywords target recurrent violations of its guidelines—not any particular viewpoint. *See Madsen*, 512 U.S. at 762-63.

In short, plaintiffs have not shown that NIH has selectively enforced its guidelines in a manner that reflects viewpoint discrimination. At best, they have shown that NIH's attempts to moderate frequently recurring off-topic comments have a disproportionate effect on speech with a particular viewpoint. But as the Supreme Court has admonished, regulations that serve purposes unrelated to viewpoint—like NIH's enforcement of its policy prohibiting off-topic commentary—are viewpoint neutral. *Perry*, 460 U.S. at 49. To the extent that the restrictions have the practical effect of limiting speech only on one side of the debate, that is merely because the violative comments have overwhelmingly come from those who oppose animal testing as opposed to those who favor it—a dynamic that the Supreme Court has expressly recognized does not form a proper basis for a claim of viewpoint discrimination. *See Madsen*, 512 U.S. at 762-63; *see also Ward*, 491 U.S. at 791. Plaintiffs—who have entirely failed

51

to cast doubt on record evidence that the purpose of the keyword filters is to target recurrent violations of the commenting guidelines—have not shown that NIH's use of this tool to moderate off-topic commentary discriminates on the basis of viewpoint.

## CONCLUSION

For the foregoing reasons, this appeal should be dismissed for lack of jurisdiction, or, if the jurisdictional defect is cured, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

DANIEL TENNY

*/s/ Jennifer L. Utrecht*
JENNIFER L. UTRECHT
*Attorneys, Appellate Staff*
*Civil Division, Room 7710*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-9039*
*Jennifer.l.utrecht@usdoj.gov*

NOVEMBER 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,832 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Jennifer L. Utrecht*
Jennifer L. Utrecht

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

*/s/ Jennifer L. Utrecht*
Jennifer L. Utrecht

**ADDENDUM**

# TABLE OF CONTENTS

28 U.S.C. § 1291 ................................................................... A1

Federal Rule of Civil Procedure 54(b) .................................................... A2

**28 U.S.C. § 1291**

**§ 1291. Final decisions of district courts**

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

**Federal Rule of Civil Procedure 54(b)**

**Judgment on Multiple Claims or Involving Multiple Parties**

When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.